1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE FLINTKOTE COMPANY, a Delaware
Corporation,

              Plaintiff,

    v.

GENERAL ACCIDENT ASSURANCE COMPANY
OF CANADA, a Canada insurance company;
GENERAL ACCIDENT FIRE AND LIFE
ASSURANCE CORPORATION LIMITED OF
PERTH, SCOTLAND, a Scotland insurance company;
and Does ONE through TEN,

              Defendants.

No. C 04-01827 MHP

**<u>MEMORANDUM AND
ORDER</u>
Re: Motions for Summary
Adjudication**

      On April 14, 2004, plaintiff Flintkote Company filed an action in San Francisco Superior

Court against defendants General Accident Assurance Company of Canada and General Accident

Fire and Life Assurance Corporation Limited of Perth, Scotland, predecessors of Aviva Insurance

Company of Canada.  The state complaint alleged breach of contract for defendants' failure to

defend or indemnify plaintiff for claims covered under an insurance policy issued to two of

plaintiff's subsidiaries.  Defendants removed the action to this court.  Now before the court are two

motions, brought by plaintiff, for summary adjudication under Federal Rule of Civil Procedure 56(d)

1

of the meaning of key terms of the insurance policy.  Having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules as follows.

BACKGROUND[1]

Plaintiff, presently based in San Francisco, is a company that formerly mined and sold asbestos and asbestos-based products.  Defendants are insurance companies that issued general liability policies to two of plaintiff's Canadian subsidiaries—The Flintkote Company of Canada LTD and The Flintkote Mines Limited.  Plaintiff was recently forced to seek bankruptcy protection as a result of the enormous volume of asbestos-related litigation that arose in response to the revelation that exposure to asbestos fibers can have severe long-term health consequences.  Plaintiff brought the present action in order to obtain indemnification for money paid out as a result of that litigation.

The insurance policy at issue in the instant motions, number L-90-4672 (the "policy"), was in force between 1958 and 1961.  It provides broad coverage for damage associated with the insureds' products:  "[The policy] shall include coverage for liability. . .arising out of the possession, consumption, processing or use of any merchandise or product manufactured, sold, processed or distributed by the insured."  Declaration of John Bay in Support of Flintkote's Motion for Partial Summary Judgment Re: Definition of "Occurrence" Under Policy L 90-5010 ("Bay 'occurrence' Dec."), Exh. A at 3.  The parties do not dispute that the policy covers liability attributable to the sale of asbestos and asbestos-based products.  They do dispute, however, two key provisions of the policy that relate to the scope of parties covered and limits on the insurer's liability.

The first dispute is whether plaintiff, the corporate parent of the two companies that appear on the face of the policy, is also a "named insured."  The paragraph titled "NAME OF INSURED" lists the named insureds for the policy:  "THE FLINTKOTE COMPANY OF CANDA LIMITED and/or THE FLINTKOTE MINES LIMITED and/or Subsidiary or Affiliated corporations or corporations now existing or hereafter created as their respective interests may appear."  Id. at 2. Plaintiff requests summary adjudication that the phrase "Affiliated corporations" includes corporate parents—i.e., plaintiff.

2

United States District Court
For the Northern District of California

The second dispute relates to the meaning of the word "occurrence," as used in various sections within the policy, including the "Limitation of Liability" section. The limitation of liability clause provides, in relevant part, as follows:

> In respect of coverages A [bodily injury] and B [property damage], the liability of the Company for all damages, including damages for care and loss of services, arising out of bodily injury to or death of one person, shall be limited to the sum of $100,000.00 in any one occurrence, and subject to the same limit for each person, the total limit of the Company's liability for all damages, including damages for care and loss of services, arising out of bodily injury to or death of two or more persons, shall be limited to the sum of $200,000.00 in any one occurrence. . . . There is no limit to the number of occurrences for which claims may be made hereunder, provided such occurrences occur during the currency of this policy, except as hereafter provided.

Plaintiff requests summary adjudication that an "occurrence," in the context of asbestos-related injuries, means "each incident of asbestos exposure causing bodily injury."

Defendants object to both of plaintiff's requests for summary adjudication on jurisdictional grounds, claiming that the motions are not ripe and that plaintiff has not demonstrated that it has standing. Defendants also object that plaintiff has not yet proved that it complied with other requirements of the policy. With respect to the merits of plaintiff's arguments, defendants counter that "Affiliated corporations" should be construed to mean "sister companies or companies with a common parent." Defendants further argue that "occurrence" should be interpreted to refer to the overall enterprise of distributing asbestos-based products, or some other (less numerous) set of asbestos-related activities. In the alternative, defendants request additional time to conduct further discovery prior to adjudication of either of plaintiff's motions.

The parties dispute whether Canadian law or California law should govern interpretation of the policy, but defendants concede that there are no material differences in the two bodies of law for purposes of deciding the instant motions.[2] The court will therefore apply California law.

LEGAL STANDARD

I.    Motion for Summary Judgment

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the

3

case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving party's allegations.  Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994).  The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion.  Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.  Nonetheless, even if summary adjudication of an entire claim is not warranted, Federal Rule of Civil Procedure 56(d) allows a court to grant partial summary judgment, thereby reducing the number of facts at issue in a trial.  Fed. R. Civ. P. 56(d); State Farm Fire & Cas. Co. v. Geary, 699 F. Supp. 756, 759 (N.D. Cal. 1987) (Patel, J.).

II.    Insurance Contract Interpretation

"Where the terms and conditions of an insurance policy constitute the entire agreement between the parties, its interpretation is essentially a question of law, particularly well-suited for summary judgment."  State Farm Fire & Cas. Co. v. Yukiyo, Ltd., 870 F. Supp. 292, 294 (N.D. Cal. 1994) (Williams, J.) (citing St. Paul Fire & Marine Ins. Co. v. Weiner, 606 F.2d 864, 867 (9th Cir. 1979)).

The mutual intention of the parties at the time the contract was formed governs interpretation of an insurance policy.  Montrose Chem. Corp. v. Admiral Ins. Co., 10 Cal. 4th 645, 666 (1995). The parties' intent "is to be inferred, if possible, solely from the written provisions of the contract."

4

Id.  In construing provisions of a contract, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others." Cal. Civ. Code § 1641.

A court interpreting provisions of an insurance contract should proceed according to the following series of steps.  First, "[t]he clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, controls judicial interpretation unless [the disputed terms are] used by the parties in a technical sense, or unless a special meaning is given to them by usage." Montrose Chem., 10 Cal. 4th at 666 (internal quotations and citations omitted).  In other words, "[i]f the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning." Id. at 666–67.

Second, if the disputed terms are ambiguous, a court must attempt to resolve the ambiguity by adopting the meaning that reflects the objectively reasonable expectations of the insured.  Id. at 667.  Courts often combine the first two steps into a single inquiry, noting that "contract language cannot be found to be ambiguous in the abstract" and "must be construed in the context of [the] instrument as a whole, and in the circumstances of the case." Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1264–65 (1992).  As a result, courts consider all relevant intrinsic and extrinsic evidence before concluding that contract language is ambiguous.  See Cooper Cos. v. Transcontinental Ins. Co., 31 Cal. App. 4th 1094, 1104–05 (1995) (considering extrinsic evidence, including the "known business activities" of the insured, in evaluating the objectively reasonable expectations of the insured).

Third, if the court is unable to determine the objective expectations of the insured, the ambiguity is resolved against the insurer.  Montrose Chem., 10 Cal. 4th at 667.  Courts have also observed, generally, that ambiguities should be resolved in favor of coverage, and that coverage clauses of insurance policies should be interpreted broadly.  Id.  "Because the insurer writes the policy, it is held responsible for ambiguous policy language, which is therefore construed in favor of coverage." Id. (internal quotation omitted).

United States District Court

For the Northern District of California

DISCUSSION

I.    Jurisdictional Objections to Plaintiff's Motions

    A.    Ripeness

Defendants first argue that the issues raised in plaintiff's motions are not ripe for adjudication. Specifically, defendants complain that plaintiff has not provided sufficient evidence of claims of injury from exposure to asbestos, which are the predicate for seeking indemnification under the policy. In support of its argument, defendant cites a California case, Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co., 45 Cal. App. 4th 1, 108 (1996), which states that "before the insured's liability has been established, the trial court cannot determine the amount of the insured's indemnity obligation." Plaintiff responds that the declaration accompanying its motion provides evidence of asbestos-related claims and further observes that this court has previously taken judicial notice of the more than 100,000 asbestos-related cases pending against Flintkote nationwide. See Memorandum & Order, No. C 04-01827 MHP, slip op. at 3 (N.D. Cal. Sept. 7, 2004).

"Ripeness doctrine protects against premature adjudication of suits in which declaratory relief is sought," Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1044 (9th Cir. 1999) (en banc), in order to prevent "entanglement in theoretical or abstract disagreements that do not yet have a concrete impact on the parties." 18 Unnamed "John Smith" Prisoners v. Meese, 871 F.2d 881, 883 (9th Cir. 1989). The ripeness inquiry contains both a constitutional and a prudential component. Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc), cert. denied, 531 U.S. 1143 (2001). Ripeness is evaluated at the commencement of a lawsuit, and is not subsequently defeated through changed circumstances. Malama Makua v. Rumsfeld, 136 F. Supp. 2d 1155, 1161 (D. Haw. 2001).

The court agrees with plaintiff that the lawsuit is ripe for adjudication based on the volume of asbestos-related claims against plaintiff, many of which have been or are being heard in California courts regarding events that took place in California during the period covered by defendants' insurance policies. Defendants' argument is flawed in a number of respects.

First, Armstrong World Industries is not factually on point, as the instant motions do not seek

6

United States District Court

For the Northern District of California

a determination of the amount of defendants' liability, but rather a declaration as to whether The Flintkote Company is a named insured on the policy and a declaration of which event in the causal chain preceding an asbestos-related injury corresponds to an "occurrence" under the policy.  Indeed, the following sentence in <u>Armstrong World Industries</u> completely undermines defendants' argument: "[the court] must limit its declaration to *whether the claim is covered by the policy*."  45 Cal. App. 4th at 108 (emphasis added).  Plaintiff seeks precisely the same sort of declaration here.

Second, the ripeness inquiry applies to the lawsuit as a whole and is evaluated at the time the lawsuit commences.  <u>Malama Makua</u>, 136 F. Supp. 2d at 1161.  Defendants' argument that a motion brought in the context of an otherwise ripe lawsuit can be unripe is therefore legally malformed.

Third, as plaintiff observes, the policy includes a duty to defend the insured in any product liability lawsuits.  Thus the existence of lawsuits against plaintiff is sufficient to create a ripe controversy, regardless of whether plaintiff has made any claims for coverage.

What defendant actually appears to be arguing is that insufficient discovery has taken place for the court to consider plaintiff's motion.  <u>See</u> Fed. R. Civ. P. 56(f) (permitting the court to continue a motion for summary adjudication in order to permit further needed discovery).  The court considers the parties' arguments concerning the evidence offered in connection with the motions below.

B.    <u>Standing</u>

Defendants also argue that plaintiff does not have standing to bring the current motions. Defendants claim in particular that plaintiff has not presented evidence that it paid the required premiums for the policy, and that plaintiff has not established that it is an insured covered by the policy.

Under Article III of the United States Constitution, federal courts cannot entertain a litigant's claims unless that party demonstrates concrete injury, satisfying the burden to demonstrate both constitutional and prudential standing to sue.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  To meet constitutional requirements, a plaintiff must show that (1) he has suffered an "injury in fact" which is "concrete and particularized" and "actual or imminent"; (2) the injury is

7

1    fairly traceable to the challenged actions of the defendant; and, (3) "it must be 'likely,' as opposed to

2    merely 'speculative,' that the injury will be redressed by a favorable decision." Id. at 560–61

3    (internal quotations and citations omitted). Prudential requirements for standing include: (1) whether

4    plaintiff's alleged injury falls within the "zone of interests" protected by the statute or constitutional

5    provision at issue, (2) whether the complaint amounts to generalized grievances that are more

6    appropriately resolved by the legislative and executive branches, and (3) whether the plaintiff is

7    asserting his or her own legal rights and interests, rather than those of third parties. See Desert

8    Citizens Against Pollution v. Bisson, 231 F.3d 1172, 1179 (9th Cir. 2000); Gladstone, Realtors v.

9    Village of Bellwood, 441 U.S. 91, 100 (1979); Powers v. Ohio, 499 U.S. 400, 410 (1991).

10          Under California law, both the parties to an insurance contract and third-party beneficiaries

11   of the contract are entitled to enforce the contract. See Cal. Civ. Code § 1559 ("A contract, made

12   expressly for the benefit of a third person, may be enforced by him at any time before the parties

13   thereto rescind it"). Here, plaintiff has offered facts to prove that it is both a named insured on the

14   contract (and therefore a beneficiary) and that it is an "additional insured" under the policy by virtue

15   of its financial control over the expressly named insureds. At this stage in the case, plaintiff is not

16   seeking summary adjudication that it is covered under the policy; rather, plaintiff is seeking

17   interpretation and application of two of the policy's terms. By alleging and providing facts in

18   support of its status as a named beneficiary in the policy, plaintiff has demonstrated that it has

19   standing to do so.

20          Whether plaintiff failed to comply with some other term of the policy, such as the

21   requirement to make payments, is of course relevant to the ultimate question of defendants' liability.

22   Properly construed, defendants' challenge to plaintiff's standing is simply a challenge to plaintiff's

23   ability ultimately to prevail on the merits. The fact that defendant has an affirmative defense which

24   may undermine liability, however, is irrelevant to the question of plaintiff's standing to litigate

25   issues prefatory to establishing ultimate liability. Thus, plaintiff has standing.

26   II.    Evidentiary Objections

27          The parties make a number of objections to the affidavits offered in support of and in

28                                                      8

1    opposition to the two pending motions.

2         A.   Defendants' Objections

3         Defendants object to the contents of two declarations—one in connection with each of the

4    two pending motions—submitted by John Bay, Vice-President and Insurance Counsel for plaintiff.

5    The first declaration, for the "occurrence" motion, describes plaintiff's business during the relevant

6    time period, authenticates a copy of the insurance policy at issue, and describes the extent of

7    asbestos-related litigation against plaintiff in California.  The second declaration, for the "Affiliated

8    corporations" motion, contains much of the same information, and in addition purports to

9    authenticate certain of plaintiff's business records that describe the relationship among plaintiff and

10   the two companies expressly named on the policy—The Flintkote Company of Canada LTD and The

11   Flintkote Mines LTD.

12        Defendants object to the contents of the Bay declarations because Mr. Bay was not employed

13   by plaintiff during the time period he attempts to describe.  As a result, according to defendants, he

14   lacks foundation for his testimony.  In the alternative, assuming that Mr. Bay obtained knowledge of

15   the relevant time period by reviewing documents, defendants object that the documents are not

16   included with the declaration and, in any case, are hearsay.  Defendants also object that the

17   documents describing the relationship among plaintiff and its subsidiaries are irrelevant, as there is

18   no allegation that they were ever provided to defendants during the relevant time period.  Plaintiff

19   responds that Mr. Bay is permitted to testify based on the extensive knowledge he has gained of the

20   company's history.  Plaintiff also asserts that the documents attached to the two Bay declarations are

21   relevant to establish plaintiff's corporate relationship with the two expressly named insureds,

22   regardless of defendants' awareness of the documents.

23        Defendants are correct that Mr. Bay may not testify about events as to which he lacks

24   personal knowledge.  Fed. R. Evid. 602.  The portions of the Bay declarations that cover the general

25   history of The Flintkote Company prior to Mr. Bay's arrival at the company are therefore

26   inadmissible unless Mr. Bay can produce admissible documents or other testimony on which his

27   knowledge is based.  Mr. Bay does have personal knowledge, however, of plaintiff's record keeping

28   practices and is permitted to lay the foundation for the documents attached to his declarations.  See

9

Bay Reply Dec. ¶ 3.  The individual relevance of the attached documents is discussed, as needed, below.

In any case, defendants' objections have little or no effect on the disposition of the current motions.  Defendants do not dispute that the copy of the policy attached to the Bay declarations is accurate; rather, defendants argue that it is incomplete.  See Defs.' Objections to Bay "occurrence" Dec. at 5–6.  Defendants also do not appear to dispute that plaintiff manufactured and distributed building materials containing asbestos, that plaintiff has done business in California, or that plaintiff and its subsidiaries have obtained numerous liability insurance policies, including the policy at issue in this case.

Other than defendants' Rule 602 objection to Mr. Bay's testimony, defendants' objections are therefore overruled.

B.      Plaintiff's Objections

Plaintiff objects on two grounds to two expert declarations offered by defendants in support of their arguments on the "Affiliated corporations" motion.  First, plaintiff argues that expert testimony is irrelevant to insurance policy interpretation as a matter of law.  Second, plaintiff argues that defendants have not complied with the requirements of Rule 26 for the two expert witnesses.  Plaintiff appears to be correct that under California law expert testimony is inadmissible to establish the meaning of language in an insurance policy.  See, e.g., Cooper Cos., 31 Cal. App. 4th at 1100 ("the meaning of the policy is a question of law about which expert opinion testimony is inappropriate"); Chatton v. National Union Fire Ins. Co., 10 Cal. App. 4th 846, 865 (1992) ("it has ben held that opinion evidence is completely irrelevant to interpret an insurance contract").

The case cited by defendants in support of their contention that expert testimony is admissible, Yount v. Acuff Rose-Opryland, 103 F.3d 830, 835–36 (9th Cir. 1996), is not on point.  Yount suggested (but did not directly hold) that extrinsic evidence may be considered in interpreting an insurance contract to establish an "industry custom" or "course of dealing" that narrows the otherwise broad plain meaning of contract terms.  Id. at 836.  The Ninth Circuit said nothing, however, about whether expert testimony is appropriate extrinsic evidence.  The court cited Cooper

10

United States District Court

For the Northern District of California

1    <u>Cos.</u> with approval, which indicates the opposite.  Thus the court will not consider the proffered

2    expert testimony in ruling on plaintiff's motions.

3        Plaintiff also objects to portions of the declarations of Judith Gold in support of defendants'

4    opposition to plaintiff's motions.  The portions of the declarations to which plaintiff objects consist

5    of legal argument and opinions.  <u>See, e.g.</u>, Gold "occurrence" Dec. ¶ 4 ("it is your declarant's

6    sincere belief that Flintkote has not met its burden on summary judgment"); <u>id.</u> ¶ 7 ("Aviva is

7    mindful of the fact that while many courts have ruled in a manner consistent with Aviva's position,

8    courts have considered alternatives which Flintkote has not brought to this Court's attention").  The

9    court agrees that these statements have no significance and will disregard them.

10       Finally, plaintiff objects to Exhibit 2 to the Gold "Affiliated corporations" declaration, which

11   on its face appears to be a letter from General Accident Fire and Life Assurance Corp. to Marsh &

12   McLennan, Ltd., the insurance broker that sold the policy to plaintiff's subsidiaries.  Exhibit 2 states

13   that the policy "is primary insurance applying to Canadian operations"; defendants seek to introduce

14   the letter as evidence that "Affiliated corporations" does not encompass plaintiff, which is based in

15   the United States.  The declaration attempts to establish a foundation for the letter by noting that it

16   was found in the middle of defendant's copy of the policy and observing that the document

17   "contains the same three black circles [from a hole punch] on the left-hand side that the insurance

18   policy attached as Exhibit 1 contains."  Gold "Affiliated corporations" Dec. ¶ 2.  The same

19   paragraph notes, however, that "the chain of custody of this letter, and its initial source, are not

20   presently known."  <u>Id.</u>

21       The letter is hearsay, as it is offered for the truth of its contents—that the policy covers only

22   "Canadian operations."  The Gold declaration does not establish a proper foundation for admitting

23   the letter as a business record, as the chain of custody is unclear.  The letter (and the copy of the

24   letter included in defendants' copy of the policy) is therefore inadmissible and will not be

25   considered.

26       Having disposed of the parties' jurisdictional and evidentiary arguments, the court now turns

     to the substance of plaintiff's motions.

27

28                                                    11

III.    Contract Interpretation

    A.    Scope of Adjudication

Before embarking on the requested contract interpretation, the court must clarify the nature and scope of the adjudications that plaintiff requests in its two motions.  Plaintiff argues in its first motion that the phrase "Affiliated corporations" in the policy encompasses corporate parents, and that as a result The Flintkote Company is a named insured as a matter of law.  Plaintiff argues in its second motion that the term "occurrence" in the policy means "each incident of asbestos exposure causing bodily injury."

Although contract interpretation is a question of law—so long as the "terms and conditions of an insurance policy constitute the entire agreement between the parties," see State Farm, 870 F. Supp. at 294—plaintiff here requests both interpretation of the contract terms and application of the proper interpretation to the facts of this case.  Plaintiff's first motion requests both a legal adjudication that the phrase "Affiliated corporations" encompasses corporate parents and a factual adjudication that The Flintkote Company is the corporate parent of one of the companies expressly named in the policy.  Likewise, plaintiff's second motion requests both a legal adjudication that "occurrence" refers to the final injury-causing event (and not to some antecedent event in the chain of causation) and that in the case of asbestos-related injuries, exposure to asbestos is the final injury-causing event.

The court will separately consider the legal and factual components of plaintiff's requests in the discussion that follows.

    B.    Interpretive Authorities

The parties offer a thicket of authorities to assist the court in interpreting the policy.  First, the cited California statutes and judicial precedents set forth a fairly elaborate procedure for interpretation of insurance contracts, which serves as an interpretive "meta-framework."  Second, both parties agree that the contract itself is the primary source of interpretive authority.  Third, the parties point to numerous prior adjudications of the meaning of similar terms in other insurance

United States District Court
For the Northern District of California

12

contracts.  Fourth, the parties offer extrinsic evidence (aside from the improper expert testimony) as to what the contracting parties intended.

With respect to the first two sources of authority, the court is clearly bound to follow California contract interpretation law, and California law makes clear that the policy itself is the primary guide to interpretation.  See Montrose Chem., 10 Cal. 4th at 666 (the intent of the parties is "to be inferred, if possible, solely from the written provisions of the contract").

The court is more troubled by the parties' reliance on past judicial interpretations of other insurance contracts.  The cited cases provide guidance on various levels, not all of which is relevant to interpretation of the contract in the present case.  To the extent that the cited cases provide guidance on the *procedures* to follow in interpreting contracts under California law, they of course are controlling authority for this court, which is applying California law.  Also, to the extent that the cited cases provide general rules or policy considerations for interpreting third-party liability contracts such as the one at issue in this case, they are relevant.  See, e.g., id. at 663–64 (outlining the differences in the parties' expectations in third-party "personal" liability policies as compared to first-party "property" liability policies).

Reliance on the *holdings* of past cases is more problematic, as the insurance contracts at issue in those cases are different from the contract between plaintiff's subsidiaries and defendants.  Also, the cited cases all date from long after the date the contract in this case was formed; as a result, the holdings of those cases have no bearing on the parties' understanding of the terms at issue here.  The court is aware, however, that insurance contracts are deliberately drafted to include standardized language.  Consistent interpretation of standardized terms in insurance contracts promotes clear understanding of future contracts that are negotiated.  It would be foolish, however, to state as a matter of law that the word "occurrence" or the phrase "Affiliated corporations" has the same meaning in all insurance contracts, or even all asbestos-related insurance contracts.  Thus, the court will endeavor to construe those terms solely on the basis of the words of the policy and any necessary, relevant extrinsic evidence.  The precedents cited by the parties are valuable primarily for the guidance they provide in the interpretive process.

13

United States District Court

For the Northern District of California

1  Finally, with respect to extrinsic evidence, the relevant point in time for contract

2  interpretation is the date of formation.  The court will therefore consider, to the extent needed to

3  resolve ambiguity in the policy's language, extrinsic evidence relevant to the contracting parties'

4  reasonable expectations as of that date.

5

6  C.    "Affiliated corporations"

7  Plaintiff argues that the phrase "Affiliated corporations" means "a corporation with close

8  ties," which would include parent corporations as well as corporate siblings.  Defendants argue in

9  response that "Affiliated corporations" is limited by the context of the policy to corporations that are

10 siblings of the expressly named insured or, in the alternative, corporations whose "interests" appear

11 on the face of the policy.

12 1.    Policy Language

13 The court begins with the plain meaning of the policy language.  In determining the plain

14 meaning of language in a contract, a court may look to a "general" dictionary definition to aid in its

15 analysis.  Scott v. Continental Ins. Co., 44 Cal. App. 4th 24, 29 (1996).  Plaintiff cites a definition

16 from the Seventh Edition of Black's Law Dictionary, dated 1999, that an "affiliate" is a "corporation

17 that is related to another corporation by shareholdings or other means of control; a subsidiary,

18 parent, or sibling corporation."  Although Black's Law Dictionary qualifies as a "general" dictionary

19 for purposes of insurance contract interpretation, see Cooper Cos., 31 Cal. App. 4th at 1103 (relying

20 on Black's), the court is at a loss to see how a dictionary definition from almost forty years after the

21 formation of the contract is relevant to understanding the meaning of the terms of that contract.

22 Turning to contemporaneous dictionaries, Webster's New International Dictionary (2d ed.

23 1957) includes several potentially relevant definitions of "affiliated."  Used as a verb, "affiliate" may

24 have any of the following relevant meanings:  (1) "To adopt; to receive into the family as a son;

25 hence, usually, to bring or receive into close connection; to ally; to unite or attach as a member or

26 branch"; (2) "To connect in the way of descent; to trace origin (to)"; and (3) "To band together, as

27 railroads, by stock ownership, lease, or permanent agreement."  Id. at 43; accord Black's Law

28 Dictionary 80 (4th ed. 1951) (the word "affiliate" "[s]ignifies a condition of being united, being in

14

1    close connection, allied, or attached as a member or branch").  Taken together, these definitions

2    support several understandings of what it means to be an affiliate; i.e., a parent, a descendant, an

3    ally, or a financially linked entity.  The final definition, which expressly covers corporate affiliation

4    (in the context of railroads), appears particularly relevant, and directly supports plaintiff's argument

5    that financial connection is the essence of corporate affiliation.[3]

6        Given the range of possible meanings, however, the term is not unambiguous without

7    consideration of the remainder of the policy and its context.  See Bank of the West, 2 Cal. 4th at

8    1265; Scott, 44 Cal. App. 4th at 30 n.4.

9

10            2.      Reasonable Expectation of the Insured

11        The policy contains an assortment of language suggestive of both a narrow

12   interpretation—that the policy was intended to cover only the local Canadian mining

13   operations—and a broad interpretation covering the entirety of plaintiff's global distribution of

14   asbestos and asbestos-related products.

15        Portions of the policy supporting a narrow construction include the following.  First, as

16   defendants point out, the policy's description of how premiums are calculated appears to consider

17   only the gross receipts and sales of the Canadian subsidiaries.  Bay "occurrence" Dec., Exh. A at 2,

18   5, 9–11; cf. Gold Dec., Exh. 3 (listing annual sales for plaintiff, which are substantially higher than

19   the sales listed in the policy); see generally Cooper Cos., 31 Cal. App. 4th at 1108 n.12 (finding that

20   a layperson is capable of drawing inferences from sufficiently clear language describing the method

21   of calculating the policy premium).  Second, the policy includes express definitions for such

22   specialized equipment as "ELEVATOR" and "ESCALATOR", which appear to pertain solely to the

      Canadian mining operations.  Bay "occurrence" Dec., Exh. A at 4.

23        The following parts of the policy appear to support a broader interpretation.  First, the policy

24   covers "occurrences occurring anywhere in the World."  Id. at 4.  Second, the policy's description of

25   the "BUSINESS OF THE INSURED" includes the "manufacturing of road surfacing and

26   waterproofing materials, asphalt and asbestos products."  Id. at 2.  According to defendants'

27   complaint filed in a parallel Canadian action pertaining to the same policy, the Canadian subsidiaries

28                                              15

did not manufacture asbestos products, a fact not challenged by plaintiff: "The Flintkote Company of Canada Limited and The Flintkote Mines Limited were companies incorporated in Canada in 1945 by their parent, The Flintkote Company for the sole purpose of [the] mining and selling of raw asbestos to the U.S. parent." Bay "occurrence" Dec., Exh. B at 4 ¶ 6.[4]

Although the policy does contain some language suggesting a narrow interpretation of "Affiliated corporations," the broad geographic scope of the policy and the express global coverage of asbestos "products" which were manufactured principally by the United States parent make the narrow reading unreasonable. The court therefore finds that "Affiliated corporations" encompasses, at a minimum, the parent of the Canadian subsidiaries. As there is no dispute that plaintiff is the parent company, plaintiff is a named insured under the policy.

This conclusion is consistent with the only two cases cited by either party in support of their proposed constructions, Braun v. Insurance Co. of North America, 488 F.2d 1066 (5th Cir. 1974) and Harold Ives Trucking Co. v. Pickens, 139 S.W.3d 471 (Ark. 2003). The court in Braun held that "affiliate" can include a corporate parent, refusing to "adopt the appellant's restrictive downstream definition of the word affiliate." 488 F.2d at 1067. The court in Harold Ives Trucking also upheld the interpretation of "affiliate" as including a corporate parent. 139 S.W.3d at 474 (finding that the plaintiff and its "affiliates," including its corporate parent, had a net worth of more than $50 million).

Defendants' other arguments in support of a narrow construction are unavailing. First, defendants argue that plaintiff obtained its own separate liability coverage, which suggests that plaintiff did not believe that it was covered under its subsidiaries' policy. This argument ignores the nature of the insurance policy, which is a liability policy that provides for payment to injured third parties. The California Supreme Court has noted that insureds may purchase many such policies, resulting in overlapping coverage. Montrose Chem., 10 Cal. 4th at 665 (noting the possibility of "secondary" liability policies establishing redundant coverage). Indeed, the policy itself provides for the existence of overlapping coverage. Bay "occurrence" Dec., Exh. A at 7 ("OTHER INSURANCE," discussing the effect of "other insurance against a loss covered by this policy").

Second, defendants argue that plaintiff's previous litigation conduct demonstrates that

16

United States District Court

For the Northern District of California

1  plaintiff did not believe it was covered under the policy.  According to defendants, in 1983 plaintiff

2  filed a lawsuit against its insurers in an attempt to obtain assistance in defending against asbestos-

3  related claims.  The lawsuit did not include defendants or their predecessors.  Whatever inference

4  might be drawn from plaintiff's previous litigation tactics, however, no such inference can overcome

5  the fact that the face of the written policy supports only one reasonable interpretation.  Cf. Crestview

6  Cemetary Ass'n v. Dieden, 54 Cal. 2d 744, 752–54 (1960) (using the actions of the two parties,

7  which disclosed their intent "with crystal clarity," to interpret an otherwise undocumented oral

8  contract).[5]

9       Third, defendants argue that the phrase "as their respective interests may appear" limits

10  coverage under the policy to entities whose "interests"—apparently construed by defendants to mean

11  gross sales or other financial information—appear in the remainder of the policy.  Defendants offer

12  no reason, however, to interpret "interests" in the particular, narrow way they propose.  To the

13  extent that plaintiff's business "interests" generally include the manufacturing and distribution of

14  asbestos and asbestos products, the policy expressly provides coverage.

15       Finally, defendants claim that interpreting "Affiliated corporations" to include corporate

16  parents causes the "NAME OF INSURED" section to be redundant with the "Additional Insured"

17  section, which provides coverage for "[p]ersons, firms or corporations financially controlling or

18  controlled by the Insured."  According to defendants, interpreting the contract in a way that creates

19  overlap between these two sections is "repugnant, redundant, and in violation of the law," including

20  California Civil Code section 1641 and Carmel Development Co. v. RLI Insurance Co., 126 Cal.

21  App. 4th 502, 511 (2005).

22       Section 1641 provides that contracts should be construed in a manner that gives effect to

23  every part, "if reasonably practicable."  Here, under the court's construction the "Additional

24  Insured" section at a minimum continues to confer separate rights on "[p]ersons" financially

25  controlling the named insured.  The court also notes that the "NAME OF INSURED" section

26  extends coverage to "Subsidiary" corporations, which appears to be unavoidably redundant with

27  designating "financially. . .controlled" corporations as "Additional Insured[s]."  Compare Bay

28  "occurrence" Dec., Exh. A at 2 with id. at 3.  Construing "Affiliated corporations" in a manner that

1  results in some overlap does not introduce a significant additional violation of the statutory canon of

2  construction.  Carmel Development Co. simply rearticulates the general principle codified in section

3  1641, rejecting the argument that a contract provision was "simply a redundancy" when an alternate,

4  more plausible construction was possible.  126 Cal. App. 4th at 511–12.  Here, in contrast, the court

5  has adopted the only reasonable construction of the contract.  The fact that some redundancy results

6  is not fatal.

7          "Affiliated corporations" is thus construed to include corporate parents, which in this case is

8  plaintiff, The Flintkote Company.

9

10         D.     "Occurrence"

11         Plaintiff argues that the word "occurrence," as used in the policy and as applied to injuries

12  arising out of exposure to asbestos, means "each incident of asbestos exposure causing bodily

13  injury."  Defendants argue that the word "occurrence" might mean various things, depending on the

14  results of additional fact discovery.  For example, defendants suggest that "occurrence" might be

15  construed to mean "the insured's decision to mine and sell asbestos" or "the number of Flintkote

16  plants which receive Mines' asbestos."  Defendants' principal argument appears to be that the court

17  should adopt an "equitable alternative" to plaintiff's proposed construction, depending on the facts

18  of the instant case.

19         As an initial matter, the court is mystified as to defendants' appeal to "equity" in the context

20  of insurance contract interpretation.  Courts do not interpret contracts or other legal documents in

21  order to achieve a particular result, equitable or not.  Rather, the meaning of a contract is determined

22  by the parties' reasonable expectations at the time of formation.  Montrose Chem., 10 Cal. 4th at

23  666.  Discovery of further facts, such as the number of claims plaintiff expects to make under the

24  policy, is completely unnecessary prior to interpreting the policy's language.  Defendants' informal

25  request for such discovery, regardless of whether it meets the formal requirements of Rule 56(f), is

26  therefore denied.

27

28

18

1

1.      Policy Language

A contemporaneous dictionary defines "occurrence" in relevant part as follows:  "2. Appearance or happening; as, the occurrence of a fire.  3. Any incident or event, esp. one that happens without being designed or expected; as, an unusual occurrence."  Webster's New International Dictionary 1684 (2d ed. 1957).  Neither party argues that the definition of "occurrence," standing alone, is unambiguous, though the court notes that the phrase "without being designed or expected" favors plaintiff's proposed construction.  Frequent usage of "occurrence" throughout the policy provides ample basis for establishing the reasonable expectation of the insured.

2.      Reasonable Expectation of the Insured

The word "occurrence" is used throughout the policy in various provisions related to the scope of coverage, limitation of liability, and procedures for obtaining coverage.  The following instances are helpful in resolving plaintiff's motion.  Within the section of the policy titled "INSURING AGREEMENTS," which sets forth the scope of coverage, "occurrence" appears three times.  In the paragraph titled "Assault," the policy states that "[b]odily injury or death alleged to have been caused by an assault shall be deemed the result of an occurrence within the meaning of this policy."  Bay "occurrence" Dec., Exh. A at 4.  Here, "occurrence" refers to the "assault" which immediately preceded and caused the injury.  In the paragraph titled "Defense, Settlement, Supplementary Payments," the policy states that the insurer shall pay for "such immediate medical and surgical relief to others as shall be imperative at the time of occurrence."  Id. at 3.  Here, as well, the occurrence must immediately precede the injury, which results in the need for medical attention "at the time of occurrence."  Finally, the paragraph titled "Territory" states that the policy applies to "occurrences occurring anywhere in the World," suggesting that occurrences may be geographically dispersed.  Id. at 4.

The section of the policy titled "CONDITIONS" includes the disputed limitation of liability provision already quoted, supra.  Id. at 5–6.  As defendants correctly point out, the fact that there can be multiple injuries as part of a single occurrence indicates that "injury" and "occurrence" do not

19

1   have the same meaning.  The "CONDITIONS" section also includes a paragraph titled "Notice of

2   Occurrence," which states that "[u]pon happening of an occurrence. . .written notice shall be given

3   by or on behalf of the Insured to the Company. . .as soon as practicable after notice thereof has been

4   received by its executive officers." Id. at 6.  Further, the notice shall include "information respecting

5   the time, place and circumstances of the occurrence or accident" as well as information about the

6   injured party and any witnesses.  Id.

7       All of the preceding passage use "occurrence" in the sense of "accident":  an unforseen event

8   that causes injury to one or more persons, or to property.  In contrast, both of defendants' proposed

9   constructions for "occurrence"—"the insured's decision to mine and sell asbestos" or "the number

10  of Flintkote plants which receive Mines' asbestos"—are better characterized as business decisions or

11  operational facts of plaintiff's business.  It would be nonsensical to require plaintiff to provide

12  "written notice. . .as soon as practicable" as to its business decision to sell asbestos or as to the

13  number of plants it operates.  Neither of defendants' proposed constructions is tenable.

14      Moreover, the reporting requirements and "Supplementary Payments" portions of the

15  policies indicate that an occurrence is generally contemporaneous in time with the resulting injury.

16  Unlike other policies noted by the parties (and discussed in past cases considering liability for

17  asbestos exposure) there is no clause in the policy defining a condition existing for a prolonged

18  period of time as a single occurrence.  Cf. Chemstar, Inc. v. Liberty Mut. Ins. Co., 797 F. Supp.

19  1541, 1546 (C.D. Cal. 1992) (quoting a portion of the insurance policy at issue, which states that

20  "[f]or the purpose of determining the limit of the Company's liability all. . .property damage arising

21  out of continuous or repeated exposure to substantially the same general conditions shall be

22  considered as arising out of one occurrence").

23      Finally, it is clear that an occurrence must give rise to liability.  The portion of the policy

24  defining the scope of coverage obligates defendants to pay "all sums which the Insured shall become

25  legally obligated to pay by reason of liability for damages. . .because of bodily injury."  Bay

26  "occurrence" Dec., Exh. A at 3.

27      Taken in combination, these provisions of the policy give the term "occurrence" clear

28  meaning.  The court finds, based on consistent usage within the policy, that "occurrence" means "an

1    event that causes and immediately precedes an injury giving rise to liability under the policy."

2         Given this definition of "occurrence," the next question is which incidents qualify as

3    occurrences in the context of asbestos-related injuries.  Here, past cases considering the cause of

4    asbestos-related injuries are useful.  A Second Circuit decision, In re Prudential Lines, Inc., 158 F.3d

5    65 (2d Cir. 1998), is particularly helpful because its analysis of the meaning of "occurrence" tracks

6    this court's analysis exactly, and because it bases its conclusion in part on California law:

> The common thread running through the California cases is that an "occurrence" or
> "accident" is associated with the time of injury. This leads to the conclusion that the
> "cause" of injury which determines the number of occurrences undoubtedly refers to
> the immediate rather than the remote cause of injury. . . . As the court stated in
> Maples [v. Aetna Casualty and Surety Co.], supra, 83 Cal. App. 3d [641], 647–48,
> 148 Cal. Rptr. 80 [ (1978) ], in reference to both California and out-of-state cases on
> the timing of "occurrences" or "accidents":
>
> > [T]his seemingly unbroken line of authority find[s] that the term
> > "accident" unambiguously refers to the event causing damage, not the
> > earlier event creating the potential for future injury. . . . *The event*
> > *causing damage in the asbestos-related bodily injury cases is exposure*
> > *to asbestos fibers. . . . Since each individual claimant has a unique*
> > *work history, each claimant's exposure must be viewed as a separate*
> > *occurrence.*
>
> Id. at 1211 (quoting Asbestos Insurance Coverage Cases, Judicial Council
> Coordination Proceeding No. 1072, Statement of Decision Concerning Phase IV
> Issues, at 9–16 (Super. Ct. San Fran. Jan. 24, 1990), aff'd in part and reversed in part
> on other grounds sub nom. Armstrong World Indus. v. Aetna Cas. & Sur. Co., 26 Cal.
> Rptr. 2d 35, 20 Cal. App. 4th 296 (Ct. App. 1993))

Id. at 82 (emphasis added).  The court is therefore in substantial agreement with plaintiff and finds

that, as applied to the context of asbestos-related injuries, an "occurrence" is "exposure to asbestos

that causes and immediately precedes an injury giving rise to liability under the policy."

         Defendants vehemently argue that the court should ignore portions of the policy and

precedent cases that define "occurrence" in the context of triggering coverage, because the meaning

of "occurrence" is different in the coverage and limitation of liability contexts.  Defendants

seemingly contend that a single word—"occurrence"—should be given two different meanings in

two different sections of the policy.  The two principal cases cited by defendants in support of their

argument, however, compel no such finding.

         In Whittaker Corp. v. Allianz Underwriters, Inc., 11 Cal. App. 4th 1236 (1992), the court

considered whether property damage associated with defective rubber seals was covered under a

liability policy.  The manufacturer of the seals began using the defective rubber compound during

21

United States District Court

For the Northern District of California

the coverage period of the policy, but the damage resulting from the defective seals occurred after the policy expired.  Id. at 1240.  The manufacturer argued that the relevant "occurrence" triggering coverage under the policy was the decision to use the defective compound.  Id.  The court disagreed, noting that the policy at issue in Whittaker contained the following definition of "occurrence": "'Occurrence' means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."  Id. at 1241.  In light of the fact that an "occurrence" required both a "condition" and resulting "property damage," the court concluded that property damage occurring after the termination of the policy was not covered.  Id. at 1244–45.

In reaching this conclusion, however, the court noted that in the context of establishing the correct limitation of liability, "occurrence has generally been held to mean the underlying cause of the injury, rather than the injury or claim itself; otherwise, the insurer's effort to limit its liability would be substantially weakened."  Id. at 1241–42.  This passage is confusing in several respects.

First, although the court never explicitly so stated, the strong implication of the quoted passage is that there was only a single occurrence for purposes of determining the limitation on liability—the decision to use the defective compound, which "caused" all of the resulting property damage.  See id. at 1242 (citing Champion Int'l Corp. v. Continental Casing Co., 546 F.2d 502 (2d Cir. 1976), in which the court found that 1,400 instances of damage related to defective plywood panels constituted a single "occurrence" for purposes of establishing limitation of liability).  The Whittaker court did not reconcile that conclusion with the express language of the policy, which defined an "occurrence" as an "accident, including continuous or repeated exposure to conditions." Id. at 1241.  To say that a business decision is an "accident" or a harmful "condition" tortures language beyond reason.

Second, the Whittaker court's argument that construing "occurrence" as anything beyond the decision to use the defective compound would be detrimental to insurers is pure "reasoning from result," see In re Prudential Lines, 158 F.3d at 83 n.10, and is at odds with both the statutory framework for contract interpretation based on the language of the policy and the requirement of resolving truly ambiguous language in favor of the insured.  See Montrose Chem., 10 Cal. 4th at

22

United States District Court

For the Northern District of California

1    667.  California statutes and decisions of the California Supreme Court have substantially more

2    weight than dicta in a single Court of Appeal decision.

3          Third, the Whittaker court's observation that an "occurrence" is "the underlying cause of the

4    injury" (also the holding of  Chemstar, 797 F. Supp. at 1547, the other case cited by defendants) is

5    not particularly helpful analytically, as many events preceding an injury are causally connected to

6    the injury. Plaintiff's motion seeks a determination of which event preceding an asbestos-related

7    injury is an "occurrence" as contemplated by the policy.  As just discussed, the plain language of the

8    policy indicates that the "occurrence" immediately precedes the injury.  In the case of asbestos-

9    related injuries, the immediate cause of injury is exposure to asbestos fibers.

10         Finally, contrary to defendants' suggestion, the finding that "occurrence" in the context of

11   asbestos-related injuries refers to an exposure to asbestos fibers does not eliminate the distinction

12   drawn in the policy between occurrences and injuries.  As the court pointed out at oral argument, an

13   exposure to asbestos fibers is not an injury; rather, the harm done to the body as a result of the

14   exposure is the injury.

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                  23

1  CONCLUSION

2       For the above reasons the court hereby GRANTS plaintiff's motions for summary

3  adjudication of the meaning of "Affiliated corporations" and "occurrence" as used in policy number

4  L-90-4672 and the application of those meanings to the facts of this case. The phrase "Affiliated

5  corporations" is construed to include the corporate parent—The Flintkote Company—of the

6  expressly named insureds. The term "occurrence" in the context of plaintiff's asbestos products is

7  construed to mean "exposure to asbestos that causes and immediately precedes an injury giving rise

8  to liability under the policy."

9

10       IT IS SO ORDERED.

11

12

13  Date: January 3, 2006

                               MARILYN HALL PATEL

14                                 United States District Judge

15                                 Northern District of California

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

ENDNOTES

1. Unless otherwise noted, background facts are taken from the declarations accompanying the parties' briefs. Material disputes of fact are noted.

2. Defendants somewhat confusingly include "Choice of Law" sections in their briefs in opposition, suggesting that the choice of law may have bearing on the resolution of the motions. In the same section, however, defendants note that "there is slight or no difference between the laws of Ontario, and the laws of California." As defendants have stated no cognizable argument based on choice of law, the court will assume that California law governs for purposes of deciding the instant motions.

3. Oddly, defendants observed at oral argument that the Latin root for "affiliate," *filius*, means "son." This meaning further supports plaintiff's construction of "affiliate," which includes corporate parent-child relationships as well as the sibling relationship that defendants propose.

4. At oral argument, defendants initially corroborated this assertion while addressing the interpretation of "occurrence," claiming that the Canadian companies were only in the business of mining. When confronted with the implications of such a fact for the interpretation of "Affiliated corporations," defendants retracted, instead claiming that the Canadian companies engaged in limited manufacturing of asbestos products for use only in Canada. Even if defendants were able to prove this through admissible evidence, limited local manufacturing of asbestos products is difficult to reconcile with the policy's coverage of all occurrences, including occurrences resulting from product defects, which occur "anywhere in the World." See Bay "occurrence" Dec., Exh. A at 4.

5. Because plaintiff's litigation conduct is not dispositive of the meaning of "Affiliated corporations," defendants' implied request for further discovery regarding the earlier litigation is denied.