**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

9

10  THE FLINTKOTE COMPANY, a Delaware    No. C 04-01827 MHP
    Corporation,

11
              Plaintiff,                **TENTATIVE MEMORANDUM & ORDER**
12
        v.                              **Re: Aviva's Motion for Summary Judgment**
13                                       **Regarding Assignments; Flintkote's Motion**
    GENERAL ACCIDENT ASSURANCE           **to Streamline its Damages Presentation at**
14  COMPANY OF CANADA, a Canada          **Trial**
    insurance company; GENERAL ACCIDENT
15  FIRE AND LIFE ASSURANCE
    CORPORATION LIMITED OF PERTH,
16  SCOTLAND, a Scotland insurance company;
    and DOES 1 through 10,
17
              Defendants.
18  _____/

19

20        On April 14, 2004 plaintiff the Flintkote Company ("Flintkote") filed an action in San

21  Francisco Superior Court against defendants General Accident Assurance Company of Canada and

22  General Accident Fire and Life Assurance Corporation Limited of Perth, Scotland, predecessors of

23  Aviva Insurance Company of Canada (aka "Aviva").  The complaint alleged breach of contract for

24  defendants' failure to defend or indemnify plaintiff for claims covered under a primary insurance

25  policy issued to two of plaintiff's subsidiaries.  Defendants removed the action to this court.  Now

26  before the court are Aviva's "Motion for Summary Judgment Regarding Assignments" as well as

27  Flintkote's "Motion to Streamline Damages Presentation at Trial."  Having considered the written

28  submissions of the parties, the court enters the following **TENTATIVE** memorandum and order.

United States District Court

For the Northern District of California

BACKGROUND

Plaintiff Flintkote, presently based in San Francisco, is a company that formerly mined and sold asbestos and asbestos-based products.  Flintkote sought bankruptcy protection in 2004 as a result of its exposure to asbestos-related lawsuits.  Flintkote asserts that between 1988 and 2004, it defended and paid over 270,000 asbestos tort claims at a cost of approximately $630 million.

This action concerns an insurance policy Flintkote purchased from defendant Aviva to cover general commercial liability, including liability for asbestos-related bodily injury claims.  The Aviva policy, numbered L-90-5010[1], was in force between January 1, 1958 and January 1, 1961.  There is no dispute that the Aviva insurance policy is a primary insurance policy[2].  Flintkote brings the present action to recover from Aviva defense and liability costs paid out as a result of asbestos-related tort claims brought against Flintkote.

In addition to the Aviva policy, between 1942 and 1985 Flintkote purchased over 200 policies from some 30 separate insurance companies.  Like the Aviva policy, two of these policies, issued by Liberty Mutual and American Mutual, are primary insurance policies.  The remaining policies are excess insurance policies.


LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249. The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

DISCUSSION

I.      AVIVA'S MOTION FOR SUMMARY JUDGMENT

Aviva's motion, styled as a "Motion for Summary Adjudication Regarding Assignments," raises a host of interrelated issues concerning the scope of damages claimed by Flintkote. These issues can generally be grouped into three categories. First, Aviva argues that because all of Flintkote's past claims have been covered and in fact paid or reimbursed by other insurance, Flintkote has suffered no direct damage as a result of Aviva's breach and complete failure to pay. Second, given that Flintkote's liability has been paid or reimbursed by other insurance, Aviva argues that Flintkote's only claims for damages are as an assignee of the primary insurers' claims for contribution or as an assignee of the excess insurers' claims for subrogation. Aviva argues that only a small number of primary and excess insurers have made valid and enforceable assignments, and therefore, amounts recoverable by Flintkote are limited accordingly. Third and finally, insofar as there have been valid agreements assigning to Flintkote the claims of other insurers, Aviva argues that those claims are subject to a statute of limitations which should not be equitably tolled. The court discusses each of these three issues below.

A.      Flintkote's Direct Damages

Aviva argues that Flintkote has suffered no direct damage because although Flintkote has incurred liability for past asbestos claims, that liability has been paid or otherwise reimbursed by Flintkote's other insurers.  Flintkote does not dispute the fact that all of its past claims have indeed been paid or otherwise reimbursed by its additional insurers, and that with respect to those *past* claims, Flintkote has suffered no direct damage that Flintkote can now recover on its own behalf.  Rather, Flintkote argues that its direct damages relate to *future* claims for which Flintkote may be forced to pay on its own because other insurance which would have otherwise been available has been prematurely exhausted as a direct result of Aviva's failure to pay on past claims.

As a preliminary matter and to guide the discussion that follows, it is helpful to first summarize the court's prior orders in this action as they relate to the present motion.  In Flintkote v. General Accident Assurance Co., 480 F. Supp. 2d 1167, 1172–74 (N.D. Cal. Mar. 13, 2007) (Patel, J.) (hereinafter "Flintkote IV"), the court addressed the question of when coverage under the Aviva policy is triggered.  This question turned on the interpretation of the term "injury" as used in the policy as well as when an "injury" could be considered to take place.  Id. 1173–74.  The court concluded that coverage under the Aviva policy is triggered for "injuries arising from exposure during the policy period [between January 1, 1958 and January 1, 1961], as well as injuries resulting from exposure before the policy period that manifested or continued during the policy period," subject to certain exclusions.[3]  Id.  This theory of coverage is known as the "continuous trigger" theory.  Id. at 1173.

In Flintkote IV, the court went on to conclude that for past claims, because Aviva did not provide any defense for asbestos bodily injury claims brought against Flintkote, and because Aviva failed to make any liability payments in connection with covered losses, Aviva had breached its duty to defend and indemnify.  Id. at 1174–76.  The court declared that Flintkote was entitled to recover for all past paid claims which were covered by the Aviva policy under the continuous trigger theory.  Id. at 1176.

Additionally, the court in Flintkote IV concluded that with respect to all pending and future claims covered under the continuous trigger theory, Aviva has a duty to defend and a duty to

4

United States District Court

For the Northern District of California

indemnify Flintkote.  Id. at 1174.  In Flintkote v. General Accident Assurance Co., 2006 WL 1867538 (N.D. Cal. July 5, 2006) (Patel, J.) (hereinafter "Flintkote III"), the court rejected Aviva's argument that declaratory relief as to future, unfiled asbestos claims was inappropriate because such claims were not actual "cases" or "controversies" pursuant to Article III of the U.S. Constitution. Having found in Flintkote III that future, unfiled claims were sufficiently certain such that the court had jurisdiction to declare the rights of the parties even as to those claims, the court properly declared in Flintkote IV that Aviva owed a duty to defend and indemnify as to not only past and pending claims, but to future claims as well.

With this background in mind, it is apparent that under the continuous trigger theory, coverage under the Aviva policy, which was in effect from January 1, 1958 through January 1, 1961, may overlap with coverage under additional policies even if those policies were not in effect contemporaneously with the Aviva policy.  For example, assume Flintkote incurs liability for an asbestos claim in the year 1980.  Assume further that Flintkote has an insurance policy in effect for the year 1980 which covers Flintkote's liability for the claim.  If the 1980 claim arises from injuries incurred as a result of exposure to asbestos during the period in which Aviva's policy was in effect, then under the continuous trigger theory, the Aviva policy also covers the claim.  Accordingly, both the Aviva policy and a second policy cover Flintkote's liability for the 1980 claim.  To be sure, the issue of when additional policies are triggered is not before the court and the court need not decide that issue.  The court only notes that, as is the case here, there exists an additional policy which shares overlapping coverage with the Aviva policy.

Given this type of overlapping coverage, the court agrees with Flintkote that Flintkote is directly harmed by Aviva's failure to pay on past claims, even if those past claims have been paid or otherwise reimbursed by other insurers.  This is because, as Flintkote argues and as the court agrees, where an insurer with unlimited aggregate liability breaches, and the gap is filled by an insurer whose performance reduces a limited liability policy, the insured suffers damage directly when the limited policy is unavailable to respond to later claims.  In other words, when a policy with aggregate limits pays a past claim that it would not otherwise have paid but for Aviva's breach, the

limits of that policy are prematurely exhausted.  Flintkote is directly harmed insofar as it can no longer rely on the limited policy to cover *future* claims and is forced to pay the claim on its own.

To illustrate the nature of Flintkote's damages, the court finds it helpful to set forth the stylized example described in Flintkote's opposition.  Assume an insured, which the court will label F for Flintkote, has two primary insurance policies.  Assume that one of these policies, like the Aviva policy, has a $100,000 per occurrence limit with no aggregate limit.  Label this policy as policy A.  The other policy, which the court will label B, has a $700,000 per occurrence and aggregate limit.  Assume further that F has five asbestos claims for $200,000, each triggering coverage under both policies A and B, and a sixth claim for $200,000 triggering only policy B.  As already discussed above, a single claim may trigger two different policies in effect during different time periods because policy A is triggered under the continuous trigger theory.  Now consider the following three scenarios:

**Scenario 1.**  Assume there is no breach by A and that A and B share the claims equally.  Each insurer will pay $100,000 per claim, or $500,00 each, for a total of $1 million for the first five claims.  B will pay $200,000 fully covering the sixth claim.  F is fully covered by the insurance purchased.

**Scenario 2.**  Assume instead that A is in total breach and refuses to pay any of the claims.  If B steps forward to fill in the gap left by A, B will pay $200,000 on the first three claims, and $100,000 on the fourth, thereby exhausting B's aggregate limit of $700,000.  F is forced to pay $100,000 for the remainder of the fourth claim, plus $200,000 each for the fifth and sixth claims.  Compared to scenario 1, F pays a total of $500,000 it would not have otherwise paid had A not breached the contract.  F has direct damages against A in the amount of $500,000.

**Scenario 3.**  Even if A begins paying on later filed claims and meets its obligations in full on those later claims, F is still harmed by A's past breach.  Assume A refuses to pay the first three claims, and is then forced, or decides, to pay beginning with the fourth claim.  B will exhaust its limits on the fourth claim, just as in scenario 2.  On the fourth and fifth claims, A will pay its $100,000 per occurrence limit, and will pay nothing on the sixth claim because that claim does not trigger policy A.  F must still pay the remaining $100,000 on the fifth claims as well as $200,000 on

United States District Court

For the Northern District of California

the sixth claim.  F incurs direct damages against A in the amount of $300,000 which, compared to scenario 1, would not have been paid but for A's breach.  Note that in both this scenario and scenario 2, F may recover from A amounts F paid on the sixth claim, even though the sixth claim does not trigger A's policy.

Flintkote's "premature exhaustion" theory as it applies to the unique circumstances of this case  is a novel one that apparently has been neither adopted nor rejected by any court. Nevertheless, the conclusion that Flintkote is harmed by Aviva's breach insofar as prematurely exhausted policies are unavailable to pay on future claims follows from straight forward application of general principles of contract law.  It is well-settled that "when one party breaches a contract the other party ordinarily is entitled to damages sufficient to make that party 'whole,' that is, enough to place the non-breaching party in the same position as if the breach had not occurred."  Postal Instant Press, Inc. v. Sealy, 43 Cal. App. 4th 1704, 1708–09 (1996).  These damages are limited to the extent that the damages are "proximately caused" by the breach and can be estimated with "reasonable certainty."  Id. at 1709.

Here, as illustrated by the scenarios discussed above, Flintkote's harm does not occur but for Aviva's breach.  The chain of causation is clear—Aviva breaches, additional insurance fills in the gap left by Aviva, the additional insurance is prematurely exhausted and is unavailable to pay on subsequent claims, and therefore, Flintkote is on the hook for liability that would have otherwise been covered and paid.  The court concludes and hereby declares that Flintkote's damages are proximately caused by Aviva's breach.

With respect to whether Flintkote's damages may be estimated with reasonable certainty, the court has already found that additional asbestos claims against Flintkote "will be filed in the future with a high degree of certainty."  Flintkote III, 2006 WL 1867538 at *5.  The court understands that Flintkote has produced to Aviva Flintkote's monthly bills to insurers.  Fehner Dec. ¶ 3.  These bills lay out in detail what claims have been billed to which insurers and in what proportion.  Id. Moreover, the court understands that Aviva has asked, and Flintkote has promised to gather, base-level payment records showing that the insurers in fact paid what they were billed.  These records,

combined with reasonably certain information on the scope of Flintkote's liability for future claims, can form the basis of a reasonably certain estimate of Flintkote's direct damages.

B.    Flintkote's Assignments

Separate and apart from Flintkote's direct damages for Aviva's breach of contract, Flintkote also asserts that as an assignee, it has the right to recover amounts other insurers paid in lieu of Aviva.  There is no question that Flintkote may recover on behalf of the other insurers insofar as Flintkote is the assignee of the insurers' rights.  Both a primary insurer's claim for contribution and an excess insurer's claim for subrogation are choses in action that are assignable to third parties.  See Bush v. Superior Court of Sacramento County, 10 Cal. App. 4th 1374, 1380-82 (1992).

In the stylized example set forth above, F seeks to recover on behalf of B, the amounts B overpaid as a result of A's breach.  For example, in scenario 2 of the stylized example, B paid $200,000 each on the first three claims, whereas had A paid its share, B would have only paid $100,000 each.  B, therefore, may assert a claim against A for contribution in the amount of $100,000 each for the first three claims, recovering $300,000 total.

As Flintkote recognizes, any recovery by insurer B against insurer A replenishes B's aggregate limits, so that additional funds are available to pay subsequent claims.  Continuing with scenario 2 of the stylized example, if B is successful in recovering $300,000 from A, then additional monies are available for B to pay the remaining $100,000 on the fourth claim as well as $200,000 on the fifth claim.  F, the insured, must still pay $200,000 on the sixth claim.  This is direct damage to F as a result of breach by A, and as already discussed above, is recoverable by F from A.  Note however, that because B has recovered $300,000 from A and has applied that recovery to payment of subsequent claims, F's claim for direct damages against A is $200,000, not $500,000 as before where there was no recovery by B.

As is apparent from this example, the effect of any recovery by insurer B against insurer A is to offset the direct damages F may claim against A.  Insofar as any recovery by B against A revives B's previously extinguished aggregate limits, and such recovery is applied to subsequent claims, B's recovery against A offsets one-for-one F's recovery against A for direct damages.  In the end, A

United States District Court

For the Northern District of California

8

United States District Court

For the Northern District of California

pays a total of $500,000—$300,000 to B via a claim for contribution, and $200,000 to F via a claim for breach of contract. This is the same amount A would have paid in scenario 1 had A not breached in the first place. B pays a total of $700,000, reaching its policy limits, and F is fully reimbursed any amounts it is paid. Each party—A, B, and F—is restored to the position it would have been in had A not breached. This is precisely the situation set forth in scenario 1.

Because any recovery from B against A is credited to B's policy limits, thereby offsetting F's claim for direct damages against A, there is no double recovery by F or double payment by A. Consider the situation in which B's recovery does *not* replenish B's policy limits. Continuing with scenario 2 of the stylized example, if A breaches by failing to pay any of the claims, F has a claim for direct damage in the amount of $500,000. If B also recovers $300,000 from A through a contribution claim, and this amount is *not* credited against F's claim for direct damages, A will have paid a total of $800,000. Insofar as Aviva argues that this constitutes impermissible double recovery, this situation does not occur because as Flintkote recognizes and as the court concludes, any recovery by B against A offsets F's recovery against A. There is no double recovery. If B does not bring a claim for contribution against A, then F may recover $500,000 from A as direct damages. If B does bring a claim for contribution against A, B recovers $300,000, reducing F's claim for direct damages to $200,000. In either event, A pays $500,000, the amount it would have paid had it not breached in the first place.

Having set forth the nature of Flintkote's direct damages claim against Aviva, and having clarified the relationship between that claim and the contribution claims of other insurers, the court now turns to the question of whether the other insurers have given Flintkote valid assignments of their claims, or have otherwise authorized Flintkote to pursue claims on their behalf. Because the other insurers are not parties to this action, Flintkote may only recover for amounts other insurers paid in lieu of Aviva if those insurers assigned their claims to Flintkote.

With regard to Flintkote's assignments, the only disputes between the parties are: (1) whether recent settlement agreements containing valid assignments, but executed after the commencement of this action, affect Aviva's obligations; and (2) whether the so-called "Wellington Agreement" contains a valid assignment clause. The court discusses each dispute below.

1.      Recently Executed Agreements

Since this action was filed in 2004, Flintkote has entered into five separate settlement agreements.  One of these agreements, executed on October 14, 2006, is between Flintkote and its primary insurer Liberty Mutual.  See Ross Dec., Exh. E.  The other four agreements are between Flintkote and various excess insurers.  They include:

1.      An agreement executed on September 14, 2007 with Highlands Insurance Company, see Ross Dec., Exh. F;

2.      An agreement executed on November 1, 2007 with "Certain London Companies" including AXA Belgium f/k/a "Royal Belge Incendie-Reassurance" societe anonyme d'assurances; Dominion Insurance Company Ltd.; Stronghold Insurance Company Limited; Terra Nova Insurance Company Limited n/k/a Markel International Insurance Company Limited; and Compagnie Euro-Belge de Reassurances S.A.; see Ross Dec., Exh. G;

3.      An agreement executed on February 4, 2008 with American Home Assurance Company, see Ross Dec., Exh. H.; and

4.      An agreement executed on January 18, 2008 with National Union Fire Insurance Company, L'Union Atlantique de Assurance S.A., and Granite State Insurance Company, Lexington Insurance Company; see Ross Dec., Exh. I.

All five agreements were executed after Flintkote filed for bankruptcy.  By their terms, they require approval by the bankruptcy court and are effective only upon such approval.

Aviva does not dispute that these agreements contain valid clauses assigning the insurer's rights to contribution and/or subrogation to Flintkote.  Aviva argues, however, that it has never received notice from Flintkote that it considers the five assignments part of the instant action, and therefore, Flintkote should not be allowed to assert those claims in this lawsuit.  Nevertheless, Flintkote argues and the court agrees that although Aviva has been informed only recently of the new settlement agreements, Aviva has received proper notice of the claims Flintkote now asserts. The second amended complaint filed on December 22, 2006 clearly states and puts Aviva on notice that Flintkote is asserting "claims for compensatory and consequential damages both directly *and as an assignee of other insurers*."  Second Amended Complaint ¶ 12.  Aviva, therefore, has been on notice for quite some time that Flintkote intended to assert claims as an assignee of other insurers. Aviva cannot be now heard to complain that Flintkote does in fact have valid assignment agreements, even if those agreements have been made only recently.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

2.     Wellington Agreement

In the 1980s, Flintkote, like many other producers of asbestos products was engaged in coverage litigation with general liability insurers.  A large part of this industry-wide litigation was ended when a number of parties reached a negotiated settlement, commonly referred to as the Wellington Agreement.  See Ross Dec., Exh. J.  The Wellington Agreement was named for Harry Wellington, then-Dean of the Yale University Law School who facilitated negotiations between the asbestos producers and their insurers.

This accord, signed in 1985 by numerous manufacturers and their insurers—including Flintkote and some of its insurers, not including Aviva—resolved persistent contribution and indemnity issues, thereby allowing for joint representation in thousands of pending asbestos-related lawsuits.  The Wellington Agreement provided for the creation of the Asbestos Claims Facility to analyze, defend, and settle pending and future asbestos-related bodily injury claims referred to it by participating former asbestos producers.  In re National Gypsum Co., 208 F.3d 498, 502 (5th Cir. 2000).  Under the agreement, funding for the payment of settlements, judgments, and legal expenses incurred in the defense of asbestos-related bodily injury claims against the party-producers was provided by the party-insurers.  Id.

But, like Aviva, not all insurers signed the agreement, causing gaps in coverage to arise where non-signatory insurer payments were called for.  Id.  Under the Wellington Agreement, party-insurers agreed to make gap-filling payments to cover the non-signatory insurers' share of defense and indemnity costs.  Id.  It was recognized that this would cause the insurers to pay out their policy limits more quickly than they would if the non-signatory insurers were participating.  Id. In response, Section XX of the Wellington Agreement was designed to compensate signatory insurers for these interim payments.  Id.  Under Section XX, producers are required to use their best efforts to obtain coverage from non-signatory insurers.  Id.  To encourage producers to pursue non-signatory insurers, interest on gap-filler payments begins to accrue two years after payment is made.  Id.  The producer must thereafter pay interest quarterly until the earlier of (a) a settlement with or final judicial determination against the non-signatory insurer, or (b) the date on which the signatory insurer would have exhausted its policy limits if the non-signatory insurer had been a

United States District Court

For the Northern District of California

participating party to the Wellington Agreement.  Id.  Moreover, under Section XX of the Wellington Agreement, when a producer obtained a final judgment or settlement against a non-signatory insurer, each signatory insurer was entitled to be reimbursed by the producer for the amounts previously paid.      Aviva does not dispute that this was the arrangement effected by the Wellington Agreement.  Indeed, Aviva recognizes that "the consideration Flintkote gave to its insurers in exchange for their [payments] was a promise to use its reasonable best efforts to pursue additional insurance money, coupled with an agreement to return any money Flintkote thereby obtained to the settling insurers."  Aviva argues, however, that whatever arrangement the Wellington Agreement effected between Flintkote and its other insurers, that arrangement did not constitute an assignment of claims from the insurers to Flintkote.

Aviva points out that one of the signatories to the Wellington Agreement, Employers Insurance of Wasau, executed a later settlement agreement in September 1990 which states, "Wasau retains all its rights to assert claims and to litigate against non-signatories for contribution or indemnity with respect to payments made by Wasau, but this shall not modify or extinguish Flintkote's obligation to use its reasonable best efforts to obtain insurance benefits from non-signatories."  Ross Dec., Exh. K.  Aviva argues that reservation of rights clauses are contrary to an intent to assign those rights to Flintkote.  The court agrees with Aviva that the Wellington Agreement itself does not operate as an assignment of claims from insurers to Flintkote.

Nevertheless, it is clear from the language of the Wellington Agreement itself that the parties intended an arrangement whereby Flintkote would pursue non-signatory insurance companies for reimbursement on behalf of the signatory insurers.  Signatory insurance companies may have reserved rights to bring their own claims, but section XX of the Wellington Agreement evidences the intent of the parties that as long as Flintkote was using its best efforts, signatories would not initiate simultaneous lawsuits against non-signatories.  In the meantime, signatories would fill in gaps left by non-signatories, and would be reimbursed by Flintkote in the event Flintkote was successful in obtaining payment from non-signatories.  While not a complete assignment of rights, there is a clear understanding among the parties that Flintkote would pursue claims against non-signatories such as Aviva on behalf of the signatories.  The court concludes that section XX of the Wellington

12

1    Agreement gives Flintkote the authority to assert the contribution and subrogation claims of the

2    other signatory insurers.

3

4            C.        Statute of Limitations and Equitable Tolling of Assigned Claims

5            By limiting the time within which a plaintiff may bring a claim, statutes of limitations

6    promote repose for defendants and encourages plaintiffs to diligently prosecute their claims. Fox v.

7    Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 806, 27 Cal. Rptr. 3d 661, 110 P.3d 914 (2005).

8    Indeed, Flintkote only now seeks an adjudication of rights arising from claims tendered and paid by

9    other insurers as long ago as 1982. Claims arising out of breach of "contract, obligation or liability

10   founded upon an instrument in writing," as Flintkote's direct and assigned claims do, must be

11   brought within four years of accrual. Cal. Civ. Proc. Code § 337(1). However, this is only the

12   beginning of the inquiry; the statute requires a determination of when claims accrued. The equitable

13   subrogation claims accrued when the excess insurers paid the claims.

14           In Flintkote IV, the court ruled only that Flintkote's direct claims are equitably tolled

15   because Aviva has sat on claims tendered by Flintkote and Aviva has neither paid nor denied

16   Flintkote's claims. Flintkote, 480 F. Supp. 2d at 1177–79. Aviva is correct that Flintkote IV did not

17   concern equitable tolling of Flintkote's assigned claims from other insurers. However, similar

18   considerations that applied in Flintkote IV to equitably toll Flintkote's direct claim apply here with

19   equal force to equitably toll Flintkote's assigned claims.

20           Equitable tolling runs after a timely claim for loss is tendered to the insurer while the insurer

21   investigates the claim, until coverage is denied. Prudential–LMI Commerical Ins. v. Super. Ct., 51

22   Cal. 3d 674, 693, 274 Cal. Rptr. 387, 798 F.2d 1230. The doctrine avoids the perverse possibility

23   that an insured will have to file suit against its insurer before the claim is investigated or denied. Id.

24   at 692. It also encourages insurers to diligently investigate claims before denying them, protects

25   insureds from unwittingly forfeiting claims due to the statute of limitations, discourages unnecessary

26   bad faith suits, and promotes prompt notice of claims to the insure, thereby furthering and not

27   frustrating the purposes of the statute of limitations. Id. The same concerns apply equally to claims

28   brought by an insured against an insurer as well as one insurer against another insurer.

United States District Court
For the Northern District of California

1    In this case, Flintkote has submitted monthly reports to Aviva showing claims against

2    Flintkote and which insurers were billed for those claims.  Although the record does not reflect the

3    extent of communications between Aviva and the other insurers, it is clear that Aviva was informed

4    of payments made by other insurers.  As this court found in <u>Flintkote IV</u>, the ball has been in

5    Aviva's court and Aviva has failed to give any response with respect to Flintkote's claims for breach

6    of the duty to defend and indemnify and with respect to the other insurer's claims for contribution

7    and subrogation.  The court acknowledges that Flintkote and the other insurers are not without fault

8    insofar as claims were not asserted until 2004, but on balance, the court finds that the statute of

9    limitations is equitably tolled because of Aviva's complete failure to respond.

10

11   II.    <u>FLINTKOTE'S MOTION FOR SUMMARY JUDGMENT</u>

12    Flintkote moves this court to clarify the allocation mechanism to be employed when

13   determining the proportion of the asbestos bodily injury claims made against Flintkote for which

14   Aviva is responsible.  Flintkote's primary argument is that its primary policies must be exhausted

15   before excess policies have to pay.  Further, it argues that primary policies share responsibilities

16   only with other primary policies with overlapping coverage periods.  Aviva raises seven arguments

17   in response.  First, Flintkote's motion is procedurally flawed.  Second, indispensable parties are

18   absent from the proceedings.  Third, genuine issues of material fact preclude summary judgment.

19   Fourth, Flintkote's argument relies upon inadequate hypothetical allocation issues.  Fifth, Flintkote's

20   excess carriers can become primary carries upon the occurrence of certain events.  Sixth, Flintkote's

21   allocation methods are inequitable.  And seventh, an aggregate limit should be attributed to the

22   Aviva policy.  The court first disposes of Flintkote's first and second arguments before setting forth

23   an allocation formula.

24

25    A.    <u>Appropriateness of Motion</u>

26    Flintkote styled its motion as a "Motion to Streamline its Damages Presentation at Trial."

27   Resolution of this motion depends primarily on interpretation of the "other insurance" provision in

28   the various contracts to which Flintkote is a party.  Aviva argues that this motion is premature for

United States District Court

For the Northern District of California

1  three reasons: first, it seeks an impermissible advisory opinion; second, the motion does not meet the

2  procedural requirements of Rule 56 of the Federal Rules of Civil Procedure; and third, Flintkote is

3  prematurely attempting to obtain an adjudication for pending and/or future asbestos bodily injury

4  claims.  Consequently, Aviva argues, the motion must be denied.

5       First, Aviva argues that Flintkote's motion cannot ask for an advisory opinion.  Aviva,

6  however, presents no evidence that demonstrates that an advisory opinion is sought.

7       Second, Aviva states that Flintkote's motion seeks a dispositive ruling as to matters of law.

8  It, however, does not specify how Flintkote failed to follow the requirements of Federal Rule of

9  Civil Procedure 56.  To the extent that Aviva argues this summary judgment motion should be

10  denied because of genuine issues of material fact, these arguments are discussed in greater detail

11  below.

12       Furthermore, these arguments are foreclosed by the court's prior rulings, which have invited

13  motions to frame and narrow the issues presented by this litigation.  Specifically, this court has

14  stated: "[Claims of assignment], including any statute of limitations that may apply to them, should,

15  along with the 'other insurance' provision, be addressed at the damages phase of this case."

16  Flintkote IV, 480 F. Supp. 2d at 1181.  After having filed its motion regarding assignments and the

17  applicable statute of limitations, Aviva cannot be heard to argue that issues with respect to the "other

18  insurance" provisions are unripe.  Furthermore, at the Case Management Conference held on

19  December 17, 2007, the court specifically allowed Flintkote to bring a motion of this nature.  Fehner

20  Reply Dec., Exh. 6 at 3:21–4:4 ("Actually, I don't care what you call it if it's a motion that will

21  narrow the issues . . . Denominate it whatever you want to.").  This motion is designed to narrow the

22  issues, and consequently, the court does not give dispositive weight to the manner in which it is

23  denominated.

24       Third, this court has already ruled that its decisions pertain to pending and/or future asbestos

25  bodily injury claims.  See Flintkote III, 2006 WL 1867538, at *5 ("Defendants' argument in support

26  of dismissal [of future claims] appears to be predicated on the absurd assumption that plaintiff must

27  individually litigate defendants' obligations with respect to each asbestos-related lawsuit that is

28

15

United States District Court

For the Northern District of California

1     filed.  Aside from being impossible, this suggested approach would frustrate the entire purpose of

2     obtaining insurance policies with broad duties to defend.").

3          In sum, Flintkote has properly brought this motion and the court will now consider it on the

4     merits.

5

6          B.       <u>Indispensable Parties</u>

7          Aviva next argues, four years after commencement of the instant litigation, that The Flintkote

8     Mines Limited and The Flintkote Company of Canada Limited are indispensable parties to the

9     action.  These two companies are the named insured on the policy at issue in this action.[4]  In support

10    of this theory, Aviva's sole support is a district court opinion from 1961 holding that "[j]ustice

11    between the parties before the Court cannot be adequately rendered without adjudicating the

12    question of what interest [the non-appearing party] has (plaintiff, of course, contends that [the non-

13    appearing party] has no interest in the proceeds of the policy). The final determination, if judgment

14    is entered with [the non-appearing party] absent, may quite conceivably lead to a double recovery."

15    <u>Stenhouse v. Jacobson</u>, 193 F. Supp. 694, 696 (N.D. Cal. 1961) (Halbert, J.).  However, as discussed

16    above, there are no issues of double recovery here.  Nor is there concern that other parties will be

17    precluded from bringing suit against Aviva due to Flintkote's action.  Indeed, this action will only

18    adjudicate rights between Aviva and Flintkote, along with the parties Flintkote represents.

19    Furthermore, The Flintkote Company of Canada Limited has been subsumed into Flintkote.  As to

20    The Flintkote Mines Limited, Aviva has not made even a cursory showing that any of the numerous

21    prongs of Federal Rule of Civil Procedure 19(a)(1)—the standard defining indispensable

22    parties—cannot be met.

23          To the extent that Aviva's arguments are based on Flintkote's inability to pursue claims on

24    behalf of the other primary insurers or the excess insurers due to a lack of assignments, those

25    arguments have been discussed and rejected above.

26

27          C.       <u>Genuine Issues of Material Fact</u>

28

United States District Court

For the Northern District of California

Aviva spends almost four pages of its brief discussing the infirmity of the facts offered by Flintkote's declarant, John Bay.  Specifically, Bay makes claims regarding the number of claims paid by Flintkote and Aviva's potential liability.  Aviva's declarant, Tyler Will, makes short order of Bay's declaration and effectively demonstrates that Bay's declarations may be factually infirm.  However, none of Bay's factual declarations are in any way material to the motion at hand.  For the court to determine a method of allocation—a legal issue—the court does not concern itself with the number of claims paid and the exact dollar amounts involved therein.  Consequently, the court does not consider any of Bay's declarations and overrules all of Aviva's objections to Bay's declaration as moot.

A summary chart attached to the Bay declaration as exhibit 3, however, is considered by this court.  This chart lists the relevant "other insurance" clauses found in the insurance policies Flintkote had with its insurers.  Both arguments made by Aviva in objection to this chart are overruled.  First, for a summary to be admissible, the underlying documents need not be in evidence if there is a declaration as to authenticity, by one with personal knowledge, such as is provided by Bay.  See Fed. R. Evid. 901(b)(1), 1006.  Second, the document is not hearsay since it is not offered for the truth, but rather to prove the mere existence of underlying facts.  Fed. R. Evid. 801(c).

D.      Apportionment of Damages

It is undisputed that Aviva has not paid any funds on behalf of Flintkote's defense or to indemnify Flintkote.  Flintkote argues that the primary insurance policy, with an "other insurance" clause, compels a rule of horizontal exhaustion, whereby primary policies must exhaust before excess policies are implicated.  Specifically, it solicits a rule whereby Aviva is to share proportionally with other primary policies until the other primary policies become exhausted or not collectible.  If the other primary policies are exhausted or not collectible, Aviva would then be responsible for the per-occurrence claim limit before excess policies are implicated.  Implicitly, then, Flintkote argues that *no* excess insurer is implicated until *all* primary insurance is exhausted.  Aviva, on the other hand, argues that equity requires the "other insurance" provisions be ignored and that the court fashion a rule of vertical exhaustion, whereby excess insurers that are specifically linked to

United States District Court

For the Northern District of California

1   particular primary insurers be considered primary coverage upon exhaustion of the linked-to primary

2   insurers.

3

4

5           1.      "Other Insurance"

6           As a preliminary matter, Flintkote is correct to argue that "other insurance" clauses do not

7   serve to reduce obligations to a policyholder.  See Dart Industries, Inc. v. Commercial Union Ins.

8   Co., 28 Cal. 4th 1059, 1080 (2002) ("apportion[ment] pursuant to the 'other insurance' clauses . . .

9   or under the equitable doctrine of contribution . . . has no bearing upon the insurers' obligations to

10  the policyholder." (citation omitted)).  Here, however, Flintkote is not exclusively pursuing damages

11  on its own behalf.  Flintkote is also pursuing claims for indemnification and contribution on behalf

12  of excess insurers and other primary insurers.  Thus, the "other insurance" clause plays a paramount

13  role here.  Indeed, the gravamen of this action is which insurer shall pay what.

14          Historically, "other insurance" clauses were designed to prevent multiple recoveries when

15  more than one policy provided coverage for a given loss.  Fireman's Fund Ins. Co. v. Maryland Cas.

16  Co., 65 Cal. App. 4th 1279, 1304 (1998).  Where such clauses are in effect, each insurer's ultimate

17  liability "is generally determined by the explicit provisions of the respective 'other insurance'

18  clauses."  Continental Cas. Co. v. Pacific Indem. Co., 134 Cal. App. 3d 389, 394 (1982).  "[T]he

19  application of 'other insurance' clauses requires, as a foundational element, that there exist multiple

20  policies applicable to the *same loss*."  Fire Ins. Exch. v. American States Ins. Co., 39 Cal. App. 4th

21  653, 660 (1995).  These several insurers must insure the same risk at the same *level* of coverage.  For

22  the provision to apply, it is imperative that the insurers cover the same risk at the same level.  In

23  other words, an "other insurance" dispute cannot arise between excess and primary insurers.  Dart,

24  28 Cal. 4th at 1079.  Here, there is no dispute that Aviva, along with American Mutual and Liberty

25  Mutual, is responsible for primary coverage of asbestos bodily injury claims.  This court has already

26  determined that "Aviva is a primary insurer in this action."  Flintkote IV, 480 F. Supp. 2d at 1180.

27  Indeed, there are no underlying limits listed anywhere in the policy that would make this policy an

28  excess policy.  Further, the court has also held that Aviva breached its defense and indemnity

18

United States District Court

For the Northern District of California

1   obligations with respect to past claims for covered injuries.  Id. at 1174, 1175–76.  The court now

2   discusses how to calculate the amount of this liability.

3          The Aviva policy states:

4          G. If the Insured has other insurance against a loss covered by this policy, the Insurer
           shall not be liable for a greater proportion of such loss than the applicable limit of

5          liability bears to the total applicable limit of liability of all valid and collectible
           insurance against such loss. Excess insurance shall not be considered as valid and

6          collectible I-nsurance until such time as the limit of primary insurance has been
           exhausted as the result of a loss.

7
    Bay Dec., Exh. 2 at 5, ¶ G of Conditions.  The first clause here—the "other insurance" clause—is a

8
    pro-rata clause which shares equally with other primary insurance.  See Am. Continental Ins. Co. v.

9
    Am. Cas. Co. of Reading, Pa., 73 Cal. App. 4th 508, 515 (1999).  The "other insurance" clause,

10
    however, could be in conflict with the "other insurance" clauses of the other primary insurers.

11
    Therefore, the court analyzes the "other insurance" clauses in the other primary insurance policies in

12
    order to determine the amount of "collectible insurance" applicable to Flintkote's policy with Aviva.

13
           The term "collectible insurance" as used in an "other insurance" clause means coverage

14
    available to the insured under insurance provided by another insurer.  Hellman v. Great Am. Ins.

15
    Co., 66 Cal. App. 3d 298, 304 (1977).  If the other policies contain an "other insurance" clause that

16
    purports to limit or exclude coverage, insurance thereunder is technically not "collectible."  CSE Ins.

17
    Group v. Northbrook Prop. & Cas. Co., 23 Cal. App. 4th 1839, 1845 (1994).  Thus, a host of issues

18
    arise where overlapping liability insurance policies covering the same risk at the same level have

19
    conflicting "other insurance" provisions.  According to Flintkote's declarations, all of its policies

20
    with American Mutual have one or more of the following "other insurance" clauses:

21
           •      If the insured has other insurance against a loss covered by this policy the company

22                shall not be liable under this policy for a *greater proportion* of such loss than the
                  applicable limit of liability stated in the declarations bears to the total applicable limit

23                of liability of all valid and collectible insurance against such loss.  Bay Dec., Exh. 3
                  at 11, Table Entry C-1 (emphasis added).

24
           •      If the Insured has any other insurance, prior or subsequent, whether valid or not, or by

25                solvent or insolvent insurers, against a loss covered by this Policy, he shall recover on
                  this Policy no *greater proportion* of the loss sustained than the sum thereby insured,

26                in respect of such loss, bears to the whole amount of insurance applicable thereto.
                  Id., Table Entry C-2 (emphasis added).

27
           •      The insurance afforded by the policy shall be *excess* over any other valid and

28                collectible insurance issued to the insured.  Id., Table Entry C-3 (emphasis added).

United States District Court

For the Northern District of California

- The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance. When both this insurance and other insurance apply to the loss on the same basis, whether primary excess or contingent, the company shall not be liable under this policy for a *greater proportion* of the loss than that stated in the applicable contribution provision below: (a) Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a *greater proportion* of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid. (b) Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares the company shall not be liable for a *greater proportion* of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss. Id. at 11–12, Table Entry C-5 (emphases added).

Similarly, Flintkote's policies with Liberty Mutual contain one or more of the following "other insurance" provisions:

- Bay Declaration, Exhibit 3 at 11–12, Table Entry C-5, as described immediately above.

- With respect to losses to which this policy applies, this policy does not apply to that portion of the loss for which the "insured" has other valid and collectible insurance, whether on a primary, excess or contingent basis unless such insurance was specifically purchased by the "named insured" to apply in *excess* hereof. Id. at 12, Table Entry C-7 (emphasis added).

- If the insured has other insurance against a loss covered by this policy, the company shall not be liable to the insured hereunder for a *greater proportion* of such loss than the amount which would have been payable under this policy, had no such other insurance existed, bears to the sum of said amount and the amounts which would have been payable under each other policy applicable to such loss, had each such policy been the only policy so available. Id. at 15, Table Entry C-23 (emphasis added).

- If other collectible insurance with any other Insurer is available to the Insured covering a loss also covered by this policy (except insurance purchased to apply in excess of the insurance afforded by this policy), the insurance afforded by this policy shall be in *excess* of, and shall not contribute with, such other insurance. In the event of other concurrent insurance by or for or inuring to the benefit of the Insured with any other insurer covering operations also covered by this policy (except insurance purchased to apply in excess of the insurance afforded by this policy), the insurance afforded by this policy shall be in *excess* of such insurance (unless this policy is intended by, or required of, the named insured to be primary), and shall, in any event, cover the named insured on a primary basis to the extent that the insurance afforded under this policy exceeds those coverages available on such other insurance. If the Insured carries other insurance with the Company covering a loss also covered by this policy, the Insured must elect which policy shall apply, and the Company shall be

1
2
3
4

liable only under the policy so elected; but in no event shall the liability of the Company exceed the limits of liability hereunder, except that, where this policy functions as *excess* over any such other insurance carried with the company, then liability hereunder is limited to an amount sufficient to give the Insured a combined amount of protection in respect of the insured hazard equal to the limits of this policy. Id. at 15–16, Table Entry C-24 (emphases added).

Most of the "other insurance" provisions above contemplate pro-rata distribution. To the extent that any of the "excess" provisions in these primary policies are "escape clauses"—clauses that extinguish an insurer's liability when other valid and collectible insurance exists, to the extent of such other insurance—they are void as a matter of public policy. Dart, 28 Cal. 4th at 1079–80 ("'other insurance' clauses that attempt to shift the burden away from one primary insurer wholly or largely to other insurers have been the objects of judicial distrust"). In any event, to the extent that the clauses do not envision pro-rata distribution, but are conflicting, "the modern trend [with conflicting 'other insurance' clauses] is to require equitable contributions on a pro-rata basis from all primary insurers regardless of the type of 'other insurance' clause in their policies." Id. at 1080. Thus, both a plain reading of the first clause in the "other insurance" provision of Aviva's policy with Flintkote and an application of equitable principles to that clause require pro-rata distribution amongst primary insurers.

In sum, the distribution of liability shall be pro-rata according to the applicable per-occurrence policy limits of the primary insurance. Thus, according to the terms of its policy, with respect to covered losses, Aviva "shall not be liable for a greater proportion of such loss than the applicable limit of liability bears to the total applicable limit of liability of all valid and collectible insurance against such loss." Bay Dec., Exh. 2 at 5, ¶ G of Conditions. The plain meaning of "applicable limit of liability" is the limits on liability stated in the insurance policy. Since there are no aggregate limits stated in the Aviva policy, the court must use the per-occurrence limit. For example, if Aviva's policy provides for a $100,000 per occurrence limit and the other primary insurers provide for per occurrence limits of $500,000 and $1,000,000 respectively, then Aviva's share of any damages claim will be $100,000 / [$100,000 + $500,000 + 1,000,000] = 1/16. Thus, for a $800,000 claim, Aviva would be responsible for $50,000.

Flintkote proposes an alternate calculation, whereby the amount of indemnification is determined by the amount of the claim. Flintkote simply states, without explanation, that it "makes

21

sense" to add up the sum each policy *would have paid* on a claim as if it were the sole responding policy and then to apportion accordingly. Mot. at 9. Continuing the example from above, if each primary insurer was the sole responding policy, Aviva would have paid $100,000 and the two other primary insurers would have paid $500,000 and $800,000 respectively. Proportionally then, Aviva's share would be $100,000 / [$100,000 + $500,000 + $800,000] = 1/14, or $57,143. The court, however, rejects this approach as Flintkote has not presented any evidence as to the superiority of this method of calculation.

Flintkote's arguments that its proposed method takes into account both American Mutual's insolvency and consumption of the primary policies are both equally as applicable to the calculation method set forth by the court above. Under the standard set forth above, American Mutual's insolvency merely resets their per occurrence limit to $0. Specifically, Aviva can at most retain the benefit of what was actually recovered from American Mutual, its estate and guarantors, but cannot avail itself of coverage and funds not collectible by reason of the insolvency. Second, to the extent that the aggregate limits of the other primary policies were *prematurely* exhausted due to Aviva's non-payment, that action shall not reduce the other primary policies' limits for subsequent claims. In essence, the calculations are to be performed as though Aviva had never breached and once the other primary policies are exhausted, their per occurrence limit shall only then be reset to $0. It is worth noting that the aggregate limits are to take into account other non-asbestos related claims as covered by the policies if and when they accrue.

### 2.    Horizontal versus Vertical Exhaustion

As stated above, the Aviva policy states:

> G. If the Insured has other insurance against a loss covered by this policy, the Insurer shall not be liable for a greater proportion of such loss than the applicable limit of liability bears to the total applicable limit of liability of all valid and collectible insurance against such loss. Excess insurance shall not be considered as valid and collectible Insurance until such time as the limit of primary insurance has been exhausted as the result of a loss.

Bay Dec., Exh. 2 at 5, ¶ G of Conditions. This second clause here—the "excess insurance" clause—demonstrates that the policy in question is a primary insurance policy. Furthermore, the clause is consistent with the provisions of umbrella excess policies—those that provide excess

**United States District Court**
For the Northern District of California

1   coverage only when *all* primary policies are exhausted—because the clause requires exhaustion of

2   primary insurance.  The ambiguity arises with respect to *specific* excess insurance—policies that

3   provide excess coverage *only* over specified primary policies—because the specific excess policies

4   provide coverage as soon as the particular underlying primary policy is exhausted and does not

5   require exhaustion of all primary policies.  Consequently, the question the court must answer is this:

6   Does the "excess insurance" clause above require that all primary insurance be exhausted before

7   *specific* excess policies are considered "collectible insurance"?

8          The court answers this question in the negative.  When read in context, the provisions above

9   are discussing the implications of the existence of other insurance upon the coverage afforded by

10  Aviva's policy.  Specifically, "collectible insurance" refers to the other insurance in place alongside

11  Aviva's policy.  The policy then goes on to exclude excess insurance if primary insurance has not

12  been exhausted.  This excess insurance, when being discussed in the context of other insurance, must

13  necessarily refer to excess insurance that is excess to primary policies other than the Aviva policy.

14  Any excess policy that is in excess to Aviva's policy, whether specific or general, is irrelevant to this

15  section because for that excess policy to be triggered, Aviva must have already exhausted its per-

16  occurrence limit with respect to the underlying claim.  Thus, by definition, exhaustion of the Aviva

17  policy is not required to implicate excess policies that only depend upon exhaustion of other primary

18  policies.  In sum, specific excess policies can be considered "collectible insurance" as soon as the

19  relevant underlying primary policies are exhausted.  Then, the indemnification rules set forth above

20  would apply to the excess insurer as well and Aviva would share with the excess insurer.

21          Flintkote's argument that the following passage requires horizontal exhaustion is without

22  merit:

23          Inasmuch as the insurance provided by this policy is not the sole insurance applicable
to the risks insured by this policy, the Insured's right of recovery against any person
24          or other entity cannot be exclusively subrogated to others.  It is, therefore, agreed that
in case of any payment hereunder, the Insurers will act in concert with all other
25          interests concerned (including the Insured) in the exercise of such right of recovery.
The apportioning of any amounts which may be so recovered shall follow the
26          principle that any interests (including the Insured's) that shall have paid amounts in
excess of this policy shall first be reimbursed up to the amount paid by them; the
27          Insurers are then to be reimbursed out of the balance of the recovery then remaining
up to the amount paid hereunder.

28

1   Bay Dec., Ex. 2 at 5, ¶ I of Conditions.  This provision, however, is only applicable "in case of any

2   payment hereunder."  This event has not occurred.  Consequently, this provision is currently

3   inapplicable, though it does state that in case of a recovery from others of monies paid by Aviva,

4   Aviva shall be reimbursed last.

5         The court will now delineate the standard for an excess policy to be considered a specific

6   excess policy as opposed to a general excess policy.  The court adopts the following rule set forth by

7   Judge Croskey:

8         Absent a provision in the excess policy *specifically describing* and *limiting* the
       underlying insurance, a horizontal exhaustion rule should be applied in continuous

9       loss cases because it is most consistent with the principles enunciated in Montrose. In
       other words, all of the primary policies in force during the period of continuous loss

10      will be deemed primary policies to each of the excess policies covering that same
       period. Under the principle of horizontal exhaustion, all of the primary policies must

11      exhaust before any excess will have coverage exposure.

12   Community Redevelopment Agency v. Aetna Cas. & Sur. Co., 50 Cal. App. 4th 329, 340 (1996).

13   The court now applies this rule to the excess policy entered into between Flintkote and The Hartford

14   Insurance Group.  See Chen Dec., Exh. M.[5]

15         The Hartford insurance policy purports to "indemnify the **insured** for **ultimate net loss** in

16   excess of the **underlying limit** . . . to which this insurance applies."  Id. at 1.  The underlying limit is

17   defined as "amounts of the applicable limits of liability of the underlying insurance as stated in the

18   Schedule of Underlying Insurance Policies less the amount . . . ."  The Schedule then lists various

19   policies.  The plain meaning of these provisions implies that this is a specific excess policy that

20   requires exhaustion only of the policies listed in the Schedule.

21         The only argument put forth by Flintkote that its excess policy with The Hartford Insurance

22   Group is a general excess policy is based upon language from the "other insurance" provision of the

23   policy.  However, as described above, the "other insurance" provision is only applicable if there

24   "exist multiple policies applicable to the *same loss*."  Fire Ins. Exch., 39 Cal. App. 4th at 660.

25   Specifically, the several insurers must insure the same risk at the same *level* of coverage.  Here, the

26   dispute arises between a primary insurer and an excess insurer.  Consequently, the "other insurance"

27   provision is not relevant to the analysis.  Here, the "other insurance" provision of the Hartford

28   Policy No. 10HU463359 states that:

24

> The insurance afforded by this policy shall be *excess* insurance over *any* other valid and collectible insurance (except when purchased specifically to apply in excess of this insurance) available to the Insured, *whether or not described in the Schedule of Underlying Policies*, and applicable to any part of ultimate net loss, whether such other insurance is stated to be primary, contributing, excess or contingent . . . .

Chen Dec., Exh. M at 5.  This provision in the excess policy, then, is an escape clause with respect to other *excess* policies in place.

In any event, even if this provision is construed by this court to apply to *all* insurance policies, whether excess or primary, Flintkote's argument nevertheless fails.  In Community Redevelopment Agency, the underlying limit in the excess policy was defined as "[a]n amount equal to the Limits of Liability indicated beside the underlying insurance listed in the Schedule of Underlying Insurance (Schedule A), *plus the applicable limits of any other underlying insurance collectible by the Insured . . . .*"  Id. at 335.  Judge Croskey held that:

> Those other provisions do not limit the coverage of the Scottsdale policy to only the "excess" over the State Farm limits, but expressly extends it to "the applicable limits of *any other underlying insurance* collectible by the [insureds]." (Italics added.) The only reasonable interpretation of this policy language is that the term "underlying insurance" must be read to include all available primary insurance, not just the policy expressly listed on the schedule of underlying insurance.

Id. at 341; see also Fireman's Fund Indemnity Co. v. Prudential Assurance Co., 192 Cal. App. 2d 492 (1961) (holding that the definition of ultimate net loss included unnamed primary policies).  Here, however, the offending language is found in the "other insurance" section of the policy, not as part of the definition of underlying limit or the ultimate net loss.  Indeed, neither definition mentions policies not listed in the "Schedule of Underlying Insurance Policies."  In this respect, the facts here are closer to Carmel Development Co. v. RLI Ins. Co., 126 Cal. App. 4th 502, 511 (2005).

In Carmel Development Co., the court held that defendant RLI's insurance was not a specific excess policy, but was a general excess policy, because the policy "asserted its role as excess over 'other primary, excess or excess-contingent insurance not scheduled on this policy as scheduled underlying insurance.'" 126 Cal. App. 4th at 511.  The court also found that

> Fireman's Fund, however, points out that its agreement to pay the "excess of Primary Insurance" was expressly made "subject to the other provisions of this policy." Fireman's Fund argues that through this conditional language the policy incorporated the "other insurance" clause, thereby making it, like the RLI policy, excess to both scheduled and unscheduled insurance. The plain language of the Fireman's Fund agreement, however, provided coverage to the insured upon exhaustion of the Reliance policy limits. Its insuring language did not clearly and unequivocally inform

25

1    the insured that it was excess over all other insurance, primary and excess, but buried
2    its limitation on the second to the last page in a generally worded "other insurance"
     clause, a condition generally accorded judicial disfavor.

3    Id.

4           It is impossible to reconcile the language of the policy purporting to be a specific excess

5    policy with the "other insurance" provisions of the policy.  Specifically, giving effect to the "other

6    insurance" provision would effectively nullify the Schedule of Underlying Insurance Policies and

7    turn the policy into a general excess policy.  Though the same result was sanctioned by Judge

8    Croskey in Community Redevelopment Agency, it is distinguishable to the extent that reference to

9    all other underlying primary insurance was made in the definition of underlying limit.  Here, this

10   reference is made in a stand-alone manner on the last page of the policy.  On the other hand, the

11   "other insurance" provision is far from buried and all provisions of the contract ought to be given

12   weight.  Indeed, the excess insurance contract is five pages in length, uses the same font throughout,

13   does not use footnotes and placed the "other insurance" provision under the Conditions section on

14   the signature page of the policy.  Furthermore, the coverage section of the policy specifically states

15   that indemnification is only available for losses in excess "to which this insurance applies."  Chen

16   Dec., Exh. M at 1.

17          In light of this competing evidence, this court is nevertheless unconvinced that this policy

18   was meant to be a general insurance policy.  Specifically, the stand-alone nature of the provision

19   purporting to make this policy a general insurance policy, along with no mention of other

20   unscheduled policies in the coverage section of the policy compels this result.  The court thus finds

21   the "other insurance" provision to be boilerplate, and consequently, the court holds that the parties

22   here intended a specific excess coverage policy.[6]

23          The court does not rule as to the nature of the other excess policies in place between

24   Flintkote and other insurers since those policies are not before the court.  As discussed above, the

25   determination cannot be made solely on the basis of the "other insurance" provision of the policies.

26   However, the court encourages the parties, based on the standard set forth above, to agree upon the

27   character of the excess policies, whether specific excess or general excess.  The court specifically

28   notes that under the standard espoused in Community Redevelopment Agency and Fireman's Fund

26

Indemnity Co., both discussed above, if the excess policy states it is in excess to "all other insurance" or has similar language, in either the underlying limit or the ultimate net loss sections of the policy, the excess policy is likely a general excess policy.

Excess policies which provide for *coverage for liability*, however, do not automatically "drop down" to become a primary policy upon exhaustion of the applicable primary policies. The excess policy nevertheless remains excess. Whether the excess policy "drops down" to the level of primary insurer, whereby the excess insurer assumes the obligations of the primary insurer, including defense obligations, depends on the provisions of the excess policy. At this time, the court makes no determination as to which excess insurers have the responsibility to "drop down"—an obligation distinct from the obligation to provide coverage—and act in the shoes of primary insurers in case the primary insurers' policies are exhausted. If an excess insurer is required to drop down and assume the responsibilities of a particular primary insurer upon the occurrence of certain events, then the excess insurer would be *considered a primary insurer* and the indemnification and defense costs rules set forth above with respect to primary insurers would apply. However, since the parties have not argued which specific excess insurers have the duty to drop down, the court reserves resolution of this question for another day.

Aviva argues that neither the provisions dealing with other insurance and excess insurance, nor the subrogation clause in the policy it has with Flintkote require that a rule of horizontal exhaustion be adopted. Aviva is correct to the extent that neither clause governs whether an excess insurer has the responsibility to "drop down" and take the place of a primary insurer. Indeed, the excess insurers have insurance policies with Flintkote which define the nature of their obligations to Flintkote. Aviva claims that because equity prevails, it overrides the terms of the insurance policies. As discussed above, that is indeed the case, and equity requires a horizontal pro-rata distribution. Equity does not implicate the excess insurers because the excess insurers do not insure the same risk as the primary insurers. Indeed, equity does not turn a primary policy into an excess one, or vice versa.

Aviva next relies on the "Conflicting Statutes" provision in the policy, which provides:

If any condition in this policy conflicts with any *specific statutory provision* in the province or state in which it is claimed that the Insured is liable for any such injuries

27

or loss as are covered by this policy, such specific statutory provision shall be substituted for such condition.

Bay Dec., Exh. 2 at 5, ¶ H of Conditions (emphasis added).  Aviva argues that if the "other insurance" or subrogation clause requires adoption of the horizontal rule, then they clash with California law and consequently cannot be given effect.  However, Aviva has not presented any specific statutory provision to this effect.  Consequently, this argument fails.

### 3.   Defense Costs

Flintkote proposes that defense costs be apportioned on a "per capita" basis, contending that each of the three primary insurers assume one-third of the defense costs.  Aviva claims these methods are inequitable and implores this court to consider the length of time the Aviva policy was in effect, its per-occurrence limits, the excess policies in place that have drop down responsibilities and its low policy premiums.  Specifically, the two other primary insurers, American Mutual issued seventy-one policies covering thirty-four years and Liberty Mutual issued fourteen policies covering nine years as compared with Aviva's sole policy covering three years.  Under Flintkote's method of defense cost allocation, the multiple policies issued by the other insurers would be compressed into a single defense share.  In its argument, Aviva seems to argue that a "time-on-risk" system of coverage ought to be adopted.  See Armstrong World Indus., Inc. v. Aetna Cas. & Surety Co., 45 Cal. App. 4th 1, 52–53 (1996).  Nevertheless, it states that it is not prepared to espouse any particular allocation method at this time.

This court agrees that a "per capita" allocation would be inequitable.  At the same time, the court does not agree that a "time-on-risk" system would be equitable given the continuos trigger rule that the court has already adopted with respect to Aviva's liability.  Consequently, the court holds that defense costs should be shared proportionally amongst the insurers with defense obligations that are found liable for *payment* of the underlying claim.  For instance, if Aviva is to pay $100,000 to satisfy the claim, and the other insurers with defense costs obligations are to pay $500,000, $200,000 and $800,000 respectively, then Aviva is responsible for $100,000 / [$100,000 + $500,000 + $200,000 + $800,000] = 1/16 of the defense costs.  The amount paid by other insurers, whether excess or otherwise, who do not have defense obligations to Flintkote, is irrelevant.  Furthermore, to

1   the extent that an insurer with defense obligations is insolvent or unable to meet its full obligation,

2   the amount of actual payment shall be used in the calculation.

4   F.      Other Matters

5         The court now disposes of Aviva's other non-meritorious arguments.  First, the court can

6   easily dismiss Aviva's claim that to the extent that excess insurer's paid before Aviva did, they did

7   so as volunteers.  Accepting this argument, made without supporting legal authority, would turn

8   insurance law on its head.  Specifically, Aviva claims that it should be rewarded for not paying the

9   claims when it was required to do so under the terms of its policy with Flintkote.  Further

10  demonstrating the absurdity of this argument, Aviva claims that the excess insurers who did pay—to

11  cover for Aviva's share of the liability—should be punished for performing responsibly.  The court

12  will not indulge this argument any further.

13        Second, Aviva argues that Flintkote should be judicially estopped from pleading that excess

14  carriers have no duty to drop down vertically.  They premise this argument on the fact that this

15  position is inconsistent with Flintkote's position in a related litigation against other insurers.  See

16  Chen Dec., Exh. N (Flintkote's trial brief in Mt. McKinley Ins. Co. v. The Flintkote Company, Case

17  No. 407641 at the San Francisco Superior Court).  There, with respect to a settlement agreement

18  interpretation, Flintkote argued against horizontal exhaustion and in favor of vertical exhaustion.

19  This position with respect to the interpretation of a settlement agreement, however, is not "clearly

20  inconsistent" with its current position interpreting the underlying insurance policies at issue.  See

21  Chen Dec., Exh. V at 13 (trial court decision interpreting the parties' responsibilities under the

22  settlement agreement).  Consequently, judicial estoppel does not apply.  See New Hampshire v.

23  Maine, 532 U.S. 742, 749 (2001) (requiring "clearly inconsistent" positions for judicial estoppel to

24  apply).

25        Finally, Aviva's argument that equity demands that the court impute an aggregate limit into

26  the policy in question is preposterous.  Aviva had the option of becoming a signatory to the

27  Wellington Agreement and it declined.  Aviva argues that Flintkote has reached agreements with

28  other non-aggregate limit insurers imputing an aggregate limit to those policies.[7]  Aviva wants the

United States District Court

For the Northern District of California

same treatment.  Aviva ignores the fact that it has, to this day, the option of entering into a

settlement with Flintkote.  However, instead of reaching an agreement with Flintkote, Aviva chooses

to continue litigating this action while demanding the court provide it with equitable remedies that

are more favorable or as favorable as any settling party.  Aviva, having chosen to make a bargain

whereby it was to insure Flintkote, cannot now hide under alleged drafting errors that neglected to

include an aggregate cap or actuarial errors that caused the policy premium to be too low.  When

determining who shall be financially responsible for unforeseen liabilities incurred under an

insurance policy, the answer must be the insurer who wrote the policy and received the premium, not

the insured who paid the premium for the insurance coverage.


CONCLUSION

With respect to Aviva's motion for summary judgment, the court finds that: (1) Flintkote is

directly harmed by Aviva's failure to pay on past claims insofar as other insurance is prematurely

exhausted and is unavailable to pay on future claims; (2) under recently executed settlement

agreements containing undisputed assignments, as well as under the Wellington Agreement and

others like it, Flintkote has the authority to assert claims on behalf of its other insurers to recover

amounts those insurers paid in lieu of Aviva; and (3) the claims of the other insurers are equitably

tolled.

With respect to Flintkote's motion for summary judgment, the court adopts a standard to

determine damages as described above.


IT IS SO ORDERED.


Dated: June 17, 2008                          _____

                                             MARILYN HALL PATEL
                                             United States District Court Judge
                                             Northern District of California

ENDNOTES

1.    The same policy is also numbered L-90-4672.

2.    Aviva seems to argue that Flintkote's course of performance has somehow changed the character of the insurance policy between the parties.  However, not only did Flintkote provide Aviva with annual litigation summaries, but it explicitly invited Aviva to be part of the Wellington Agreement and Aviva refused.  This behavior is not consistent with Aviva's argument that Flintkote did not believe that Aviva was responsible for asbestos claims against Flintkote.

3.    The parties agreed that coverage excluded: (1) claims resulting from exposure to asbestos after January 1, 1961, the end of the policy period; (2) claims where the employee had workers compensation benefits; and (3) claims for injuries sustained in connection with vehicles and equipment.  Flintkote IV, 480 F. Supp. 2d at 1172.

4.    Aviva objects to Exhibit B of Bay's declaration, which attaches a copy of the insurance policy at issue here.  Aviva seems to be contesting Bay's declaration only to the extent that he characterizes the policy attached as the exhibit to be a "certified copy."  However, since the objection does not argue that the terms of the policy are improperly demonstrated by the exhibit, the court nevertheless relies upon it for the policy's terms and conditions.  Indeed, Aviva itself submits the *exact same* policy as Exhibit U to Chen's declaration, albeit without the "certified copy" designation.  Aviva is warned that the court does not look favorably upon antics designed to delay the litigation, harass opposing counsel and needlessly consume judicial resources.

5.    The following analysis assumes that a valid assignment was made from The Hartford Insurance Group to Flintkote.

6.    Travelers Cas. & Surety Co. v. Transcontinental Ins. Co., 122 Cal. App. 4th 949, 955–59 (2004), does not compel a different result.  Though the court there gave weight to the "other insurance" provision and found that "provision constitutes a condition to *payment of claims* when coverage exists," the issue in that case was the duty to defend.  Id. at 956.

7.    Aviva does not argue that imputing these aggregate caps to the other insurance providers has led to an increase in its own duty to indemnify or defend.

### APPENDIX: Supplemental Questions

1.  What proportion of Flintkote's past paid claims has been paid or otherwise reimbursed by insurers other than Aviva?  In other words, what proportion of claims has Flintkote itself paid out of pocket?

2.  How many of Flintkote's insurance policies have already been exhausted, and for those that have not been exhausted, how soon is it expected that they will exhaust?

3.  Can Flintkote's direct damages be estimated with reasonable certainty?  What additional information or data would be required to estimate the damages with reasonable certainty?

4.  What communications regarding the payment of claims have occurred between Aviva and the other insurers, either directly or through Flintkote?  When did the communications begin and at what frequency did they continue?

5.  In apportioning damages equitably, what factors should the court consider relevant and what effect should they have upon the court's analysis?

6.  With respect to specific excess insurance, can it be considered "collectible" if the per-occurence limit of the relevant underlying primary policies is prematurely exhausted due to Aviva's breach?