1

2

3

4

5

6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE FLINTKOTE COMPANY, a Delaware
Corporation,

        Plaintiff,

    v.

GENERAL ACCIDENT ASSURANCE
COMPANY OF CANADA, a Canada
insurance company; GENERAL ACCIDENT
FIRE AND LIFE ASSURANCE
CORPORATION LIMITED OF PERTH,
SCOTLAND, a Scotland insurance company;
and DOES 1 through 10,

        Defendants.
_____/

No. C 04-01827 MHP

**OPINION**

**Re: Aviva's Motion for Summary Judgment
Regarding Assignments; Flintkote's Motion
to Streamline its Damages Presentation at
Trial**

        On April 14, 2004 plaintiff the Flintkote Company ("Flintkote") filed an action in San

Francisco Superior Court against defendants General Accident Assurance Company of Canada and

General Accident Fire and Life Assurance Corporation Limited of Perth, Scotland, predecessors of

Aviva Insurance Company of Canada (aka "Aviva").  The complaint alleged breach of contract for

defendants' failure to defend or indemnify plaintiff for claims covered under a primary insurance

policy issued to two of plaintiff's subsidiaries.  Defendants removed the action to this court.  Now

before the court are Aviva's "Motion for Summary Judgment Regarding Assignments" as well as

Flintkote's "Motion to Streamline Damages Presentation at Trial."  The court has considered the

parties' arguments fully, and for the reasons set forth below, the court rules as follows.

28

United States District Court

For the Northern District of California

BACKGROUND

Plaintiff Flintkote, presently based in San Francisco, is a company that formerly mined and sold asbestos and asbestos-based products. Flintkote sought bankruptcy protection in 2004 as a result of its exposure to asbestos-related lawsuits. Flintkote asserts that between 1988 and 2004, it defended and paid over 270,000 asbestos tort claims at a cost of approximately $630 million.

This action concerns an insurance policy that Flintkote purchased from defendant Aviva to cover general commercial liability, including liability for asbestos-related bodily injury claims. The Aviva policy, numbered L-90-5010,[1] was in force between January 1, 1958 and January 1, 1961. This policy has a $100,000 per occurrence limit and no aggregate limit. There is no dispute that the Aviva insurance policy is a primary insurance policy.[2] Flintkote brings the present action to recover from Aviva defense and liability costs paid out as a result of asbestos-related tort claims brought against Flintkote.

In addition to the Aviva policy, between 1942 and 1985 Flintkote purchased over 200 policies from some 30 separate insurance companies. Like the Aviva policy, policies issued by Liberty Mutual and American Mutual are primary insurance policies. The remaining policies are excess insurance policies.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

United States District Court

For the Northern District of California

1    Once the moving party meets its initial burden, the nonmoving party must go beyond the

2    pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

3    genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving

4    party's allegations. Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The

5    court may not make credibility determinations, and inferences to be drawn from the facts must be

6    viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker

7    Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249. The moving party may "move

8    with or without supporting affidavits for a summary judgment in the party's favor upon all or any

9    part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing affidavits shall be made on personal

10   knowledge, shall set forth such facts as would be admissible in evidence, and shall show

11   affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P.

12   56(e).

13

14   DISCUSSION

15   I.    AVIVA'S MOTION FOR SUMMARY JUDGMENT

16   Aviva's motion, styled as a "Motion for Summary Adjudication Regarding Assignments,"

17   raises a host of interrelated issues concerning the scope of damages claimed by Flintkote. These

18   issues can generally be grouped into three categories. First, Aviva argues that because all of

19   Flintkote's past claims have been covered and in fact paid or reimbursed by other insurance,

20   Flintkote has suffered no direct damage as a result of Aviva's breach and complete failure to pay.

21   Second, given that Flintkote's liability has been paid or reimbursed by other insurance, Aviva argues

22   that Flintkote's only claims for damages are as an assignee of the primary insurers' claims for

23   contribution or as an assignee of the excess insurers' claims for subrogation. Aviva argues that only

24   a small number of primary and excess insurers have made valid and enforceable assignments, and

25   therefore, amounts recoverable by Flintkote are limited accordingly. Third and finally, insofar as

26   there have been valid agreements assigning to Flintkote the claims of other insurers, Aviva argues

27   that those claims are subject to a statute of limitations which should not be equitably tolled. The

28   court discusses each of these three issues below.

United States District Court

For the Northern District of California

A.      Flintkote's Direct Damages

Aviva argues that Flintkote has suffered no direct damage because although Flintkote has incurred liability for past asbestos claims, that liability has been paid or otherwise reimbursed by Flintkote's other insurers.  Even assuming that all past claims have been covered by other insurance policies, a fact which Flintkote disputes, Flintkote argues that it nevertheless suffers direct damages as a result of Aviva's breach.  Flintkote argues that it suffers direct damage related to *future* claims insofar as additional insurance which would have otherwise been available has been prematurely exhausted as a direct result of Aviva's failure to pay on *past* claims.

As a preliminary matter and to guide the discussion that follows, it is helpful to first summarize the court's prior orders in this action as they relate to the present motion.  In Flintkote v. Gen. Accident Assurance Co., 480 F. Supp. 2d 1167, 1172–74 (N.D. Cal. Mar. 13, 2007) (Patel, J.) (hereinafter "Flintkote IV"), the court addressed the question of when coverage under the Aviva policy is triggered.  This question turned on the interpretation of the term "injury" as used in the policy as well as when an "injury" could be considered to take place.  Id. at 1173–74.  The court concluded that coverage under the Aviva policy is triggered for "injuries arising from exposure during the policy period [between January 1, 1958 and January 1, 1961], as well as injuries resulting from exposure before the policy period that manifested or continued during the policy period," subject to certain exclusions.[3]  Id.  This theory of coverage is known as the "continuous trigger" theory.  Id. at 1173.

In Flintkote IV, the court concluded that for past claims, because Aviva did not provide any defense for asbestos bodily injury claims brought against Flintkote, and because Aviva failed to make any liability payments in connection with covered losses, Aviva had breached its duty to defend and indemnify.  Id. at 1174–76.  The court declared that Flintkote was entitled to recover for all past paid claims which were covered by the Aviva policy under the continuous trigger theory.  Id. at 1176.

Additionally, the court in Flintkote IV concluded that with respect to all pending and future claims covered under the continuous trigger theory, Aviva has a duty to defend and a duty to indemnify Flintkote.  Id. at 1174.  In Flintkote v. Gen. Accident Assurance Co., No. C 04-01827

MHP, 2006 WL 1867538 (N.D. Cal. July 5, 2006) (Patel, J.) (hereinafter "Flintkote III"), the court rejected Aviva's argument that declaratory relief as to future, unfiled asbestos claims was inappropriate because such claims were not actual "cases" or "controversies" pursuant to Article III of the U.S. Constitution.  Having found in Flintkote III that future, unfiled claims were sufficiently certain such that the court had jurisdiction to declare the rights of the parties even as to those claims, the court properly declared in Flintkote IV that Aviva owed a duty to defend and indemnify as to not only past and pending claims, but to future claims as well.

With this background in mind, it is apparent that under the continuous trigger theory, coverage under the Aviva policy, which was in effect from January 1, 1958 through January 1, 1961, may overlap with coverage under additional policies even if those policies were not in effect contemporaneously with the Aviva policy.  For example, assume Flintkote incurs liability for an asbestos claim in the year 1980.  Assume further that Flintkote has an insurance policy in effect for the year 1980 which covers Flintkote's liability for the claim.  If the 1980 claim arises from injuries incurred as a result of exposure to asbestos during the period in which Aviva's policy was in effect, then under the continuous trigger theory, the Aviva policy is also triggered by the claim.  Accordingly, both the Aviva policy and a second policy cover Flintkote's liability for the 1980 claim.  To be sure, the issue of when additional policies are triggered is not before the court and the court need not decide that issue.  The court only notes that, as is the case here, there exists an additional policy which shares overlapping coverage with the Aviva policy.

Given this type of overlapping coverage, the court agrees with Flintkote that Flintkote is directly harmed by Aviva's failure to pay on past claims, even if those past claims have been paid or otherwise reimbursed by other insurers.  This is because, as Flintkote argues and as the court agrees, where an insurer with unlimited aggregate liability breaches, and the gap is filled by an insurer whose performance reduces a liability policy with an aggregate limit, the insured suffers damage directly when the policy with an aggregate limit is unavailable to respond to later claims.  In other words, when a policy with aggregate limits pays a *past* claim that it would not otherwise have paid but for Aviva's breach, the limits of that policy are "prematurely exhausted."  Flintkote is directly

United States District Court

For the Northern District of California

1  harmed insofar as it can no longer rely on the policy with an aggregate limit to cover *future* claims

2  and is forced to pay the claim on its own.

3        To illustrate the nature of Flintkote's damages, the court finds it helpful to set forth the

4  stylized example described in Flintkote's opposition.  Assume an insured, which the court will label

5  F for Flintkote, has two primary insurance policies.  Assume that one of these policies, like the

6  Aviva policy, has a $100,000 per occurrence limit with no aggregate limit.  Label this policy as

7  policy A.  The other policy, which the court will label B, has a $700,000 per occurrence and

8  aggregate limit.  Assume further that F has five asbestos claims for $200,000 each, triggering

9  coverage under both policies A and B, and a sixth claim for $200,000 triggering only policy B.  As

10 already discussed above, a single claim may trigger two different policies in effect during different

11 time periods under the continuous trigger theory.  Now consider the following three scenarios:

12       **Scenario 1.**  Assume there is no breach by A and that A and B share the claims equally.

13 Each insurer will pay $100,000 per claim for a total of $1 million for the first five claims.  B will pay

14 $200,000 fully covering the sixth claim.  F is fully covered by the insurance purchased.

15       **Scenario 2.**  Assume instead that A is in total breach and refuses to pay any of the claims.  If

16 B steps forward to fill in the gap left by A, B will pay $200,000 on the first three claims, and

17 $100,000 on the fourth, thereby exhausting B's aggregate limit of $700,000.  F is forced to pay

18 $100,000 for the remainder of the fourth claim, plus $200,000 each for the fifth and sixth claims.

19 Compared to scenario 1, F pays a total of $500,000 it would not have otherwise paid had A not

20 breached the contract.  F has direct damages against A in the amount of $500,000.

21       **Scenario 3.**  Even if A begins paying on later filed claims and meets its obligations in full on

22 those later claims, F is still harmed by A's past breach.  Assume A refuses to pay the first three

23 claims, and is then forced, or decides, to pay beginning with the fourth claim.  B will exhaust its

24 limits on the fourth claim, just as in scenario 2.  On the fourth and fifth claims, A will pay its

25 $100,000 per occurrence limit, and will pay nothing on the sixth claim because that claim does not

26 trigger policy A.  F must still pay the remaining $100,000 on the fifth claim as well as $200,000 on

27 the sixth claim.  F incurs direct damages against A in the amount of $300,000 which, compared to

28 scenario 1, would not have been paid but for A's breach.

United States District Court

For the Northern District of California

Note that in both scenario 2 (in which A refuses to pay any of the claims) and scenario 3 (in which A refuses to pay on earlier-filed claims, but begins to pay on later-filed claims), F pays $200,000 on the sixth claim, whereas in scenario 1 (in which there is no breach by A), F pays nothing on the sixth claim. Note also, that under the assumptions of these examples, the sixth claim triggers only policy B. Under Flintkote's "premature exhaustion" theory of damages, F may recover from A the $200,000 F paid on the sixth claim, *even though the sixth claim does not trigger A's policy*. This is because, as illustrated in scenario 1, in the absence of any breach by A, the coverage amounts available under policy B are fully available to cover the sixth claim. However, when A breaches, either by failing to pay on some or all of the claims, coverage amounts available under policy B are "consumed" at an earlier time than they otherwise would have been had A not breached. As a result, F is faced with a sixth claim for which it has no available insurance to call upon and must pay the sixth claim on its own. The payment by F of the sixth claim is caused directly by A's refusal to pay on earlier-filed claims. Under Flintkote's "premature exhaustion" theory of damages, F is entitled to recover from A the $200,000 it pays on the sixth claim. Recovery of the amount paid on the sixth claim is through F's *breach of contract* claim against A, and is *not* through assignment to F of B's claim for *contribution* against A.

Flintkote's "premature exhaustion" theory as it applies to the unique circumstances of this case is a novel one that apparently has been neither adopted nor rejected by any court. Nevertheless, the conclusion that Flintkote is harmed by Aviva's past breach insofar as prematurely exhausted policies are unavailable to pay on future claims follows from straight-forward application of general principles of contract law. It is well-settled that "when one party breaches a contract the other party ordinarily is entitled to damages sufficient to make that party 'whole,' that is, enough to place the non-breaching party in the same position as if the breach had not occurred." Postal Instant Press, Inc. v. Sealy, 43 Cal. App. 4th 1704, 1708–09 (1996). These damages are limited to the extent that the damages are "proximately caused" by the breach and can be estimated with "reasonable certainty." Id. at 1709.

Here, as illustrated by the scenarios discussed above, Flintkote's harm does not occur but for Aviva's breach. The chain of causation is clear—Aviva breaches, additional insurance fills in the

gap left by Aviva, the additional insurance is prematurely exhausted and is unavailable to pay on subsequent claims, and therefore, Flintkote is on the hook for liability that would have otherwise been covered and paid by its insurers.  The court concludes that Flintkote's damages are "proximately caused" by Aviva's breach and could have been "reasonably contemplated or foreseen by both parties at the time they made the contract."  See Witkin, Summary of California Law, Contracts, § 814 (9th ed.); Cal. Civ. Code § 3300.

With respect to whether Flintkote's damages may be estimated with reasonable certainty, the court has already found that additional asbestos claims against Flintkote "will be filed in the future with a high degree of certainty."  Flintkote III, 2006 WL 1867538, at *5.  The court understands that Flintkote has provided Aviva with its monthly bills to insurers.  Fehner Dec., ¶ 3.  These bills lay out in detail what claims have been billed to which insurers and in what proportion.  Id.  Moreover, the court understands that Aviva has asked, and Flintkote has promised to gather, base-level payment records showing that the insurers in fact paid what they were billed.  These records, combined with reasonably certain information on the scope of Flintkote's liability for future claims, can form the basis of a reasonably certain estimate of Flintkote's direct damages.  "Reasonable, not mathematical certainty, is required for an award of damages; and where there is no uncertainty as to the *fact* of future damages, it is no objection to recovery that the *amount* cannot be exactly determined, or is subject to contingencies."  Witkin, Summary of California Law, Contracts, § 823 (9th ed.) (citing Noble v. Tweedy, 90 Cal. App. 2d 738 (1949)).


B.      Flintkote's Assignments

Separate and apart from Flintkote's direct damages for Aviva's breach of contract, Flintkote also asserts that as an assignee, it has the right to recover amounts other insurers paid in lieu of Aviva.  There is no question that Flintkote may recover on behalf of the other insurers insofar as Flintkote is the valid assignee of the insurers' rights.  Both a primary insurer's claim for contribution and an excess insurer's claim for subrogation are choses in action that are assignable to third parties. See Bush v. Superior Court of Sacramento County, 10 Cal. App. 4th 1374, 1380–82 (1992).

United States District Court

For the Northern District of California

In the stylized example set forth above, F seeks to recover on behalf of B, the amounts B overpaid as a result of A's breach. For example, in scenario 2 of the stylized example, B paid $200,000 each on the first three claims, whereas had A paid its share, B would have only paid $100,000 each. B, therefore, may assert a claim against A for contribution in the amount of $100,000 each for the first three claims, recovering $300,000 total.

As Flintkote recognizes, any recovery by insurer B against insurer A replenishes B's aggregate limits, so that additional funds are available to pay subsequent claims. Continuing with scenario 2 of the stylized example, if B is successful in recovering $300,000 from A, then additional monies are available for B to pay the remaining $100,000 on the fourth claim as well as $200,000 on the fifth claim. F, the insured, must still pay $200,000 on the sixth claim. This is direct damage to F as a result of breach by A, and as already discussed above, is recoverable by F from A. Note however, that because B has recovered $300,000 from A and has applied that recovery to payment of subsequent claims, F's claim for direct damages against A is now $200,000, not $500,000 as before where there was no recovery by B.

As is apparent from this example, the effect of any recovery by insurer B against insurer A is to offset the direct damages F may claim against A. Insofar as any recovery by B against A revives B's previously extinguished aggregate limits, and such recovery is applied to subsequent claims, B's recovery against A offsets one-for-one F's recovery against A for direct damages. In the end, A pays a total of $500,000—$300,000 to B via a claim for contribution, and $200,000 to F via a claim for breach of contract. This is the same amount A would have paid in scenario 1 had A not breached in the first place. B pays a total of $700,000, reaching its policy limits, and F is fully reimbursed any amounts it is paid. Each party—A, B, and F—is restored to the position it would have been in had A not breached. This is precisely the situation set forth in scenario 1.

Because any recovery from B against A is credited to B's policy limits, thereby offsetting F's claim for direct damages against A, there is no double recovery by F or double payment by A. Consider the situation in which B's recovery does *not* replenish B's policy limits. Continuing with scenario 2 of the stylized example, if A breaches by failing to pay any of the claims, F has a claim for direct damage in the amount of $500,000. If B also recovers $300,000 from A through a

United States District Court

For the Northern District of California

1  contribution claim, and this amount is *not* credited against F's claim for direct damages, A will have

2  paid a total of $800,000.  Insofar as Aviva argues that this constitutes impermissible double

3  recovery, this situation does not occur because as Flintkote recognizes and as the court concludes,

4  any recovery by B against A offsets F's recovery against A.  There is no double recovery.  If B does

5  not bring a claim for contribution against A, then F may recover $500,000 from A as direct damages.

6  If B does bring a claim for contribution against A, B recovers $300,000, reducing F's claim for

7  direct damages to $200,000.  In either event, A pays $500,000, the amount it would have paid had it

8  not breached in the first place.

9       Having set forth the nature of Flintkote's direct damages claim against Aviva, and having

10  clarified the relationship between that claim and the contribution claims of other insurers, the court

11  now turns to the question of whether the other insurers have given Flintkote valid assignments of

12  their claims, or have otherwise authorized Flintkote to pursue claims on their behalf.  Because the

13  other insurers are not parties to this action, Flintkote may only recover for amounts other insurers

14  paid in lieu of Aviva if those insurers validly assigned their claims to Flintkote or authorized

15  Flintkote to act on their behalf.

16       With regard to Flintkote's assignments, the two disputes between the parties are: (1) whether

17  recent settlement agreements containing valid assignments, but executed after the commencement of

18  this action, affect Aviva's obligations; and (2) whether the so-called "Wellington Agreement"

19  contains a valid assignment clause.  The court discusses each dispute below.

20                   1.      Recently Executed Agreements

21       Since this action was filed in 2004, Flintkote has entered into five separate settlement

22  agreements.  One of these agreements, executed on October 14, 2006, is between Flintkote and its

23  primary insurer Liberty Mutual.  See Ross Dec., Exh. E.  The other four agreements are between

24  Flintkote and various excess insurers.  They include:

25          1.      An agreement executed on September 14, 2007 with Highlands Insurance Company,
                   see id., Exh. F;
26
          2.      An agreement executed on November 1, 2007 with "Certain London Companies"
27                 including AXA Belgium f/k/a "Royal Belge Incendie-Reassurance" societe anonyme
                   d'assurances; Dominion Insurance Company Ltd.; Stronghold Insurance Company
28                 Limited; Terra Nova Insurance Company Limited n/k/a Markel International

United States District Court

For the Northern District of California

Insurance Company Limited; and Compagnie Euro-Belge de Reassurances S.A.; <u>see id.</u>, Exh. G;

3.  An agreement executed on February 4, 2008 with American Home Assurance Company, <u>see id.</u>, Exh. H.; and

4.  An agreement executed on January 18, 2008 with National Union Fire Insurance Company, L'Union Atlantique de Assurance S.A., and Granite State Insurance Company, Lexington Insurance Company; <u>see id.</u>, Exh. I.

All five agreements were executed after Flintkote filed for bankruptcy.  By their terms, they require approval by the bankruptcy court and are effective only upon such approval.

Aviva does not dispute that these agreements contain valid clauses assigning the insurer's rights to contribution and/or subrogation to Flintkote.  Aviva argues, however, that it has never received notice from Flintkote that it considers the five assignments part of the instant action, and therefore, Flintkote should not be allowed to assert those claims in this lawsuit.  Flintkote argues and the court agrees that although Aviva has been informed only recently of the new settlement agreements, Aviva has received proper notice of the claims Flintkote now asserts.  The second amended complaint filed on December 22, 2006 clearly states and puts Aviva on notice that Flintkote is asserting "claims for compensatory and consequential damages both directly *and as an assignee of other insurers*."  Second Amended Complaint, ¶ 12.  Aviva, therefore, has been on notice for quite some time that Flintkote intended to assert claims as an assignee of other insurers.  Aviva cannot now be heard to complain about notice regarding the assignments, even if those agreements were made recently.

Moreover, "[t]here is no general requirement as to when an assignment must be made and it has been held that even when the claim is not assigned until after the action has been instituted," the assignee may still maintain the action.  <u>See</u> Wright, Miller, and Kane, Federal Practice & Procedure, § 1545; <u>see also</u> <u>Eie Guam Corp. v. Long Term Credit Bank of Japan</u>, 322 F.3d 635, 650 (9th Cir. 2003) (approving a district court's exercise of jurisdiction where a foreign sovereign removed the case to district court on the basis of an assignment it received after the litigation commenced); <u>Donovan v. Wechsler</u>, 11 Cal. App. 3d 210, 214 (1970) (post-filing assignment cured any prematurity in filing of complaint as shown by evidence at trial).

2.    Wellington Agreement

In the 1980s, Flintkote, like many other producers of asbestos products, was engaged in coverage litigation with general liability insurers.  A large part of this industry-wide litigation ended when a number of parties reached a negotiated settlement, commonly referred to as the Wellington Agreement.  See Ross Dec., Exh. J.  The Wellington Agreement was named for Harry Wellington, then-Dean of the Yale University Law School who facilitated negotiations between the asbestos producers and their insurers.

This accord, signed in 1985 by numerous manufacturers and their insurers—including Flintkote and some of its insurers, not including Aviva—resolved persistent contribution and indemnity issues, thereby allowing for joint representation in thousands of pending asbestos-related lawsuits.  The Wellington Agreement provided for the creation of the Asbestos Claims Facility to analyze, defend and settle pending and future asbestos-related bodily injury claims referred to it by participating former asbestos producers.  In re National Gypsum Co., 208 F.3d 498, 502 (5th Cir. 2000).  Under the agreement, funding for the payment of settlements, judgments and legal expenses incurred in the defense of asbestos-related bodily injury claims against the party-producers was provided by the party-insurers.  Id.

But, like Aviva, not all insurers signed the agreement, causing gaps in coverage to arise where non-signatory insurer payments were called for.  Id.  Under the Wellington Agreement, party-insurers agreed to make gap-filling payments to cover the non-signatory insurers' share of defense and indemnity costs.  Id.  *It was recognized that this would cause the insurers to pay out their policy limits more quickly than they would if the non-signatory insurers were participating.*  Id.  In response, Section XX of the Wellington Agreement was designed to compensate signatory insurers for these interim payments.  Id.  Under Section XX, producers are required to use their best efforts to obtain coverage from non-signatory insurers.  Id.  To encourage producers to pursue non-signatory insurers, interest on gap-filler payments begins to accrue two years after payment is made.  Id.  The producer must thereafter pay interest quarterly until the earlier of (a) a settlement with or final judicial determination against the non-signatory insurer, or (b) the date on which the signatory insurer would have exhausted its policy limits if the non-signatory insurer had been a

12

participating party to the Wellington Agreement.  Id.  Moreover, under Section XX of the

Wellington Agreement, when a producer obtained a final judgment or settlement against a non-

signatory insurer, each signatory insurer was entitled to be reimbursed by the producer for the

amounts previously paid.      Aviva does not dispute that this was the arrangement effected by the

Wellington Agreement.  Indeed, Aviva recognizes that the consideration Flintkote gave to its

insurers in exchange for their payments was a promise to use its reasonable best efforts to pursue

additional insurance money, coupled with an agreement to return any money Flintkote thereby

obtained to the settling insurers.  Aviva argues, however, that whatever arrangement the Wellington

Agreement effected between Flintkote and its other insurers, that arrangement did not constitute an

assignment of claims from the insurers to Flintkote.

Aviva points out that one of the signatories to the Wellington Agreement, Employers

Insurance of Wasau, executed a later settlement agreement in September 1990 which states, "Wasau

retains all its rights to assert claims and to litigate against non-signatories for contribution or

indemnity with respect to payments made by Wasau, but this shall not modify or extinguish

Flintkote's obligation to use its reasonable best efforts to obtain insurance benefits from non-

signatories."  Ross Dec., Exh. K.  Aviva argues that reservation of rights clauses are contrary to an

intent to assign those rights to Flintkote.  The court agrees with Aviva that the Wellington

Agreement itself does not operate as a complete assignment of claims from insurers to Flintkote.

The Wellington Agreement does not use the term "assignment" and signatories to the Wellington

Agreement, such as Employers Insurance of Wasau, retained their rights to contribution and

subrogation.

Nevertheless, it is clear from the language of the Wellington Agreement itself that the parties

intended an arrangement whereby Flintkote would pursue non-signatory insurance companies for

reimbursement on behalf of the signatory insurers.  Signatory insurance companies may have

reserved rights to bring their own claims, but section XX of the Wellington Agreement evidences the

intent of the parties that as long as Flintkote was using its best efforts, signatories would not initiate

simultaneous lawsuits against non-signatories.  In the meantime, signatories would fill in gaps left

by non-signatories, and would be reimbursed by Flintkote in the event Flintkote was successful in

United States District Court

For the Northern District of California

obtaining payment from non-signatories.  While not a complete assignment of rights, there is a clear understanding among the parties that Flintkote would pursue claims against non-signatories such as Aviva on behalf of the signatories.  The court concludes that section XX of the Wellington Agreement gives Flintkote the authority to assert the contribution and subrogation claims of the other signatory insurers.

Although not cited by Flintkote, there are several cases that bolster Flintkote's position. These cases generally recognize that even in the absence of a *complete* assignment where the assignor relinquishes all rights to a claim, including the legal title to assert the claim and the substantive right to collect on any recovery, an assignee may still have a valid claim to assert.  In other words, arrangements short of a complete assignment have been recognized as valid.  See Sprint Comm'ns v. APCC Servs, 128 S. Ct. 2531 (2008) (assignees of payphone operators' claims against long distance carriers for 'dial-around' compensation had standing for purposes of Article III, even though monetary recovery from suit would be remitted to payphone operator); Klamath-Lake Pharmaceutical Assn. v. Klamath Med. Serv. Bureau, 701 F.2d 1276 (9th Cir. 1983) (retention by pharmacies of interest in outcome of action did not prevent pharmaceutical association from being treated as real party in interest for purposes of Federal Rule of Civil Procedure Rule 17(a)). Although a valid concern that may implicate case management issues, the threat of multiple suits by assignees and assignors who both retain sufficient interests in a claim does not by itself invalidate a partial assignment.  Furthermore, courts are fully capable of assuring there will be no double recovery.

C.      Statute of Limitations and Equitable Tolling of Assigned Claims

By limiting the time within which a plaintiff may bring a claim, statutes of limitations promote repose for defendants and encourage plaintiffs to diligently prosecute their claims.  Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 806 (2005).  Indeed, Flintkote only now seeks an adjudication of rights arising from claims tendered and paid by other insurers as long ago as 1982. Claims arising out of breach of "contract, obligation or liability founded upon an instrument in writing," as Flintkote's direct and assigned claims do, must be brought within four years of accrual.

14

Cal. Civ. Proc. Code § 337(1).  However, this is only the beginning of the inquiry; the statute requires a determination of when claims accrued.  The equitable subrogation claims accrued when the excess insurers paid the claims.

In Flintkote IV, the court ruled only that Flintkote's direct claims are equitably tolled because Aviva has sat on claims tendered by Flintkote and Aviva has neither paid nor denied Flintkote's claims.  480 F. Supp. 2d at 1177–79.  Aviva is correct that Flintkote IV did not concern equitable tolling of Flintkote's assigned claims from other insurers.  However, similar considerations that applied in Flintkote IV to equitably toll Flintkote's direct claim apply with equal force here to equitably toll Flintkote's assigned claims.

Equitable tolling runs after a timely claim for loss is tendered to the insurer while the insurer investigates the claim, until coverage is denied.  Prudential–LMI Commercial Ins. v. Superior Court, 51 Cal. 3d 674, 693 (1990).  The doctrine avoids the perverse possibility that an insured will have to file suit against its insurer before the claim is investigated or denied.  Id. at 692.  It also encourages insurers to diligently investigate claims before denying them, protects insureds from unwittingly forfeiting claims due to the statute of limitations, discourages unnecessary bad faith suits, and promotes prompt notice of claims to the insurer, thereby furthering and not frustrating the purposes of the statute of limitations.  Id.  The same concerns apply equally to claims brought by an insured against an insurer as well as one insurer against another insurer.

Here, Flintkote submitted monthly reports to Aviva showing claims against Flintkote and which insurers were billed for those claims.  Although the record does not reflect the extent of communications between Aviva and the other insurers, it is clear that Aviva was informed of payments made by other insurers.  As this court found in Flintkote IV, the ball has been in Aviva's court and Aviva has failed to give any response with respect to Flintkote's claims for breach of the duty to defend and indemnify and with respect to the other insurer's claims for contribution and subrogation.  The court acknowledges that Flintkote and the other insurers are not without fault insofar as claims were not asserted in court until 2004, but on balance, the court finds that the statute of limitations is equitably tolled because of Aviva's complete failure to respond.

United States District Court
For the Northern District of California

II.     FLINTKOTE'S MOTION FOR SUMMARY JUDGMENT REGARDING DAMAGES

Flintkote moves this court to clarify the allocation mechanism to be employed when determining the proportion of the asbestos bodily injury claims made against Flintkote for which Aviva is liable.  Flintkote argues that its primary policies must all be exhausted before excess policies have to pay.  Further, it argues that primary policies share only with other primary policies with overlapping coverage periods.  Aviva raises seven arguments in response.  First, Flintkote's motion is procedurally flawed.  Second, indispensable parties are absent from the proceedings.  Third, genuine issues of material fact preclude summary judgment.  Fourth, Flintkote's argument relies upon inadequate hypothetical allocation issues.  Fifth, Flintkote's excess carriers can become primary carries upon the occurrence of certain events.  Sixth, Flintkote's allocation methods are inequitable.  And seventh, an aggregate limit should be attributed to the Aviva policy.  The court first disposes of Flintkote's first, second and third arguments before setting forth an allocation formula.

A.     Procedural Appropriateness of Motion

Flintkote styled its motion as a "Motion to Streamline its Damages Presentation at Trial." Resolution of this motion depends primarily on interpretation of the "other insurance" provisions in the various contracts to which Flintkote is a party.  Aviva argues that this motion is premature for three reasons: first, it seeks an impermissible advisory opinion; second, the motion does not meet the procedural requirements of Rule 56 of the Federal Rules of Civil Procedure; and third, Flintkote is prematurely attempting to obtain an adjudication for pending and/or future asbestos bodily injury claims.  Consequently, Aviva argues, the motion must be denied.

First, Aviva argues that Flintkote's motion cannot ask for an advisory opinion.  However, by trying to fit this motion into a Rule 56 mold, Aviva misses the point.  This is a motion in the nature of a pretrial motion or a motion in limine to establish the parameters of the trial in this action.

Second, Aviva's arguments are foreclosed by the court's finding that this motion will be treated as a pretrial motion or a motion in limine.  Further, Aviva's arguments are also foreclosed by this court's prior rulings, which have invited motions to frame and narrow the issues presented by

this litigation.  Specifically, this court has stated: "[Claims of assignment], including any statute of limitations that may apply to them, should, along with the 'other insurance' provision, be addressed at the damages phase of this case." Flintkote IV, 480 F. Supp. 2d at 1181.  After having filed its motion regarding assignments and the applicable statute of limitations, Aviva cannot be heard to argue that issues with respect to the "other insurance" provisions are unripe.  Furthermore, at the Case Management Conference held on December 17, 2007, the court specifically allowed Flintkote to bring a motion of this nature. Fehner Reply Dec., Exh. 6 at 3:21–4:4 ("Actually, I don't care what you call it if it's a motion that will narrow the issues . . . Denominate it whatever you want to."). This motion is designed to narrow the issues, and consequently, the court does not give dispositive weight to the manner in which it is denominated.

Third, this court has already ruled that its decisions pertain to pending and/or future asbestos bodily injury claims.  See Flintkote III, 2006 WL 1867538, at *5 ("Defendants' argument in support of dismissal [of future claims] appears to be predicated on the absurd assumption that plaintiff must individually litigate defendants' obligations with respect to each asbestos-related lawsuit that is filed.").

In sum, Flintkote has properly brought this motion and the court will now consider it on the merits.

B.      Indispensable Parties

Aviva next argues, four years after commencement of the instant litigation, that The Flintkote Mines Limited and The Flintkote Company of Canada Limited are indispensable parties to the action.  These two companies are the named insureds on the Aviva policy at issue in this action.[4]  In support of this theory, Aviva's sole support is a district court opinion from 1961 holding that "[j]ustice between the parties before the Court cannot be adequately rendered without adjudicating the question of what interest [the non-appearing party] has (plaintiff, of course, contends that [the non-appearing party] has no interest in the proceeds of the policy). The final determination, if judgment is entered with [the non-appearing party] absent, may quite conceivably lead to a double recovery." Stenhouse v. Jacobson, 193 F. Supp. 694, 696 (N.D. Cal. 1961) (Halbert, J.).  However,

1    as discussed above, there are no issues of double recovery here.  Nor is there concern that other

2    parties will be precluded from bringing suit against Aviva due to this action.  Indeed, this action will

3    only adjudicate rights between Aviva and Flintkote, along with the parties Flintkote represents.

4           Furthermore, The Flintkote Company of Canada Limited has been subsumed into Flintkote.

5    As to The Flintkote Mines Limited, Aviva has not made even a cursory showing that any of the

6    numerous prongs of Federal Rule of Civil Procedure 19(a)(1)—the standard defining required

7    parties—cannot be met.

8           To the extent that Aviva's arguments are based on Flintkote's inability to pursue claims on

9    behalf of other insurers due to a lack of assignments, those arguments have been discussed and

10   rejected above.

11

12          C.      Genuine Issues of Material Fact

13          Aviva spends almost four pages of its brief discussing the infirmity of the facts offered by

14   Flintkote's declarant, John Bay.  Specifically, Bay makes claims regarding the number of claims

15   paid by Flintkote and Aviva's potential liability.  Aviva's declarant, Tyler Will, makes short order of

16   Bay's declaration and effectively demonstrates that Bay's declarations may be factually infirm.

17   However, none of Bay's factual declarations are in any way material to the motion at hand.  For the

18   court to determine a method of allocation—a legal issue—the court does not concern itself with the

19   number of claims paid and the exact dollar amounts involved therein.  Consequently, the court does

20   not consider any of Bay's declarations and overrules all of Aviva's objections to Bay's declaration

21   as moot.

22          A summary chart attached to the Bay declaration as exhibit three, however, is considered by

23   this court.  This chart lists the relevant "other insurance" clauses found in the insurance policies

24   Flintkote had with its insurers.  Both arguments made by Aviva in objection to this chart are

25   overruled.  First, the chart has been properly authenticated by a person having personal knowledge,

26   such as is provided in Bay's declaration.  See Fed. R. Evid. 901(b)(1), 1006.  Second, the chart is

27   offered for a non hearsay purpose, since it is not offered for the truth, but rather to prove the

28   existence of underlying facts.  Fed. R. Evid. 801(c).

18

**United States District Court**
For the Northern District of California

1    D.    Apportionment of Damages

2    It is undisputed that Aviva has not paid any funds on behalf of Flintkote's defense or to

3    indemnify Flintkote.  Flintkote argues that the Aviva primary insurance policy, with an "other

4    insurance" clause, compels a rule of horizontal exhaustion, whereby primary policies must exhaust

5    before any excess policies are implicated.  Specifically, it solicits a rule whereby Aviva is to share

6    proportionally with all other primary policies until the other primary policies become exhausted or

7    not collectible.  If the other primary policies are unavailable, Aviva would then be responsible for

8    the per-occurrence claim limit on its policy before excess policies are implicated.  Implicitly, then,

9    Flintkote argues that *no* excess insurer is implicated until *all* primary insurance is exhausted with

10   respect to a particular claim.  Aviva, on the other hand, argues that equity requires the "other

11   insurance" provisions be ignored and that the court fashion a rule of vertical exhaustion, whereby

12   excess insurers that are specifically linked to particular underlying primary insurers be considered

13   primary upon unavailability of the linked-to primary insurers.

14        1.    "Other Insurance"

15   As a preliminary matter, Flintkote is correct to argue that "other insurance" clauses do not

16   serve to reduce the insurer's obligations to a policyholder.  See Dart Indus., Inc. v. Commercial

17   Union Ins. Co., 28 Cal. 4th 1059, 1080 (2002) ("apportion[ment] pursuant to the 'other insurance'

18   clauses . . . or under the equitable doctrine of contribution . . . has no bearing upon the insurers'

19   obligations to the policyholder." (citation omitted)).  Here, however, Flintkote is not exclusively

20   pursuing damages on its own behalf.  Flintkote is also pursuing claims for contribution and/or

21   subrogation on behalf of other primary insurers and excess insurers.  Thus, the "other insurance"

22   clause plays a paramount role here.  Indeed, the gravamen of this action is which insurer shall pay

23   what.

24        Historically, "other insurance" clauses were designed to prevent multiple recoveries when

25   more than one policy provided coverage for a given loss.  Fireman's Fund Ins. Co. v. Maryland Cas.

26   Co., 65 Cal. App. 4th 1279, 1304 (1998).  Where such clauses are in effect, each insurer's ultimate

27   liability "is generally determined by the explicit provisions of the respective 'other insurance'

28   clauses."  Continental Cas. Co. v. Pacific Indem. Co., 134 Cal. App. 3d 389, 394 (1982).  "[T]he

19

United States District Court

For the Northern District of California

1   application of 'other insurance' clauses requires, as a foundational element, that there exist multiple

2   policies applicable to the *same loss*."  Fire Ins. Exch. v. Am. States Ins. Co., 39 Cal. App. 4th 653,

3   660 (1995).  These several insurers must insure the same risk at the same *level* of coverage.  For the

4   provision to apply, it is imperative that the insurers cover the same risk at the same level.  In other

5   words, an "other insurance" dispute cannot arise between excess and primary insurers.  Dart, 28 Cal.

6   4th at 1079.  Here, there is no dispute that Aviva, along with American Mutual and Liberty Mutual,

7   is responsible for primary coverage of asbestos bodily injury claims.  This court has already

8   determined that "Aviva is a primary insurer in this action."  Flintkote IV, 480 F. Supp. 2d at 1180.

9   Indeed, there are no underlying limits listed anywhere in Aviva's policy that would make its policy

10  an excess policy.  Further, the court has also held that Aviva breached its defense and indemnity

11  obligations with respect to past claims for covered injuries.  Id. at 1174, 1175–76.  The court now

12  discusses how to calculate the amount of this liability.

13         The Aviva policy states:

14         G. If the Insured has other insurance against a loss covered by this policy, the Insurer
           shall not be liable for a greater proportion of such loss than the applicable limit of
15         liability bears to the total applicable limit of liability of all valid and collectible
           insurance against such loss. Excess insurance shall not be considered as valid and
16         collectible Insurance until such time as the limit of primary insurance has been
           exhausted as the result of a loss.
17
18  Bay Dec., Exh. 2 at 5, ¶ G of Conditions.  The first clause here—the "other insurance" clause—is a

19  pro-rata clause which shares equally with other primary insurance.  See Am. Continental Ins. Co. v.

20  Am. Cas. Co. of Reading, Pa., 73 Cal. App. 4th 508, 515 (1999).  This "other insurance" clause,

    however, could be in conflict with the "other insurance" clauses of the other primary insurers.
21
22  Therefore, the court analyzes the "other insurance" clauses in the other primary insurance policies in

    order to determine the amount of "collectible insurance" applicable to Flintkote's policy with Aviva.
23
24         The term "collectible insurance" as used in an "other insurance" clause means coverage

25  available to the insured under insurance provided by another insurer.  Hellman v. Great Am. Ins.

    Co., 66 Cal. App. 3d 298, 304 (1977).  If the other policies contain an "other insurance" clause that
26
27  purports to limit or exclude coverage, insurance thereunder is technically not "collectible."  CSE Ins.

    Group v. Northbrook Prop. & Cas. Co., 23 Cal. App. 4th 1839, 1845 (1994).  Thus, a host of issues
28
    arise where overlapping liability insurance policies covering the same risk at the same level have

20

conflicting "other insurance" provisions.  According to Flintkote's declarations, all of its primary

policies with American Mutual have one or more of the following "other insurance" clauses:

- If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a *greater proportion* of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss.  Bay Dec., Exh. 3 at 11, Table Entry C-1 (emphasis added).

- If the Insured has any other insurance, prior or subsequent, whether valid or not, or by solvent or insolvent insurers, against a loss covered by this Policy, he shall recover on this Policy no *greater proportion* of the loss sustained than the sum thereby insured, in respect of such loss, bears to the whole amount of insurance applicable thereto. Id., Table Entry C-2 (emphasis added).

- The insurance afforded by the policy shall be *excess* over any other valid and collectible insurance issued to the insured.  Id., Table Entry C-3 (emphasis added).

- The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance. When both this insurance and other insurance apply to the loss on the same basis, whether primary excess or contingent, the company shall not be liable under this policy for a *greater proportion* of the loss than that stated in the applicable contribution provision below: (a) Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a *greater proportion* of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid. (b) Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares the company shall not be liable for a *greater proportion* of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.  Id. at 11–12, Table Entry C-5 (emphases added).

Similarly, Flintkote's primary policies with Liberty Mutual contain one or more of the

following "other insurance" provisions:

- Bay Declaration, Exhibit 3 at 11–12, Table Entry C-5, as described immediately above.

- With respect to losses to which this policy applies, this policy does not apply to that portion of the loss for which the "insured" has other valid and collectible insurance, whether on a primary, excess or contingent basis unless such insurance was specifically purchased by the "named insured" to apply in *excess* hereof.  Id. at 12, Table Entry C-7 (emphasis added).

- If the insured has other insurance against a loss covered by this policy, the company shall not be liable to the insured hereunder for a *greater proportion* of such loss than

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

the amount which would have been payable under this policy, had no such other insurance existed, bears to the sum of said amount and the amounts which would have been payable under each other policy applicable to such loss, had each such policy been the only policy so available. Id. at 15, Table Entry C-23 (emphasis added).

- If other collectible insurance with any other Insurer is available to the Insured covering a loss also covered by this policy (except insurance purchased to apply in excess of the insurance afforded by this policy), the insurance afforded by this policy shall be in *excess* of, and shall not contribute with, such other insurance. In the event of other concurrent insurance by or for or inuring to the benefit of the Insured with any other insurer covering operations also covered by this policy (except insurance purchased to apply in excess of the insurance afforded by this policy), the insurance afforded by this policy shall be in *excess* of such insurance (unless this policy is intended by, or required of, the named insured to be primary), and shall, in any event, cover the named insured on a primary basis to the extent that the insurance afforded under this policy exceeds those coverages available on such other insurance. If the Insured carries other insurance with the Company covering a loss also covered by this policy, the Insured must elect which policy shall apply, and the Company shall be liable only under the policy so elected; but in no event shall the liability of the Company exceed the limits of liability hereunder, except that, where this policy functions as *excess* over any such other insurance carried with the company, then liability hereunder is limited to an amount sufficient to give the Insured a combined amount of protection in respect of the insured hazard equal to the limits of this policy. Id. at 15–16, Table Entry C-24 (emphases added).

Most of the "other insurance" provisions above contemplate pro-rata distribution. To the extent that any of the "excess" provisions in these primary policies are "escape clauses"—clauses that extinguish an insurer's liability when other valid and collectible insurance exists, to the extent of such other insurance—they are void as a matter of public policy. Dart, 28 Cal. 4th at 1079–80 ("'other insurance' clauses that attempt to shift the burden away from one primary insurer wholly or largely to other insurers have been the objects of judicial distrust"). In any event, to the extent that the clauses do not envision pro-rata distribution, but are conflicting, "the modern trend [with conflicting 'other insurance' clauses] is to require equitable contributions on a pro-rata basis from all primary insurers regardless of the type of 'other insurance' clause in their policies." Id. at 1080. Thus, both a plain reading of the first clause in the "other insurance" provision of Aviva's policy and an application of equitable principles to that clause require pro-rata distribution amongst the primary insurers.

The court holds that the distribution of liability shall be pro-rata according to the applicable per-occurrence policy limits of the primary insurance.[5] Thus, according to the terms of its policy, with respect to covered losses, Aviva "shall not be liable for a greater proportion of such loss than

United States District Court

For the Northern District of California

the applicable limit of liability bears to the total applicable limit of liability of all valid and collectible insurance against such loss." Bay Dec., Exh. 2 at 5, ¶ G of Conditions. The plain meaning of "applicable limit of liability" is the limits on liability stated in the insurance policy. Since there are no aggregate limits stated in the Aviva policy, the court uses the per-occurrence limit.

Aviva argues for a per-occurrence method of apportionment, but further asks the court to consider the length of time the Aviva policy was in effect. Effectively, Aviva argues that a "time-on-risk" system of coverage ought to be adopted. See Armstrong World Indus., Inc. v. Aetna Cas. & Surety Co., 45 Cal. App. 4th 1, 52–53 (1996). The "time-on-risk" scheme has sometimes been used in continuous loss cases. See id. This system of allocation also distributes pro-rata according to the applicable per-occurrence policy limits of the primary insurance; however, the per-occurrence policy limits are multiplied by the years the particular policy was on the risk. Specifically, one court has formulated this approach as:

> When more than one policy is triggered by a claim, defense and indemnity costs shall be allocated among all triggered policies according to applicable 'per occurrence' policy limits, multiplied by years of coverage. When a policy does not contain a 'per occurrence' limit, the 'per person' limit shall be used in this calculation.

Id. at 52.

In Armstrong, the California Court of Appeal found, in dicta, that the trial court's ruling on the method of apportionment stated above was nontraditional, but nonetheless sound. Id. at 52. Concurrently, the court found that "[t]he general rule, when multiple policies share the same risk but have inconsistent 'other insurance' clauses, is to prorate according to the policy limits." Id.; see also Argonaut Ins. Co. v. Transport Indem. Co., 6 Cal. 3d 496, 507 (1972); Employers Reinsurance Corp. v. Phoenix Ins. Co., 186 Cal. App. 3d 545, 557 (1986); CNA Casualty of Cal. v. Seaboard Surety Co., 176 Cal. App. 3d 598, 620 (1986). In CNA, the court specifically found that the California Supreme Court had declined to formulate a definitive rule in light of the "'varying equitable considerations which may arise'" in particular cases. 176 Cal. App. 3d at 619 (quoting Signal Companies, Inc. v. Harbor Ins. Co., 27 Cal. 3d 359, 369 (1980). Thus, the CNA court found that "in an appropriate case the scope of an insured's coverage could be affected by such factors as the insurer's time on the risk." Id. at 620.

United States District Court

For the Northern District of California

1        Here, this court is not convinced that the most equitable measure of apportionment would

2   include the time on the risk because, as already discussed, the weight of California authority that has

3   considered this equitable issue has adopted a per occurrence limit method of allocation without time

4   on the risk.  Furthermore, although equity overrides the terms of the policies at issue here, it is worth

5   noting that this method of allocation is not supported by the "other insurance" clauses of the

6   policies, whereas the court's adopted approach is so supported.  Finally, the parties did not seem to

7   take issue with the court's chosen method of allocation at the hearing on this matter.  In any event,

8   the court notes that this discussion may be academic.  Indeed, over time "all primary policies have

9   been or will be exhausted by asbestos-related claims. The method of allocation affects only the

10  timing of payments."  Armstrong, 45 Cal. App. 4th at 54 n.17.  Given the deluge of claims that are

11  likely to be filed when Flintkote emerges from bankruptcy and the fact that many of its other policies

12  are exhausted or the insurer insolvent, the court notes that it is only a matter of time before Aviva

13  will be responsible for the lion's share of most claims under $100,000 that trigger its policy.  In sum,

14  the court rejects Aviva's argument and adopts the standard pro rata method of apportionment

15  according to per occurrence limits.

16        In order to dispel any confusion as to the apportionment scheme envisioned by the court, it

17  provides the following numerical example.  Here, Aviva's policy provides for a $100,000 per

18  occurrence limit.  For the purposes of the following example, the court assumes that the other two

19  primary insurers, American Mutual and Liberty Mutual have per occurrence limits of $1,000,000

20  and $1,500,000 respectively.  Thus, if a particular claim triggers the policies of all three primary

21  insurers, then Aviva's share of any damages claim will be $100,000 / [$100,000 + $1,000,000 +

22  $1,500,000] = 1/26.  For a $100,000 claim, Aviva would be responsible for $3,846.15.  If only Aviva

23  and American Mutual's policies are triggered, then Aviva's share of any damages claim will be

24  $100,000 / [$100,000 + $1,000,000] = 1/11.  Aviva would then be responsible for $9,090.91.

25  Similarly, if only Aviva and Liberty Mutual's policies are triggered, then Aviva's share of any

26  damages claim will be $100,000 / [$100,000 + $1,500,000] = 1/16.  Here, Aviva would be

27  responsible for $6,250.  Obviously, if only Aviva's policy is triggered by a particular claim, it pays

28

United States District Court

For the Northern District of California

1  up to its per-occurrence policy limit (in this example, all of the $100,000) and if Aviva's policy is

2  not triggered by a claim, it is not liable at all.

3         Flintkote proposes an alternate calculation, whereby the amount of indemnification is

4  determined by the amount of the claim.  Flintkote simply states, without explanation, that it "makes

5  sense" to add up the sum each policy *would have paid* on a claim as if it were the sole responding

6  policy and then to apportion accordingly.  Mot. at 9.  Continuing the example from above, if each

7  primary insurer was the sole responding policy, Aviva would have paid $100,000 and the two other

8  primary insurers would also have paid $100,000 and $100,000 respectively.  Proportionally then,

9  Aviva's share would be $100,000 / [$100,000 + $100,000 + $100,000] = 1/3, or $33,333.33.  The

10  court, however, rejects this approach as Flintkote has not presented any evidence as to the

11  superiority of this method of calculation.  Not only does this method go against the plain meaning of

12  the "other insurance" clause found in the Aviva policy, this method is inequitable because it always

13  apportions the damages equally amongst the triggered primary policies when the claim amount is

14  less than Aviva's per occurrence limit, without any regard for the individual policy limits.[6]

15                2.       Horizontal Exhaustion versus Vertical Exhaustion

16        As stated above, the Aviva policy states:

17        G. If the Insured has other insurance against a loss covered by this policy, the Insurer
          shall not be liable for a greater proportion of such loss than the applicable limit of
18        liability bears to the total applicable limit of liability of all valid and collectible
          insurance against such loss. Excess insurance shall not be considered as valid and
19        collectible Insurance until such time as the limit of primary insurance has been
          exhausted as the result of a loss.

20
21  Bay Dec., Exh. 2 at 5, ¶ G of Conditions.  This second clause here—the "excess insurance"

22  clause—demonstrates that the Aviva policy is a primary insurance policy.  Furthermore, the clause is

23  consistent with the provisions of general excess policies—those that provide excess coverage only

24  when *all* primary policies are exhausted—because the clause requires exhaustion of primary

25  insurance.  The ambiguity arises with respect to *specific* excess policies—those that provide excess

26  coverage *only* over specified primary policies—because specific excess policies do not require

27  exhaustion of all primary policies.  Consequently, the question the court must answer is this: Does

28  the "excess insurance" clause above require that all primary insurance be exhausted before *specific*

excess policies are considered "collectible insurance"?

United States District Court

For the Northern District of California

The court answers this question in the negative, with important limitations.  Generally, the court adopts a rule of horizontal exhaustion, wherein all primary policies must exhaust before excess policies are implicated, with an exception when there is "a provision in the excess policy *specifically describing* and *limiting* the underlying insurance."[7]  Community Redevelopment Agency v. Aetna Cas. & Sur. Co., 50 Cal. App. 4th 329, 339–40 (1996).

Aviva's policy excludes excess insurance if primary insurance has not been exhausted.  This excess insurance, when discussed in the context of other insurance, must necessarily refer to excess insurance that is in excess to primary policies other than the Aviva policy.  Any excess policy, whether specific or general, that is in excess to Aviva's policy is irrelevant to this section because for that excess policy to be triggered, Aviva must have already exhausted its per-occurrence limit with respect to the underlying claim.[8]  Consequently, exhaustion of the Aviva policy is not required to implicate excess policies that *only* depend upon exhaustion of *other* primary policies.  Thus, specific excess policies can be considered "collectible insurance" as soon as the relevant underlying primary policies are legitimately unavailable.[9]  In that situation, the triggered specific excess policies would be liable for the amount apportioned to the unavailable underlying primary policy.

Aviva argues that neither the provisions dealing with other insurance and excess insurance, nor the subrogation clause in its policy require a rule of horizontal exhaustion.  Aviva is correct to the extent that neither clause governs whether an excess insurer has the responsibility to "drop down" and step into the shoes of the primary insurer.  Indeed, the excess policies define the nature of the excess insurers' obligations to Flintkote.  Aviva claims that because equity prevails, it overrides the terms of the insurance policies.  As discussed above, that is indeed the case, and equity requires a horizontal pro-rata distribution.  Equity does not implicate the excess insurers because the excess insurers do not insure the same risk as the primary insurers.  Indeed, equity does not turn a primary policy into an excess one, or vice versa.

Aviva next relies on the "Conflicting Statutes" provision in its policy, which provides:

> If any condition in this policy conflicts with any *specific statutory provision* in the province or state in which it is claimed that the Insured is liable for any such injuries or loss as are covered by this policy, such specific statutory provision shall be substituted for such condition.

**United States District Court**

For the Northern District of California

Bay Dec., Exh. 2 at 5, ¶ H of Conditions (emphasis added).  Aviva argues that if the "other insurance" or subrogation clause requires adoption of the horizontal rule, then they clash with California law and consequently cannot be given effect.  However, Aviva has not presented any specific statutory provision to this effect.  Consequently, this argument fails.

The court now explains the adopted standard with multiple examples.[10]  The court first notes that proportional allocation of damages according to per occurrence policy limits makes it impossible for a particular primary policy to reach its per occurrence policy limit before the others.  For instance, if Aviva has a $100,000 per occurrence policy limit, American Mutual has a $1,000,000 per occurrence policy limit, and National Mutual has a $1,500,000 per occurrence policy limit, then if all three policies are triggered by a claim, Aviva would be responsible for 1/26th of that claim, American Mutual for 10/26th of that claim and National Mutual for 15/26th of that claim.  For any claim under $2,600,000, the proportionate share of each primary policy will be less than that policy's per occurrence limit.  A claim of $2,599,999, for example, will make Aviva liable for $99,999.96; American Mutual for $999,999.62; and National Mutual liable for $1,499,999.42.  For a claim of exactly $2,600,000, the proportionate share of each primary policy will be exactly each policy's per occurrence limit.  Thus, under this scheme, as long as a claim is for less than or equal to the sum of the per occurrence limits of the triggered policies, no triggered policy's per occurrence limit will exhaust before the other triggered policies exhaust.

The court also notes that Aviva may not benefit from its own breach.  For instance, assume the triggered Aviva policy has a $100,000 per occurrence limit, the triggered American Mutual policy has a $1,000,000 per occurrence limit and the Liberty Mutual policies are not triggered.  Further assume that a $1,100,000 claim is made against Flintkote and a specific excess insurer with a $5,000,000 per occurrence limit exists only with respect to American Mutual's policy.  Here, Aviva's share is $100,000 / [$100,000 + $1,000,000] = 1/11th of the claim up to a maximum of $100,000.  If Aviva fails to pay all of its share but American Mutual pays its per occurrence policy limit, then the specific excess insurer would be liable for $100,000.  This payment by the specific excess insurer, however, does not affect Aviva's liability calculation.  For instance, Aviva's breach *does not* make its share $100,000 / [$100,000 + $1,000,000 + $5,000,000] = 1/61 of the claim.

United States District Court

For the Northern District of California

Aviva's share of the damages remains at $100,000 and the specific excess insurer, which paid $100,000, now has a $100,000 equitable subrogation claim against Aviva.  This rule is compelled by a fundamental concept of contract law: to place the parties in as good a position as they would have been had the breach never occurred.  The same rule applies if a primary policy prematurely reaches it aggregate limits due to Aviva's breach—the specific excess policy that covered this breach is not to be considered "collectible insurance" for apportionment purposes if it would not have been triggered but for Aviva's breach.

Once underlying primary policies are legitimately unavailable, for instance, due to aggregate limits or insolvency, the triggered specific excess policies are liable only for the amount apportioned to the unavailable underlying primary policy.  To demonstrate, assume Aviva has a $100,000 per occurrence policy limit, American Mutual has a $1,000,000 per occurrence policy limit, and National Mutual has a $1,500,000 per occurrence policy limit.  Here, if all three policies are triggered by a claim, Aviva would be responsible for 1/26th of that claim, American Mutual for 10/26th of that claim and National Mutual for 15/26th of that claim.  Assume further that American Mutual is unavailable, but has an available specific excess policy.  The specific excess policy covering American Mutual would then be responsible for 10/26th of the claim amount.[11]

If all specific excess policies covering an unavailable primary policy are also unavailable for some reason, then the amount of unrecovered liability must be apportioned amongst the remaining primary insurers.[12]  This effectuates the purpose of the insurance policies: in case of covered losses, the insured does not bear the risk, up to policy limits, as long as available primary and excess policies are triggered.  In appropriate circumstances, however, this reapportionment may lead to a claim for contribution by the other primary insurers against the unavailable primary policy.  For example, if American Mutual and all of its specific excess insurers are unavailable,[13] then American Mutual's 10/26 share is distributed proportionally, by per occurrence policy limits, amongst the remaining primaries.  Here, that means Aviva would now be responsible for $100,000 / [$100,000 + $1,500,000] = 1/16th of the 10/26 claim share that once belonged to American Mutual.  This would be in addition to the 1/26 share for which Aviva is already responsible.  Thus, the total amount Aviva would then be responsible for is [1/16 * 10/26] + 1/26 of the total claim.  This is equal to

1   1/16th of the claim.  Similarly, National Mutual would be liable for [15/16 * 10/26] + 10/26 of the

2   total claim, or in other words, 15/16th of the claim.  Note that this is equal to performing the

3   calculation as if American Mutual and its specific excess insurers did not exist.

4        The same methodology is to be used if more than one primary insurance policy is

5   unavailable.  The applicable specific excess insurers would then be liable for the amounts

6   apportioned to the respective primary insurance policies that they cover.  If all the specific excess

7   policies covering the particular primary policies are also unavailable, the liability apportioned to

8   those primary insurance policies must be apportioned amongst the remaining primary policies.  If

9   three primary insurance policies are triggered, but two of them are unavailable and all specific

10  excess insurance policies above those two primaries are also unavailable, then the third primary

11  insurance policy would be liable up to its per occurrence limit.  If the third primary insurance policy

12  reaches its per occurrence limit, then the specific excess policies above that third primary policy

13  would be liable for the excess.  Furthermore, once all primary insurance policies are unavailable the

14  general excess insurance policies would also be responsible for the unpaid excess.[14]

15       Finally, the court discusses the implications of buy-outs and buy-backs.  The court holds that

16  buy-backs or buy-outs effectuated between Flintkote and insurers other than Aviva should not have

17  the effect of increasing Aviva's liability.  Thus, for each policy that the insurer bought back, its full

18  value is to be placed in the allocation formula as though the policy were still in place.  This is to be

19  done notwithstanding the fact that Flintkote may have accepted less than the full value of the

20  available coverage in order to reach a settlement.

21            3.    Specific Excess versus General Excess Policies

22       The court will now delineate the standard for an excess policy to be considered a specific

23  excess policy as opposed to a general excess policy.  This standard is designed to provide the parties

24  with a roadmap when attempting to categorize the various excess policies at issue here.  The court

25  adopts the following rule set forth by Judge Croskey:

26       Absent a provision in the excess policy *specifically describing* and *limiting* the
         underlying insurance, a horizontal exhaustion rule should be applied in continuous
27       loss cases because it is most consistent with the principles enunciated in Montrose. In
         other words, all of the primary policies in force during the period of continuous loss
28       will be deemed primary policies to each of the excess policies covering that same

United States District Court

For the Northern District of California

period. Under the principle of horizontal exhaustion, all of the primary policies must exhaust before any excess will have coverage exposure.

<u>Community Redevelopment Agency</u>, 50 Cal. App. 4th at 340.  Thus, the court begins with a presumption that all excess policies are general excess policies.  The court now analyzes the excess policy entered into between Flintkote and The Hartford Insurance Group.  <u>See</u> Chen Dec., Exh. M.[15]

The Hartford insurance policy purports to "indemnify the **insured** for **ultimate net loss** in excess of the **underlying limit** . . . to which this insurance applies."  <u>Id.</u> at 1.  The underlying limit is defined as "amounts of the applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies less the amount . . . ."  <u>Id.</u> at 4.  The Schedule then lists various policies.  <u>Id.</u> at FLI_CD_0025586, FLI_CD_0025588.  The plain meaning of these provisions implies that this is a specific excess policy that requires exhaustion only of the policies listed in the Schedule.  The presumption above, therefore, seems to be overcome.

One provision in the policy, however, adds confusion.  The "other insurance" clause of the policy states:

> The insurance afforded by this policy shall be *excess* insurance over *any* other valid and collectible insurance (except when purchased specifically to apply in excess of this insurance) available to the Insured, *whether or not described in the Schedule of Underlying Policies*, and applicable to any part of ultimate net loss, whether such other insurance is stated to be primary, contributing, excess or contingent . . . .

<u>Id.</u> at 5 (emphases added).  This provision is in conflict with the definition of underlying limit and purports to make the Hartford policy excess above *all* primary policies.  As described above, the "other insurance" provision is applicable when there "exist multiple policies applicable to the *same loss*."  <u>Fire Ins. Exch.</u>, 39 Cal. App. 4th at 660.  Specifically, the several insurers must insure the same risk at the same *level* of coverage.  However, the court "must first address the underlying premise" regarding the level of coverage provided."  <u>Carmel Development Co. v. RLI Ins. Co.</u>, 126 Cal. App. 4th 502, 509 (2005).  "This question requires a broader examination of each policy to ascertain the context in which the 'other insurance' provisions appeared."  <u>Id.</u>  Thus, the court looks broadly at the policy, including the other insurance clause, to determine the level of coverage—namely whether the policy is specific excess or general excess.

California courts have grappled with this issue before.  In <u>Community Redevelopment Agency</u>, a competing insurer, United, argued that the policy issued by Scottsdale was a specific

30

insurance policy.  The underlying limit in the excess policy issued by Scottsdale was defined as

"[a]n amount equal to the Limits of Liability indicated beside the underlying insurance listed in the

Schedule of Underlying Insurance (Schedule A), *plus the applicable limits of any other underlying*

*insurance collectible by the Insured . . . .*"  50 Cal. App. 4th at 335.  Further, the other insurance

provision stated that "[t]he insurance afforded by this policy shall be excess insurance over any other

valid and collectible insurance available to the Insured, whether or not described in the Schedule of

Underlying Insurance . . . ."  Id.  Based on these facts, Judge Croskey held that:

> The only reasonable interpretation of this policy language is that the term 'underlying insurance' must be read to include all available primary insurance, not just the policy expressly listed on the schedule of underlying insurance. This conclusion is confirmed and reinforced by the 'Defense' and 'Other Insurance' sections of the Scottsdale policy which contain additional and consistent provisions which compel rejection of United's contention.

Id. at 341.  Thus, the other insurance clause there was consistent with the definition of underlying

limit.  Here, however, the critical language is *only* found in the "other insurance" clause of the

policy, and not as part of the definition of underlying limit or ultimate net loss.  Indeed, neither

definition mentions policies not listed in the "Schedule of Underlying Insurance Policies," which

creates a conflict between the other insurance clause and the definition of underlying limit.

The facts here are closer to Carmel Development Co., 126 Cal. App. 4th 502.  There, the

California court of appeal explicitly distinguished between an excess policy similar to the one in

Community Redevelopment Agency, the RLI policy, from a policy very similar to the Hartford

policy.

RLI's policy stated, in the "Limits of Liability" section, that RLI would be liable only

> for the **ultimate net loss** in **excess of**: [¶] 1. the applicable limits of **scheduled underlying insurance** stated in Item 5 of the Declarations, for **occurrences** covered by **scheduled underlying insurance**, plus the limits of any ***unscheduled* underlying insurance** which also provides coverage for such **occurrences** . . . .

Id. at 510 (emphasis added).  In line with Community Redevelopment Agency, the court held that

the excess policy issued by RLI was a general excess policy because

> [RLI's] 'Limits of Liability' paragraph, set forth on the first page of the policy, clearly made RLI's coverage excess over scheduled and unscheduled underlying insurance. . . . Its 'other insurance' clause reinforced this limitation: It asserted its role as excess over 'other primary, excess or excess-contingent insurance not scheduled on this policy as scheduled underlying insurance.'

1    Id. at 511.  The court then construed a policy issued by Fireman's Fund that is very similar to the

2    Hartford policy at issue here.

3         The insuring clause of the Fireman's Fund policy stated:

4         Subject to the other provisions of this policy, **We** will pay on behalf of the **Insured**
          those sums in excess of **Primary Insurance** that the **Insured** becomes legally

5         obligated to pay as damages. The amount **We** will pay for damages is limited as
          described in SECTION III-LIMITS OF INSURANCE.

6
     Id. at 510.  The "Primary Insurance" was described as a policy issued by Reliance Insurance

7
     Company, and based on these facts, the court held that the Fireman's Fund was a specific excess

8
     policy.  Id. ("Thus, Fireman's Fund clearly provided a policy specifically excess to that of the

9
     primary insurer, which was defined as Reliance.").  The California Court of Appeal explicitly

10
     rejected the argument that a conflicting "other insurance" provision made the Fireman's Fund policy

11
     a general excess policy.  It stated:

12
          Fireman's Fund, however, points out that its agreement to pay the 'excess of Primary

13        Insurance' was expressly made 'subject to the other provisions of this policy.'
          Fireman's Fund argues that through this conditional language the policy incorporated

14        the 'other insurance' clause, thereby making it, like the RLI policy, excess to both
          scheduled and unscheduled insurance. The plain language of the Fireman's Fund

15        agreement, however, provided coverage to the insured upon exhaustion of the
          Reliance policy limits. Its insuring language did not clearly and unequivocally inform

16        the insured that it was excess over all other insurance, primary and excess, but buried
          its limitation on the second to the last page in a generally worded 'other insurance'

17        clause, a condition generally accorded judicial disfavor. (Dart Industries, Inc. v.
          Commercial Union Ins. Co., supra, 28 Cal.4th at p. 1080, 124 Cal.Rptr.2d 142, 52

18        P.3d 79.)

19   Id. at 511.  In sum, the court held that "when all of the relevant provisions are read in context, with

20   each clause lending meaning to the other, it is clear from the language of the RLI agreement that it

21   offers a different level of coverage to its insured than the Fireman's Fund policy."  Id. at 514.

22        The facts here are essentially identical.  The Hartford policy purports to "indemnify the

23   **insured** for **ultimate net loss** in excess of the **underlying limit** . . . to which this insurance applies."

24   Chen Dec., Exh. M at 1.  The underlying limit is defined as "amounts of the applicable limits of

25   liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies less

26   the amount . . . ."  Id. at 4.  The Schedule lists various policies.  Id. at FLI_CD_0025586,

27   FLI_CD_0025588.  The "other insurance" provision of the policy, located on the last page of the

28   policy, is conflicting, and states that "[t]he insurance afforded by this policy shall be excess

                                                    32

United States District Court

For the Northern District of California

1  insurance over any other valid and collectible insurance . . . available to the Insured, whether or not

2  described in the Schedule of Underlying Policies, . . . whether such other insurance is stated to be

3  primary, contributing, excess or contingent . . . ."  Id. at 5.  Thus, just as in Carmel Development

4  Co., the coverage terms in Section I of the policy, the definition of underlying limit and attached

5  schedule of underlying policies are sufficient to overcome the presumption that the Hartford policy

6  is a general excess policy, the conflicting other insurance provision notwithstanding.

7          On balance, construing the policy as a whole and mindful of the applicable case law, this

8  court holds that under Carmel Development Co., the Hartford policy is a specific excess policy.[16]

9  The court further notes that Judge Croskey has cited Carmel Development Co. with approval,

10 explaining that in this situation, "[i]t was irrelevant that both policies contained excess-only 'other

11 insurance' clauses."  H. Walter Croskey & Rex Heeseman, Insurance Litigation § 8:13.1 (2007).

12         Travelers Cas. & Surety Co. v. Transcontinental Ins. Co., 122 Cal. App. 4th 949, 955–59

13 (2004), does not compel a different result.  There, Federal Insurance Company ("Federal"), provided

14 two types of excess coverage to its insured contractor.  Addressing Coverage A, the court held that

15 the contract language plainly obligated Federal to defend the insured when the listed "underlying

16 insurance" was exhausted.  Id. at 956.  The court then compared Coverage A with Coverage B:

17 Whereas Coverage A did not condition a defense upon exhaustion of other insurance, Coverage B

18 required a defense only when a plaintiff sought damages "to which no underlying insurance or other

19 insurance applies."  Id.  The Carmel Development Co. court succinctly stated the applicability of

20 Travelers Cas. & Surety Co. to its facts, which were identical to the case at bar:

21         Like Coverage A in Travelers, section 1 of the Fireman's Fund policy obligated
           Fireman's Fund to provide coverage when a specific underlying policy, that of
22         Reliance, was exhausted. RLI's policy, on the other hand, was more akin to Federal's
           Coverage B by expressly conditioning the insurer's obligation on the exhaustion of
23         not only the Acceptance limits but also those of 'any insurance policies available to
           any insured (whether primary, excess, excess-contingent, or otherwise).' (Compare
24         Community Redevelopment Agency v. Aetna Casualty & Surety Co., supra, 50
           Cal.App.4th at pp. 335, 338 & fn. 6, 57 Cal.Rptr.2d 755 [policy language expressly
25         conditioned defense obligation on absence of other insurance providing defense].)

26 126 Cal. App. 4th at 516.  The rationale with respect to Fireman's Fund applies with identical force

27 to the Hartford policy.

28

**United States District Court**
For the Northern District of California

The court does not rule as to the nature of the other excess policies in place between Flintkote and other insurers since those policies are not before the court. As discussed above, the determination cannot be made solely on the basis of the "other insurance" provision of the policies. However, the court encourages the parties, based on the discussion above, to agree upon the character of the excess policies, whether specific excess or general excess. The court notes that under the standard espoused in <u>Community Redevelopment Agency</u>, if the excess policy defines either "underlying limit" or "ultimate net loss" as being in excess to "all other insurance" or the like, the excess policy is likely a general excess policy.

### 4.   "Drop Down" of Specific Excess Policies

Specific excess policies that provide for coverage for liability *only* do not automatically "drop down" to become a substitute primary policy upon unavailability of the covered primary policies. The excess policy nevertheless remains excess. Whether the excess policy "drops down" to the level of primary insurer, whereby the excess insurer assumes the obligations of the primary insurer, including defense obligations, depends on the provisions of the excess policy. At this time, the court makes no determination as to which excess policies "drop down"—an obligation distinct from and greater than the obligation to provide coverage—and act in the shoes of primary insurers in case the primary policies are unavailable. If an excess insurer is required to "drop down" and assume the responsibilities of a particular primary insurer, then the excess insurer would be considered a *substitute* primary insurer. In that situation, the specific excess policy that "dropped down" would be responsible for liabilities incurred by the primary policy. No recalculations need to be made. If the amount apportioned to the unavailable primary policy was under the primary's per occurrence limit, the specific excess policy that drops down would only be responsible for that amount, plus whatever defense costs were apportioned to the unavailable primary. If the amount apportioned to the unavailable primary policy is at or greater than the primary's per occurrence limit, then the rules set forth above—which dictate that all primaries reach their per occurrence limit simultaneously—would make Aviva liable for its per occurrence limit. Finally, since the parties have not argued which specific excess insurers have the duty to "drop down," the court reserves resolution of this question for another day.

United States District Court

For the Northern District of California

E.    Defense Costs

In light of the above discussion regarding apportionment of liability, the court holds that defense costs should be shared proportionally amongst the insurers with defense obligations that are found liable for *payment* of the underlying claim.  For instance, if Aviva is to pay $100,000 to satisfy the claim, and the other insurers with defense costs obligations are to pay $500,000, $200,000 and $800,000 respectively, then Aviva is responsible for $100,000 / [$100,000 + $500,000 + $200,000 + $800,000] = 1/16 of the defense costs.  The amount actually paid by other insurers, whether excess or otherwise, who do not have defense obligations to Flintkote, is irrelevant.

The court notes that unless excess policies provide otherwise, once primary coverage is unavailable, the *defense* burden shifts to the excess insurer even if its policy does not expressly provide for defense coverage.  The excess carrier's obligation to defend is implied from its obligation to cover losses.  Aetna Cas. & Surety Co. v. Certain Underwriters at Lloyds of London, 56 Cal. App. 3d 791, 804 (1976); see also Pacific Indem. Co. v. Fireman's Fund Ins. Co., 175 Cal. App. 1191, 1200 (1985).

F.    Other Matters

The court now disposes of Aviva's other non-meritorious arguments.  First, the court can easily dismiss Aviva's claim that to the extent that excess insurer's paid before Aviva did, they did so as volunteers.  Accepting this argument, made without supporting legal authority, would turn insurance law on its head.  Specifically, Aviva claims that it should be rewarded for not paying the claims when it was required to do so under the terms of its policy with Flintkote.  Further demonstrating the absurdity of this argument, Aviva claims that the excess insurers who did pay—to cover for Aviva's share of the liability—should be punished for performing responsibly.  The court will not indulge this argument any further.

Second, Aviva argues that Flintkote should be judicially estopped from pleading that excess carriers have no duty to "drop down" vertically.  It claims Flintkote's position is inconsistent with Flintkote's position in a related litigation against other insurers.  See Chen Dec., Exh. N (Flintkote's trial brief in Mt. McKinley Ins. Co. v. The Flintkote Company, Case No. 407641 at the San

1   Francisco Superior Court).  There, with respect to a settlement agreement interpretation, Flintkote

2   argued *against* horizontal exhaustion and in favor of vertical exhaustion.  This position with respect

3   to the interpretation of a settlement agreement, however, is not "clearly inconsistent" with its current

4   position interpreting the underlying insurance policies at issue.  <u>See</u> Chen Dec., Exh. V at 13 (trial

5   court decision interpreting the parties' responsibilities under the settlement agreement).

6   Consequently, judicial estoppel does not apply.  <u>See</u> <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749

7   (2001) (requiring "clearly inconsistent" positions for judicial estoppel to apply).

8          Finally, Aviva's argument that equity demands that the court impute an aggregate limit into

9   the policy in question is preposterous.  Aviva had the option of becoming a signatory to the

10  Wellington Agreement and it declined.  Aviva argues that Flintkote has reached agreements with

11  other non-aggregate limit insurers imputing an aggregate limit to those policies.[17]  Aviva wants the

12  same treatment.  Aviva ignores the fact that it has, to this day, the option of entering into a

13  settlement agreement with Flintkote.  However, instead of reaching an agreement, Aviva chooses to

14  continue litigating this action while demanding the court provide it with equitable remedies that are

15  more favorable or as favorable as settling parties.  Aviva, having chosen to make a bargain whereby

16  it was to insure Flintkote, cannot now hide under alleged drafting errors that neglected to include an

17  aggregate cap or actuarial errors that caused the policy premium to be too low.  When determining

18  who shall be financially responsible for unforeseen liabilities incurred under an insurance policy, the

19  answer must be the insurer who wrote the policy and received the premium, not the insured who

20  paid the premium for the insurance coverage.

21

22  <u>CONCLUSION</u>

23         With respect to Aviva's motion for summary judgment, the court finds that: (1) Flintkote is

24  directly harmed by Aviva's failure to pay on past claims insofar as other insurance is prematurely

25  exhausted and is unavailable to pay on future claims; (2) under recently executed settlement

26  agreements containing undisputed assignments, as well as under the Wellington Agreement and

27  others like it, Flintkote has the authority to assert claims on behalf of its other insurers to recover

28

amounts those insurers paid in lieu of Aviva; and (3) the claims of the other insurers are equitably tolled.

 With respect to Flintkote's motion for summary judgment, the court adopts a pro rata by per occurrence standard to determine damages as described above.

 IT IS SO ORDERED.

Dated: 8/6/2008

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

United States District Court

For the Northern District of California

**ENDNOTES**

1.      Policy number L-90-5010 replaced policy number L-90-4672.

2.      Aviva seems to argue that Flintkote's course of performance has somehow changed the character of the insurance policy between the parties.  However, not only did Flintkote provide Aviva with annual litigation summaries, but it explicitly invited Aviva to be part of the Wellington Agreement and Aviva refused.  This behavior is not consistent with Aviva's argument that Flintkote did not believe that Aviva was responsible for asbestos-related claims against Flintkote.

3.      The parties agreed that coverage excluded: (1) claims resulting from exposure to asbestos after January 1, 1961, the end of the policy period; (2) claims where the employee had workers compensation benefits; and (3) claims for injuries sustained in connection with vehicles and equipment.  Flintkote IV, 480 F. Supp. 2d at 1172.

4.      Aviva objects to Exhibit B of Bay's declaration, which attaches a copy of the Aviva policy at issue here.  Aviva seems to be contesting Bay's declaration only to the extent that he characterizes the policy attached as the exhibit to be a "certified copy."  Since the objection does not argue that the terms of the policy are improperly demonstrated by the exhibit, the court nevertheless relies upon it for the policy's terms and conditions.  Indeed, Aviva itself submits a policy with identical terms and conditions as Exhibit U to Chen's declaration, albeit without the "certified copy" designation.

5.      Flintkote's argument that liability and/or defense costs be apportioned on a "per capita" basis, wherein each primary insurer pays one-third each is patently inequitable in light of the fact that American Mutual and National Mutual both issued multiple policies over a span of multiple decades and Aviva issued one policy spanning three years.

6.      The court's analysis assumes that Aviva's per occurrence policy limit is lower than that of all the other primary insurance policies.

7.      Flintkote's argument that the following passage requires horizontal exhaustion, with no exceptions, is without merit:

> Inasmuch as the insurance provided by this policy is not the sole insurance applicable to the risks insured by this policy, the Insured's right of recovery against any person or other entity cannot be exclusively subrogated to others.  It is, therefore, agreed that in case of any payment hereunder, the Insurers will act in concert with all other interests concerned (including the Insured) in the exercise of such right of recovery.  The apportioning of any amounts which may be so recovered shall follow the principle that any interests (including the Insured's) that shall have paid amounts in excess of this policy shall first be reimbursed up to the amount paid by them; the Insurers are then to be reimbursed out of the balance of the recovery then remaining up to the amount paid hereunder.

Bay Dec., Ex. 2 at 5, ¶ I of Conditions.  This provision, however, is only applicable "in case of any payment hereunder."  This event has not occurred.  Consequently, this provision is currently inapplicable, though it does state that in case of a recovery from others of monies paid by Aviva, Aviva shall be reimbursed last.

8.      Since general excess policies require the exhaustion of *all* primary policies, they cannot be implicated until Aviva's policy is unavailable for a particular claim.  Aviva makes the argument that general excess policies may be triggered upon the unavailability of all primary policies except for Aviva's primary policy.  None of the four cases it cites supports this proposition.  See Carmel' Development Co. v. RLI Ins. Co., 126 Cal. App. 4th 502, 511–14 (2005); Travelers Cas. & Surety Co. v. Transcontinental Ins. Co., 122 Cal. App. 4th 949, 956, 959 (2004); Community Redevelopment Agency v. Aetna Cas. & Sur. Co., 50 Cal. App. 4th 329, 339–40 n.6 (1996); 20th Century Ins. Co. Liberty Mut. Ins. Co., 965 F.2d 747, 757 (1992).  In fact, the cited authorities state the opposite:

> Absent a provision in the excess policy specifically describing and limiting the

38

United States District Court

For the Northern District of California

underlying insurance, a horizontal exhaustion rule should be applied in continuous loss cases because it is most consistent with the principles enunciated in <u>Montrose</u>. In other words, all of the primary policies in force during the period of continuous loss will be deemed primary policies to each of the excess policies covering that same period. Under the principle of horizontal exhaustion, all of the primary policies must exhaust before any excess will have coverage exposure.

<u>Community Redevelopment Agency</u>, 50 Cal. App. 4th at 340.

9.      Parties have represented to the court that certain specific excess policies are triggered only upon insolvency of the underlying primary policy or only upon exhaustion of the underlying primary policy. The court makes no finding regarding which specific excess policies will be triggered upon the unavailability of the primary policy.  Further, for the purposes of brevity, the court will use the term unavailable to encompass insolvency, exhaustion and the like.

10.     The court discusses issues related to "drop down" excess policies in a separate section.

11.     The court does not reach the question of how this amount is to be apportioned amongst the various specific excess policies, if for instance  more than one specific excess policy was to be triggered due to the unavailability of a primary policy.

12.     The amount to be apportioned amongst the remaining primary insurers should not include the amounts recovered by Flintkote from liquidation proceedings related to the unavailable primary insurer or the unavailable specific excess insurer covering that primary.  In sum, only the actual unrecovered amount is to be apportioned amongst the remaining primary insurers.

13.     It is worth noting that the aggregate limits are to take into account non-asbestos related claims as covered by the policies if and when they accrue.

14.     The court does not reach the question of how any excess amount is to be apportioned amongst the various specific excess and general policies when all primary policies are unavailable for a particular claim, either via exhaustion, insolvency or the like.

15.     The following analysis assumes that a valid assignment was made from The Hartford Insurance Group to Flintkote.

16.     The court finds unpersuasive Flintkote's other untimely arguments to the contrary.  First, the Hartford policy's fleeting self-characterization as an "umbrella" policy does not demonstrate that all underlying primary insurance must be exhausted.  The inclusion of this word does not undercut the plain meaning of the coverage terms in Section I of the policy, the definition of underlying limit and the attached schedule of underlying policies.  Second, the defense duty in the Hartford policy attaches to claims "to which th[e] policy applies and which no underlying insurer is obligated to defend . . . ."  Chen Dec., Exh. M at 1.  This provision does not aid the court in determining whether the policy is specific excess or general excess.  The relevant question is the scope of the claims to which the policy applies and the *identity* of the "underlying insurer[s]."  Finally, the notice provisions in clause fourteen of the policy, pertaining to underlying insurance, do not compel a result contrary to the one reached by the court.

17.     Aviva does not argue that imputing these aggregate caps to the other insurance providers has led to an increase in its own duty to indemnify or defend.