United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE FLINTKOTE COMPANY, a Delaware Corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>GENERAL ACCIDENT ASSURANCE COMPANY OF CANADA, a Canada insurance company; GENERAL ACCIDENT FIRE AND LIFE ASSURANCE CORPORATION LIMITED OF PERTH, SCOTLAND, a Scotland insurance company; and DOES 1 through 10,<br><br>    Defendants.<br>_____ / | No. C 04-01827 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Plaintiff's Request for Reserves and Reinsurance Information**; *In Camera* **Review of Defendant's Redacted Documents** |

    On April 14, 2004, plaintiff The Flintkote Company ("Flintkote") filed an action in San Francisco Superior Court against defendants General Accident Assurance Company of Canada and General Accident Fire and Life Assurance Corporation Limited of Perth, Scotland, predecessors in interest of Aviva Insurance Company of Canada ("Aviva" or "defendant"). Plaintiff alleged breach of contract for defendants' failure to defend or indemnify plaintiff for claims covered under a primary insurance policy. Plaintiff has now requested discovery of reserves and reinsurance information that was withheld or redacted by defendant. Plaintiff has also requested *in camera* review of documents that contained information redacted by defendant on the basis of attorney-client privilege, work product privilege and confidential business information. The court instructed defendant to submit a sample of ten documents for *in camera* review to assess whether the privileges

were properly asserted. Having considered the parties' arguments and submissions, the court enters the following memorandum and order.

BACKGROUND

Plaintiff Flintkote is a company that formerly mined and sold asbestos and asbestos-based products. See Docket No. 244 (Opinion). Plaintiff purchased a primary insurance policy from defendant Aviva's predecessors in interest to cover general commercial liability, including asbestos-related bodily injury claims. Id. at 2. The policy was in force between January 1, 1958, and January 1, 1961. Id. In 2004, plaintiff sought bankruptcy protection as a result of its exposure to asbestos-related lawsuits. Id. Plaintiff brought this action to recover from defendant defense and liability costs paid out as a result of asbestos-related tort claims brought against plaintiff. Id.

Plaintiff received responses to interrogatories regarding reserves. See Docket No. 224, Exh. B. Defendant answered that sometime before October 19, 1983, it set reserves at $55,000 and then increased reserves to $250,000 between January 1988 and June 1991. Id. at 5. Defendant increased its reserves to either $450,000 or $500,000 as of February 1998. Id. Reserves were set at $400,001 in December 1999, and then increased to $2 million on March 15, 2004. Id. Defendant has continued to set reserves since 2004. Id. at 6.

Plaintiff added a bad faith liability claim against defendant, alleging that defendant engaged in malicious and unreasonable conduct, such as failing to defend plaintiff against asbestos-related claims despite knowledge that the claims were potentially covered. See Docket No. 141 ("Second Amd'd Compl.").

Plaintiff asserts that defendant should produce its reserves documents. Defendant responds that they are protected as confidential business information and are irrelevant. See Docket No. 224 (letter brief). Plaintiff now seeks production of defendant's reserves information and reinsurance documents that have been withheld and redacted. Id. Plaintiff also alleges that defendant has

improperly made redactions of documents and requests *in camera* review of these documents by the court to determine whether the redactions were improper.  Id.

LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) allows discovery for any nonprivileged matter that is relevant to any party's claim or defense.  Rule 26 states that "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).  The scope of discovery permissible under Rule 26 should be liberally construed; the rule contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a case.  See Oakes v. Halvorsen Mar. Ltd., 179 F.R.D. 281, 283 (C.D. Cal. 1998).  However, the broad scope of permissible discovery is limited by any relevant privileges, including the attorney-client privilege. See Fed. R. Civ. P. 26(b)(1).

Confidential information disclosed by a client to an attorney to obtain legal assistance is protected by the attorney-client privilege.  Fisher v. United States, 425 U.S. 391 (1976); Am. Standard Inc. v. Pfizer Inc., 828 F.2d 734, 745 (Fed. Cir. 1987).  An attorney's communications to a client may also be protected by the privilege, to the extent that they contain or are based on confidential information provided by the client, or legal advice or opinions of the attorney.  United States v. Margolis, 557 F.2d 209, 211 (9th Cir. 1977).  The purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  As a general matter, "[a] party is not entitled to discovery of information protected by the attorney-client privilege." Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation, 331 F.3d 1041, 1046 (9th Cir. 2003), citing Wharton v. Calderon, 127 F.3d 1201, 1205 (9th Cir. 1997).

The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects from discovery "documents and tangible things prepared by a party or his representative in anticipation of litigation." In re Grand Jury Subpoena, 357 F.3d 900, 906 (9th Cir. 2004), quoting Admiral Ins. Co. v. U.S. District Court, 881 F.2d 1486, 1494 (9th Cir. 1989). The work product privilege is intended to promote a fair and efficient adversarial system by protecting "the attorney's thought processes and legal recommendations" from the prying eyes of his or her opponent. Genentech, Inc. v. U.S. Int'l Trade Comm'n, 122 F.3d 1409, 1415 (Fed. Cir. 1997) (citations omitted); see also Hickman v. Taylor, 329 U.S. 495, 511-14 (1947) ("Proper preparation of a client's case demands that [the attorney] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. . . . Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten."). Work product may be subject to disclosure upon an adverse party's showing of "substantial need for the materials and undue hardship in obtaining the substantial equivalent of the materials by other means." Grand Jury Subpoena, 357 F.3d at 906, quoting Fed. R. Civ. P. 26(b)(3) (internal alterations and quotations omitted).

DISCUSSION

I.      Discovery of Reserves Information

Insurance companies typically establish a reserve to cover the potential loss that could be associated with a claim. "The main purpose of a loss reserve is to comply with statutory requirements and to reflect, as accurately as possible, the insured's potential liability. It does not automatically authorize a settlement at that figure." Lipton v. Superior Ct., 48 Cal. App. 4th 1599, 1613 (1996), quoting Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1995) ¶ 1:120 at p. 1-20 (italics omitted). State insurance law often requires insurers to maintain reserves in the "amount estimated in the aggregate to provide for the payment of all losses and claims for which the insurer may be liable and to provide for the expense of adjustment or settlement

4

of losses and claims." Lipton at 1613, citing Cal. Ins. Code § 923.5 (2008). Setting reserves is not an admission of liability for the claim. Fidelity and Deposit Co. of Md. v. McCulloch, 168 F.R.D. 516, 525 (E.D. Pa. 1996). Reserves are arguably an educated guess of what the insurer might be required to pay, may be incomplete and unreliable if set early in the claims process, and are adjusted frequently. Bernstein v. Travelers Ins. Co., 447 F. Supp. 2d 1100, 1104 (N.D. Cal. 2006)..

Courts are split as to whether reserves are discoverable in bad faith suits against insurers. Generally, courts have found that reserves are irrelevant and therefore not discoverable. The McCulloch court held, on the facts before it, that such data would merely suggest that the cost of defending the claims increased over time; the court found no connection between the bad faith claim and the insurer's estimation of its own liability. 168 F.R.D. at 525. Similarly, defendant argues that reserves information is not relevant because it is based on regulatory criteria and does not represent an evaluation of liability.

On the other hand, some courts have found that reserves information is relevant because it can be evidence of bad faith, which has a subjective intent component that can be difficult to prove. See Bernstein, 447 F. Supp. 2d at 1108; Lipton, 48 Cal. App. 4th at 1616. In particular, reserves information is relevant and discoverable when it may shed light on what an insurer actually thought regarding merits of an insured's claims where there is a "self-conscious disconnect" between the insurer's payment of benefits and its evaluation of the scope of the loss. Bernstein, 447 F. Supp. 2d at 1108. In Bernstein, the plaintiff claimed that (1) the defendant intentionally and unjustifiably delayed making payments to which it knew plaintiff was entitled and (2) understanding that the claims were likely to be large, defendant self-consciously employed a strategy of making unjustifiable demands for proof loss in order to create a level of frustration and anxiety in plaintiffs that would induce them to accept a low-ball settlement offer. Id. The reserves information was relevant to proving the insurer's bad faith conduct by showing the insurer's "internal assessments" about coverage and valuation of the insured's claims and how that differed from what they communicated to and demanded of plaintiffs. Id.

5

1    Similarly, in <u>Lipton</u>, an insured attorney brought a bad faith suit against a professional
2 liability insurer, alleging that the insurer's actions with respect to the handling of the defense
3 amounted to a breach of the implied covenant of good faith. 48 Cal. App. 4th at 1607. The plaintiff
4 alleged that the reserves information would be relevant to: (1) the insurer's state of mind regarding
5 its claims handling practices; (2) the insurer's knowledge that aggregate coverage versus singular
6 coverage applied for the benefit of the plaintiff and his firm but that such knowledge was concealed
7 from both; and (3) the degree to which the insurer ignored its own counsel's advice regarding the
8 plaintiff's probable liability with over-limits exposure. <u>Id.</u> at 1608 n.8. The court granted discovery
9 of reserves information because it might reasonably lead to the discovery of evidence admissible
10 with respect to the issues raised by plaintiff in his bad faith action. <u>Id.</u> at 1605, 1616. The court
11 further noted that "without doubt such information would assist [plaintiff] in evaluating his bad faith
12 case and in preparing it for trial," which was enough to justify discovery. <u>Id.</u> at 1616. Determining
13 whether reserves are discoverable is a "question[] of relevancy which [is] related to the trial and the
14 admissibility of evidence." <u>Id.</u> at 1614.

15    Thus, the court must determine whether reserves are discoverable in view of the bad faith
16 claims and alleged conduct by defendants. Here, plaintiff asserts that defendants have acted in bad
17 faith by engaging in a malicious and unreasonable course of conduct. <u>See</u> Second Amd'd Compl.,
18 Exh. 2 at 5. For instance, plaintiff alleges, *inter alia*, that defendants' bad faith conduct includes
19 unreasonably failing to defend plaintiff against asbestos-related claims despite knowledge that the
20 claims were potentially covered, willfully and deliberately ignoring plaintiff's repeated requests for
21 defense and indemnity, and failing to timely disclose to plaintiff documents and evidence relating to
22 its intentional strategy of failing to pay, cover, defend or respond to claims. <u>Id.</u> at 5-6.

23    The question then is whether the rationale in <u>Bernstein</u> and <u>Lipton</u> should apply based on the
24 facts and claims in this case. Like <u>Bernstein</u>, plaintiffs allege that defendants have acted
25 intentionally and unjustifiably regarding coverage and that defendants consciously employed a
26 strategy of ignoring plaintiff's requests in an attempt to avoid coverage. Although there has been no

6

allegation that defendants made unjustifiable demands for proof of loss in order to induce plaintiff to accept a low-ball settlement, as in Bernstein, there are allegations that defendants have acted in a manner suggesting a possible self-conscious disconnect.  Since reserves are set for claims that the insurer might be liable to pay, the reserves may indicate an estimate of the amount that defendant believed or knew it would have to pay for plaintiff's asbestos-related claims.  This information may be relevant to showing the difference between what defendant thought it would have to pay and its communications with plaintiff regarding its evaluation of the scope of the loss.  See Bernstein, 447 F. Supp. 2d at 1108.  If the reserves were increased but Aviva failed to communicate or respond to plaintiff's requests for defense and indemnity, this may indicate a self-conscious disconnect between what Aviva knew its losses may be and its conduct with plaintiff in regards to the asbestos claims.

Discovery of Aviva's reserves information may also lead to admissible evidence with respect to plaintiff's claims.  The reserves information may give plaintiff insight into what increases or decreases in reserves were made at certain times or if reserves were removed altogether.  Moreover, the reserves information may assist plaintiff in evaluating its bad faith claim and preparing it for trial.  See Lipton, 48 Cal. App. 4th at 1616.

Thus, the court finds reserves information relevant to plaintiff's claims of bad faith and will allow discovery of reserves information pertaining to plaintiff's asbestos-related claims.

II.     Discovery of Reinsurance Documents

Reinsurance is a form of insurance obtained by insurance companies to help spread the burden of indemnification.  Catholic Mut. Relief Soc. v. Superior Court, 42 Cal. 4th 358, 368 (2007).  An essential feature of reinsurance is that it does not alter the terms, conditions or provisions of the contract of liability insurance between the direct liability insurer and its insured.  Id. at 369. Reinsurers generally do not have a duty to investigate or defend claims between third parties and the underlying liability insurers or their insureds.  Id.  The purpose of this arrangement is to allow the insurer to reduce its statutory reserve requirements for existing policies and thereby

7

1  undertake additional risks by issuing policies to a greater number of insureds. Lipton, 48 Cal. App.
2  4th at 1617, citing American Re-Ins. Co. v. Ins. Co., 527 F. Supp. 444, 452-53 (C.D. Cal. 1981).
3        Generally, courts have chosen to deny discovery of reinsurance because it was irrelevant and
4  based solely on business considerations. Leksi, Inc. v. Federal Ins. Co., 129 F.R.D. 99, 106 (D.N.J.
5  1989); Indep. Petrochemical Corp. v. Aetna Cas. & Surety Co., 117 F.R.D. 283, 286-88 (D.D.C.
6  1986) (denying discovery of reinsurance information because it was marginally relevant).
7        The parties have extensively briefed the reinsurance issue, with particular focus upon
8  Catholic Mutual. In that case, the court denied discovery of reinsurance information because it was
9  beyond the scope of permissible discovery and not the subject matter of the underlying complaint.
10 42 Cal. 4th at 369, 373. That case is distinguishable on its facts because it was not a bad faith
11 insurance lawsuit and the plaintiffs, who were victims of sexual abuse of priests in a church, were
12 seeking reinsurance documents not from the church defendant, but from the church's insurer, a non-
13 party to the litigation. Nonetheless, Catholic Mutual provides insight into the question of when
14 reinsurance information should be discoverable. Specifically, it should be discoverable when the
15 reinsurance agreement is directly at issue and relevant to the litigation, and the insurer is the
16 defendant in the case, not an outside party. Id. at 368 n.7, citing Lipton, 48 Cal. App. 4th 1599. In
17 Lipton, the plaintiff filed a bad faith action against the insurer, alleging that the insurer had kept
18 from the plaintiff evidence of additional coverage, including related reinsurance documentation.
19 Here, the reinsurance agreements are not directly in dispute or at issue in this litigation, but rather
20 are requested for discovery as evidence to support plaintiff's bad faith claim. Thus, this case does
21 not fall within the exception for discoverability of reinsurance information.
22       Because the reinsurance information is typically based on business considerations, and since
23 this case does not fit within the limitations of Lipton, the reinsurance information is less relevant to
24 determining the "state of mind" or actual knowledge of the insurer. Accordingly, the court denies
25 plaintiff's request to discover reinsurance documents relating to Flintkote's asbestos insurance

8

1  claims. This denial is without prejudice to renewal if plaintiff can at some time during this litigation
2  show that the reinsurance agreements are in issue.

III.  Redacted Documents

Plaintiff contends that defendant has inappropriately withheld or redacted information, citing the attorney-client privilege and work product doctrine. Plaintiff also asserts that defendant has inappropriately redacted portions of documents, asserting that they comprise confidential business information and are unrelated to this action. Plaintiff requested that the court initially review *in camera* unredacted versions of documents and determine whether the redactions are proper. The court has reviewed the ten unredacted documents submitted by defendant.

A.  Work-Product Doctrine

The work product doctrine protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation. See Fed. R. Civ. P. 23(b)(3)(A). Here, defendants have lost or waived the work-product doctrine because it is unreasonable to claim that they have anticipated litigation on this case since 1958. Thus, the documents redacted based on a work-product privilege must be produced to plaintiffs.

B.  Attorney-Client Privilege

Attorney-client privilege protects the confidentiality of communications between attorney and client made for the purpose of obtaining legal advice. The purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." Upjohn, 449 U.S. at 389. The Ninth Circuit has set forth the following essential elements of the attorney-client privilege: (1) where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at this instance permanently protected, (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived. Admiral Ins. Co., 881 F.2d at

1492, citing In re Fischel, 557 F.2d 209 (9th Cir. 1977). The attorney-client privilege also extends to the attorney's advice in response to the client's communication. In re Fischel, 557 F.2d at 211.

Moreover, where communications at issue are made by corporate employees to counsel for corporation acting as such, at the direction of corporate superiors in order to secure legal advice from counsel, and employees were aware that they were being questioned so that the corporation could obtain legal advice, such communications are protected under the attorney-client privilege. Upjohn, 449 U.S. at 394.

Here, the attorney-client privilege would protect communications between Aviva's attorney and officers for the purpose of obtaining legal advice. Defendants have not provided a list of names and positions of the people listed on these documents. Based on the discussion at oral argument and its reading of the documents, the court deduces that there are two lawyers who are mentioned in these papers, one outside counsel and one general counsel. Only communications directly between these named attorneys and Aviva officers may be redacted under the attorney-client privilege. After *in camera* review, the court finds that none of the memos are communications between an attorney and an officer or employee at Aviva. Rather, the communications are between officers and employees of Aviva, and it is unclear in some places why redactions have been made and how such redactions relate to communications with counsel or advice from counsel. In certain redacted portions, there seem to be opinions of claims handlers, rather than any advice from counsel.

Thus, apart from any direct written communications between counsel and Aviva employees, or communications where the attorney is named and what he said is clearly indicated, all other non-attorney communications must be produced to plaintiff. Defendants cannot stretch the attorney-client privilege to cover documents where claims handlers or attorneys acting solely as claim handlers discuss their opinions of the Flintkote policy.

      C.      Business Information

Having the reviewed the ten documents *in camera*, the court declines to grant any protection to these documents for "confidential business information."  However, with regards to other business information, defendants may redact information that is not relevant to this litigation.  See Def.'s Tab J (Memo entitled "Meeting with U.S. Counterparts").

CONCLUSION

For the foregoing reasons, plaintiff's request for discovery of reserves information is GRANTED, and plaintiff's request for reinsurance information is DENIED.  Furthermore, defendant SHALL produce unredacted documents in accordance with this order.

IT IS SO ORDERED.

Dated: May 26, 2009

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

11