1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE FLINTKOTE COMPANY,

Plaintiff,

v.

GENERAL ACCIDENT ASSURANCE
COMPANY OF CANADA, et al.,

Defendants.

No. C 04-1827 MHP

**MEMORANDUM & ORDER**

**Re: Pre-Trial Motions and Issues**

16   After six years of litigation, the parties to this insurance coverage dispute are approaching
17   trial on the issues of damages and bad faith. The parties brought several pre-trial motions which
18   were argued at a pre-trial hearing held on February 12, 2010. Firstly, defendant moved for
19   reconsideration of an earlier ruling that plaintiff is a "named insured" under a policy issued to
20   plaintiff's two Canadian subsidiaries. Secondly, plaintiff complained that defendant had not
21   complied with the court's earlier orders pertaining to the discovery of reserves information. Thirdly,
22   defendant objected to certain findings of a special master appointed to assist in the resolution of
23   certain discovery disputes. Fourthly, plaintiff sought to exclude testimony of defendant's damages
24   experts. In order to supplement and clarify the court's bench orders, the court enters the following
25   memorandum and order.

26
27
28

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  I.       Defendant's Motion for Reconsideration

2         On January 19, 2006, the court granted plaintiff's motion for summary adjudication of the

3  meaning of "Affiliated corporations" and "occurrence" as those terms are used in policy number

4  L-90-5010, the insurance policy at issue in this action, and of the application of those meanings to

5  the facts of this case. Specifically, the court construed the phrase "Affiliated corporations" to

6  include plaintiff The Flintkote Company, which is the corporate parent of the expressly named

7  insureds. *See Flintkote Co. v. Gen. Accident Assurance Co.*, 410 F. Supp. 2d 875, 894 (N.D. Cal.

8  2006) (Patel, J.). At that time, defendant sought to introduce into evidence a document that was

9  purportedly a May 23, 1958, letter from General Accident Fire and Life Assurance Corp., Aviva's

10  predecessor-in-interest, to Marsh & McLennan, Ltd. ("Marsh"), the insurance broker which sold the

11  policy to plaintiff's subsidiaries. The court held that a proper foundation had not been laid to admit

12  the letter as a business record and that it was inadmissible as hearsay. *Id.* at 885-86. Four years

13  later, defendant seeks reconsideration of the court's evidentiary ruling and, on that basis, of the

14  ruling that plaintiff is an "Affiliated corporation" under the policy. Defendant alleges that it recently

15  discovered the underwriting file pertaining to the Flintkote policy and that copies of certain letters,

16  including the 1958 letter, demonstrate that the policy was not intended to cover the Flintkote parent

17  company.

18         Where a party moves for reconsideration on the basis that a material difference in fact or law

19  that exists from that which was presented to the court before entry of the interlocutory order, that

20  party must "show that in the exercise of reasonable diligence the party applying for reconsideration

21  did not know such fact or law at the time of the interlocutory order." Civ. Local. R. 7-9.[1]  "A party

22  seeking reconsideration must show that the evidence was discovered after the dispositive order, that

23  the evidence could not be discovered earlier through due diligence, and that the newly discovered

24  evidence is of such a magnitude that had the court known of it earlier, the outcome would likely have

25  been different." *Mannick v. Kaiser Found. Health Plan, Inc.*, 2006 WL 2168877, at *14 (N.D. Cal.

26  July 31, 2006) (Hamilton, J.) (citing *Dixon v. Wallowa County*, 336 F.3d 1013, 1022 (9th Cir.

27  2003)). "Evidence is not 'newly discovered' under the Federal Rules if it was in the moving party's

28

1    possession at the time of trial or could have been discovered with reasonable diligence." *Coastal*
2    *Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 212 (9th Cir. 1987) (citations omitted).

3         Defendant's declarants testify that defendant Aviva was moving from its location on the 18th
4    floor of 121 King Street, in Toronto, to the 14th floor of the same building in December 2009. As
5    part of the relocation process, Aviva staff reviewed files to determine which files were inactive or
6    obsolete and should be purged or moved to storage and which files were still active and should be
7    moved to the new floor. On the morning of December 11, 2009, an Aviva employee found a file
8    labeled "Flintkote Summary of Ins. Coverages 1956-1960," which defendant states is the
9    underwriting file for the policy at issue in this action. This file was found within another file that
10   was labeled "State of California (Stringfellow) 8700572971."[2] Included in the underwriting file was,
11   among other things, a copy of the May 23, 1958, letter, as well as letters from April 7, 1958, May 16,
12   1958, January 9, 1961, and January 19, 1961. Defendant argues that the content of these letters
13   demonstrates that the parties to the insurance policy believed the policy covered only the Canadian
14   subsidiaries, not The Flintkote Company. Defendant also contends that it had never had any reason
15   during the years of this litigation to look for files pertaining to the Flintkote policy in a file folder
16   labeled "State of California (Stringfellow) 8700572971."

17        Defendant's assertion that it exercised reasonable diligence in searching for the underwriting
18   file is unpersuasive. Firstly, the underwriting file was found not in some remote offsite location but
19   in defendant's office among files that had not been yet been "purged" and might still be active.
20   *See* Docket No. 459 (Zuech Dec.) ¶ 6. Secondly, defendant knew of a connection between Flintkote
21   and "Stringfellow." On April 16, 1998, David Lawther, Head Claims Analyst at General Accident,
22   wrote a memo with subject "FLINTCOTE - POLICY # 0905010RCAN." Docket No. 468-1
23   (Lawther Memo). In that memo, Lawther wrote: "Flintcote [sic] was involved in the Stringfellow
24   Site in California and other sites throughout the United States." *Id.* at 1-2. Defendant twice
25   produced redacted versions of the Lawther memo; the memo was used as an exhibit in depositions;
26   testimony referencing the memo and the Stringfellow site were designated by defendant as trial
27   testimony; and defendant used the memo as an exhibit in opposing plaintiff's motion for summary

28

United States District Court
For the Northern District of California

                                              3

1  judgment of bad faith. Defendant knew of the memo, its contents and the reference connecting
2  Flintkote to Stringfellow. Thirdly, defendant's executive vice-president has testified that defendant
3  was not qualified to do business in California, had no subsidiaries in California, had no employees,
4  branch offices or property in California, and never directed advertising toward California. *See*
5  Docket No. 7 (Somerville Dec. ISO Def.'s Mot. to Dismiss for Lack of Personal Jurisdiction) ¶¶ 5-
6  11. Defendant knew that plaintiff was located in California; considering defendant's scant business
7  dealings in the state, any file bearing the word "California" should have raised a flag. Coupled with
8  the fact that the file was marked with the "Stringfellow" reference and was located on-site at
9  defendant's office, the assertion that defendant exercised reasonable diligence during the years it
10  failed to uncover the file is clearly without merit.

11        The newly discovered evidence is also not of such a magnitude that the outcome of the
12  January 2006 ruling would likely have been different had the court known of it. The mutual intent of
13  parties to an insurance contract "is to be inferred, if possible, solely from the written provisions of
14  the contract. The clear and explicit meaning of these provisions, interpreted in their ordinary and
15  popular sense, controls judicial interpretation unless used by the parties in a technical sense, or
16  unless a special meaning is given to them by usage." *Montrose Chem. Corp. v. Admiral Ins. Co.*,
17  10 Cal. 4th 645, 666 (Cal. 1995) (internal citations and quotation marks omitted). The court found in
18  January 2006 that "the face of the written policy supports only one reasonable interpretation." 410 F.
19  Supp. 2d at 889-90. The court may not accord defendant's extrinsic evidence weight that would
20  overcome the reasonable expectations created by the unambiguous language of the policy.
21  Additionally, even if the court accorded great weight to the extrinsic evidence found in the
22  underwriting file, that evidence is susceptible to more than one interpretation. The court has
23  reviewed the letters relied upon by defendant. In none of the letters does any correspondent
24  explicitly state that the L-90-5010 policy *exclusively* covered Flintkote's Canadian operations.[3]
25  Plaintiff's theory that Flintkote, through Marsh, simply sought to ensure that the General Accident
26  policy—as opposed to the overlapping American coverage—would pay first for Canadian claims is
27  as plausible as defendant's reading of the letters to express an intent that only Canadian operations
28

United States District Court
For the Northern District of California

1  would be covered. Even if credited and given substantial weight, the letters found in the
2  underwriting file would be insufficient to overcome the language of the policy itself, upon which the
3  court's earlier ruling was based. Moreover, it is not even apparent that the opinions expressed by
4  Marsh represented the understanding of Flintkote. Defendant has asserted that Marsh was acting as
5  an agent of Flintkote when it wrote the letters, but there is little support for this conclusion. Marsh
6  could as easily have acted, at that time, as a dual agent for the insurer and the insured.

7      For all of these reasons, the motion to reconsider must be denied.

8

9  II.     Discovery of Reserves Information

10     On May 26, 2009, the court ordered defendant to produce reserves information. Docket
11  No. 287 (Memorandum and Order). On October 7, 2009, plaintiff stated at a hearing that defendant
12  had not yet produced any reserves information, and the court reiterated that defendant was required
13  to produce all information about its reserves, including reserves set following the filing of this
14  litigation. Docket No. 482 (Seigle Dec.), Exh. 1 (Hearing Tr.) at 75-77 ("[T]he reserves information.
15  That should be supplemented . . . You provide the information with respect to reserves. . . . you
16  provide it. That is a continuing obligation."). At the pretrial conference on January 7, 2010, the
17  court again ordered defendant to turn over all of the reserves information. *Id.*, Exh. 2 (Hearing Tr.)
18  at 76-77 ("I thought I just made it clear that all of that [reserves information] is to be turned over. . . .
19  In toto. Any records at all.").

20     On January 8, 2010, counsel for defendant sent two emails to counsel for plaintiff,
21  purportedly to fulfill the court's order. The first email contained thirteen pages of "screen prints
22  from the RTM system pertaining to Flintkote." *Id.*, Exh. 3. The second email contained a one-page
23  chart purportedly showing "IBNR [incurred but not reported] reserve information." *Id.* Plaintiff has
24  argued that these charts are both incomplete and indecipherable. Furthermore, the court notes that
25  adding up the entries in the "Reserves" category in the "RTM" records yields a total reserve amount
26  that is an order of magnitude higher than the amount which defense counsel has repeatedly
27  represented to the court to be the maximum amount of reserves ever set for Flintkote. Plaintiff is

28

United States District Court
For the Northern District of California

1    correct that further deposition testimony is warranted to understand the charts and the relevant
2    reserves information.

3        As the court ordered at the most recent pretrial conference, defendants SHALL produce those
4    deponents who were previously deposed by plaintiff but were instructed by defense counsel not to
5    answer questions pertaining to reserves. The scope of these further depositions shall be limited to
6    questions about reserves, the setting of reserves, the amounts of reserves set during defendant's
7    relationship with plaintiff and the existence of internal memoranda, emails or other documents
8    making recommendations concerning, or otherwise pertaining to, the setting of reserves by defendant
9    to cover potential liability arising under the Flintkote policy at issue in this action. Questions may
10   pertain to reserves set at any time, including those set following the commencement of the instant
11   litigation. Counsel for defendant may make appropriate objections to questions but shall not instruct
12   any witness not to answer.

13

14   III.    Report of the Special Master

15       The court's order of May 26, 2009, discussed the court's *in camera* review of ten documents
16   that had been withheld by defendant. The court ruled that defendant had lost or waived the work
17   product privilege and that the documents redacted based on the work product privilege must be
18   produced to plaintiffs. *See* Docket No. 287 at 9. The order also noted that some of the redacted
19   portions of the ten documents seemed to be opinions of claims handlers, rather than advice of
20   counsel. *Id.* at 10. Following the May 2009 order, defendant produced only about one hundred
21   pages of documents. When plaintiff noted at the October 7, 2009, hearing that the production was
22   paltry in comparison to the documents claimed in defendant's privilege log, defendant argued that it
23   had reserved its rights in 1983. According to defendant, it anticipated litigation from that time;
24   therefore, the work product privilege should be intact from that time. *See* Docket No. 466, Exh. 1
25   (Hearing Tr.) at 69-73. When the court was unreceptive to this argument, counsel for defendant
26   switched tactics and asserted that all of the documents at issue were protected by the attorney-client
27

28
                                                6

United States District Court
For the Northern District of California

1   privilege. *Id.* at 74:1-6. The court decided to allow plaintiff to pick forty documents to be examined
2   by a special master.

3       Special Master Cahill submitted his report on January 5, 2010. *See* Docket No. 454, Exh. A
4   (Report). Of the approximately forty documents examined, Cahill ordered "do not produce" for only
5   eight. In addition, he indicated that documents O, P, and X to BB would be covered by the work
6   product privilege had the court not ruled in May 2009 that the work product privilege had been
7   waived. *Id.* at 9 n.3. Defendant now objects to the Special Master's ruling on the basis that the
8   work product privilege should be intact from 1983, when defendant's lawyers sent plaintiff what
9   defendant describes as a "reservation of rights" letter. According to defendant, this letter shows that
10  defendant anticipated litigation from that time. Defendant specifically asks that it not be compelled
11  to produce particular documents, namely the documents designated by the Special Master as O, P,
12  and KK/LL.[4]

13      Defendant's objections to the Special Master's report must be overruled for a number of
14  reasons. Firstly, defendant's "objections" are not actually objections to the Special Master's report
15  but rather a (defective) motion for reconsideration. The Special Master merely followed the court's
16  ruling that the work product privilege had been waived; defendant is in effect seeking
17  reconsideration of the court's ruling. Secondly, even if proper, the motion for reconsideration would
18  not be granted. Defendant's present argument that it has been continuously anticipating litigation
19  since 1983 contradicts the raft of statements it has made in the course of this litigation disclaiming a
20  belief that it had any liability under the Flintkote policy or that plaintiff had made any demand on
21  defendant prior to 2003. *See, e.g.*, Docket No. 375 (Def.'s Opp. to Pl.'s Bad Faith MSJ) at 1
22  (asserting defendant reasonably believed no request for defense or indemnity had been made by
23  plaintiff prior to October 31, 2003). Defendant cannot defend itself by asserting that it thought until
24  2003 it had no duties to plaintiff and then the assert the work product privilege from 1983 onward.[5]

25      Defendant may assert the work product privilege only for documents created on or after
26  October 31, 2003, the date on which plaintiff sent a detailed letter demanding coverage, leading to
27  the initiation of the instant litigation. *See* Docket No. 376-10. Defendant must produce, if it has not

28

7

1  done so already, all documents ordered for production by the Special Master and must provide

2  additional discovery as previously ordered. *See* Docket No. 494 (Order Re: Schedule of Briefing,

3  Hearing and Trial).

4

5  IV.    Plaintiff's Motion to Exclude Defendants' Damages Experts

6          Plaintiff contends that the methodology employed by defendant's key damages expert,

7  Charles H. Mullin, misapplies the presumption of coverage applicable to asbestos coverage cases and

8  should be excluded.[6] Plaintiff also challenges several other aspects of Mullin's testimony. The

9  California Court of Appeals has explained the presumption of coverage in the following manner:

10         [A]ll of a policyholder's policies that were in effect from the date of the claimant's
           first exposure to the policyholder's asbestos product until the date of death or claim,
11         whichever occurs first, are triggered on an asbestos-related bodily injury claim, but
           the claimant is presumed to have been exposed to all defendant-manufacturers'
12         asbestos products, and the burden is on the insurer to prove that the claimant was not
           exposed to its policyholder's product before or during the policy period.
13
    *Armstrong World Indus., Inc. v. Aetna Casualty*, 45 Cal. App. 4th 1, 63 (1996). Under this standard,
14
    a claimant's date of first exposure (DOFE) to a policyholder's asbestos product is a key inquiry. If
15
    the claimant's DOFE precedes the policy's coverage period, it will be rebuttably presumed that the
16
    claimant was exposed to the policyholder's asbestos during the coverage period.
17
           Plaintiff, acting in concert with its other insurers, developed a database to track the
18
    approximately 144,000 asbestos-related claims filed against it. Plaintiff and defendant jointly
19
    identified a sample of database entries for use in damages analysis. Defendant's expert Mullin has
20
    found that a certain percentage of the sampled database entries contains incorrect DOFEs. Mullin
21
    came to this determination by reviewing those claims for which files existed containing some
22
    documentation indicating a DOFE, and then comparing the DOFEs found in the file with those
23
    entered in the database. Mullin then extrapolated the error rate across claims for which there is no
24
    documentation either supporting or contradicting the DOFE entered in the database. Mullin also
25
    appears to have essentially jettisoned the database entries for claims for which the DOFE information
26
    is inconsistent, instead using a probabilistic method of estimating the DOFE based on the age of a
27
    given claimant.
28

United States District Court
For the Northern District of California

1    As the court understands it, plaintiff does not dispute that a clear error in a database
2    entry—i.e., an instance in which actual and non-contradictory documentation exists showing that the
3    DOFE in the database is incorrect—should be rectified for the purposes of determining damages.
4    Plaintiff objects to defendant's deduction of value from any claim using a probabilistic analysis
5    where there is no evidence that the DOFE specified in the database is incorrect. According to
6    plaintiff, the parties must look to each claim and make a binary decision: the claim is either covered
7    or it is not. Per this method, if defendant cannot show on the basis of some actual evidence that a
8    claim should not be covered, it must be fully covered.

9    Defendant argues that there are gross errors in certain database entries and that defendant is
10   merely trying to reach the best approximation of the damages due to plaintiff. The presumption of
11   coverage is rebuttable, and defendant believes Mullin's statistical method is an appropriate way to
12   rebut the presumption, considering the large number of claims at issue. Neither party has cited a
13   case that is directly analogous to the facts presented in the instant action.

14   Under California law, "when a liability insurer denies coverage for a third party claim and
15   abandons its insured, it relinquishes the right to object to the manner in which the claim is resolved
16   by the insured or any other insurer providing coverage for the claim." *United Services Auto. Ass'n v.*
17   *Alaska Ins. Co.*, 94 Cal. App. 4th 638, 644 (2001). It does not appear that defendant seeks to second-
18   guess the reasonableness of any underlying settlement, but defendant challenges the reasonableness
19   or accuracy of the database itself. Defendant should not be allowed to do so, because defendant
20   could have chosen to join plaintiff's other carriers in developing and monitoring the database, but it
21   instead chose not to involve itself. Allowing defendant now to pick over the database for errors, and
22   to use statistical analyses to attempt to rebut the presumption, places defendant in a position superior
23   to those carriers who did not abandon plaintiff. Defendant could easily have protected its interests
24   by joining in the defense of its insured at an earlier time.

25   Accordingly, the general rule to be applied in any expert analysis in this action is that the
26   database is to be used to determine the DOFEs except where there is a clear discrepancy between the
27   database and the underlying documentation. Defendant shall make a proffer of Mullin's testimony

28

United States District Court
For the Northern District of California

1  before the start of trial. Such proffer shall include any testimony Mullin intends to present that
2  deviates from this general rule, i.e., any testimony that relies upon data or estimates not based upon
3  the DOFE data recorded in the database entries.

4      In addition to the presumption of coverage issue, plaintiff has raised four other objections to
5  Mullin's testimony. Plaintiff's motion to exclude is GRANTED with regard to Mullin's analysis of
6  group settlements. Mullin takes issue with the way in which such settlements were recorded in the
7  database, and this second-guessing is improper for the reasons just explained. As to the analysis
8  regarding punitive damages, plaintiff's motion to exclude is DENIED. Plaintiff can cross-examine
9  Mullin regarding his methodology. As to Mullin's intimation that some of the settlements "are not
10 the result of arm's length negotiations," Mullin Report ¶ 20, plaintiff's motion to exclude is
11 GRANTED. These statements are purely speculative. Furthermore, it is too late for defendant to
12 challenge the reasonableness of the settlements entered into by plaintiff. Finally, insofar as
13 plaintiff's motion to exclude raises the question of the treatment of general versus specific excess
14 coverage, that issue shall be resolved in a separate order.

15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28

10

1 CONCLUSION

2      For the foregoing reasons, defendant's motion for reconsideration of the January 2006 order

3 regarding "Affiliated corporations" is DENIED. Plaintiff's request for further depositions pertaining

4 to reserves information is GRANTED. Such depositions shall be conducted in accordance with the

5 principles discussed above. Defendant's objection to the January 2010 Report of Special Master

6 Cahill is OVERRULED, and the Report is HEREBY ADOPTED by the court; defendant SHALL

7 comply with its terms. Plaintiff's motion to exclude regarding the proposed testimony of defendant's

8 expert Mullin is GRANTED IN PART and DENIED IN PART as discussed above. Furthermore,

9 defendant SHALL make a proffer of Mullin's testimony before the start of trial.

10

11

12      IT IS SO ORDERED.

13

14 Dated: March 4, 2010

                          MARILYN HALL PATEL
15                           United States District Court Judge
                          Northern District of California

16

17

18

19

20

21

22

23

24

25

26

27

28

11

United States District Court
For the Northern District of California

1

**ENDNOTES**

2  1.    Under Civil Local Rule 7-9, a party must request leave of the court before filing a motion for reconsideration, and it must make certain showings before leave will be granted. Here, the court granted
3  defendant leave to file a motion for reconsideration before such a showing was made. This does not absolve the party from making the required showing prior to the granting of a motion to reconsider.

4

2.    Notably, the newly discovered underwriting file is not a thin file. The copy of the file which
5  defendant lodged with the court is approximately 1.5 inches thick and contains over 350 pages. *See* Docket No. 459, Exh. A.

6

3.    The January 19, 1961, letter from Marsh to General Accident refers to "the Canadian exposure"
7  and "insurance for the Canadian operations," which suggests an understanding on the part of the Marsh broker that the L-90-5010 policy covered Canadian operations. Even if this letter, which was written
8  two and a half years *after* Flintkote and General Accident entered into the policy, could serve as evidence of intent, defendant has not uncovered any other evidence that would shed light on how
9  thoroughly the broker had researched the question of scope of coverage for the purposes of writing the letter. The letter informed General Accident that Flintkote did not plan to renew the insurance contract.
10  It was not written as part of any process of negotiating the scope of the policy.

11  4.    KK and LL are separate copies of the same document.

12  5.    Also, document KK/LL was *not* one of the documents the Special Master ruled would be protected were the work product privilege still intact. He found that there was nothing to indicate that
13  document was prepared in anticipation of litigation, and he ordered it produced. *See* Report at 13-14.

14  6.    Plaintiff also moves to exclude the testimony of defendant's expert Charles Bates to the extent it relies on Mullin's analysis.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12

*United States District Court*
For the Northern District of California